## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

| | |
|---|---|
| **NANSEMOND INDIAN NATION,**<br>**a federally recognized Indian Tribe, and**<br><br>**FISHING POINT HEALTHCARE, LLC,**<br>**a Tribally chartered limited liability**<br>**company,**<br><br>Plaintiffs,<br><br>v.<br><br>**COMMONWEALTH OF VIRGINIA;**<br><br>**VIRGINIA OFFICE OF THE**<br>**SECRETARY OF HEALTH AND**<br>**HUMAN RESOURCES;**<br><br>**VIRGINIA DEPARTMENT OF**<br>**MEDICAL ASSISTANCE SERVICES;**<br><br>**GLENN YOUNGKIN, in his official and**<br>**personal capacity, Governor of the**<br>**Commonwealth of Virginia;**<br><br>**JANET VESTAL KELLY, in her official**<br>**capacity, Secretary of Health and Human**<br>**Resources for the Commonwealth of**<br>**Virginia;**<br><br>**CHERYL ROBERTS, in her official and**<br>**personal capacities, Director of the**<br>**Virginia Department of Medical Assistance**<br>**Services;**<br><br>**JEFFREY LUNARDI, in his official and**<br>**personal capacities, Chief Deputy Director**<br>**of the Virginia Department of Medical**<br>**Assistance Services,**<br><br>**Defendants.** | Civil Action No. 2:25-cv-00195<br><br><br>**COMPLAINT FOR DECLARATORY**<br>**AND INJUNCTIVE RELIEF,**<br>**COMPENSATORY DAMAGES, AND**<br>**PUNITIVE DAMAGES**<br><br>**Request for Jury Trial** |

# COMPLAINT

1.      This action arises from a systematic and unlawful campaign by certain agencies and officials of the Commonwealth of Virginia to undermine the sovereign rights of Tribal Nations and obstruct the operation of Tribal Health Programs established under federal law. Rather than partnering with a federally recognized Tribal Nation to improve health-care access for low-income families and stabilize Virginia's own faltering healthcare infrastructure, Virginia officials have instead weaponized the Commonwealth's administrative machinery to punish a Tribal Health Program that dared to step into the breach. If allowed to stand, Defendants' conduct will not simply destabilize a single Tribal Health Program—it will dismantle the legal framework that Congress created to protect Tribal sovereignty, incentivize Medicaid participation, and ensure access to care in underserved areas.

2.      Plaintiffs Nansemond Indian Nation ("Nation") and its Tribally chartered healthcare entity, Fishing Point Healthcare, LLC ("Fishing Point"), offer a clear and cost-effective solution to one of Virginia's most urgent public policy challenges: the collapse of Medicaid access in rural and underserved communities.[1] Fishing Point operates under a Title I Contract with the Indian Health Service ("IHS") pursuant to the Indian Self-Determination and Education Assistance Act ("ISDEAA"), 25 U.S.C. §§ 5301–5423, and provides culturally competent, community-based healthcare to its Tribal citizens, other American Indian and Alaska

---

[1] *See e.g.*, Michael Martz, *Virginia Medicaid program faces $632M hole*, THE DAILY PROGRESS (Nov. 9, 2024), https://dailyprogress.com/news/state-regional/government-politics/virginia-medicaid-shortfall-youngkin-tax-cuts/article_a52f701f-e003-5674-bfd3-3f5aa75bcb16.html (noting that Virginia faces a substantial Medicaid shortfall, with service disruptions disproportionately impacting rural hospitals and low-income communities, and warning that without immediate policy intervention, access to care in these regions may further deteriorate).

Native ("AI/AN")[2] beneficiaries, and other non-AI/AN Medicaid beneficiaries across southeastern Virginia. Federal law entitles Fishing Point, a Tribal Health Program, to operate free from unauthorized state interference, receive Medicaid reimbursements at IHS's All-Inclusive Rate ("AIR" or "Federal AIR"), and receive the same treatment as non-Tribal providers under the Medicaid program. *See* Indian Health Care Improvement Act ("IHCIA"), 25 U.S.C. §§ 1601–1683; Title XIX of the Social Security Act ("Medicaid Act"), 42 U.S.C. §§ 1396a, 1396j, 1396d(b); 42 C.F.R. §§ 431.110, 447.56.

3.      Rather than uphold these obligations, Virginia is obstructing, delaying, and outright defying federal law in response to Fishing Point's presence in Virginia as a Tribally chartered healthcare entity. Defendants—including the Virginia Department of Medical Assistance Services ("DMAS"), the Virginia Office of the Secretary of Health and Human Resources ("SHHR"), Governor Glenn Youngkin, and high-ranking agency officials—are knowingly, intentionally, maliciously, and recklessly disregarding Plaintiffs' federally protected rights.

---

[2] For purposes of Indian healthcare, the term "American Indian and Alaska Native" refers to individuals who meet the eligibility criteria for services provided by IHS, Tribal Health Programs, or urban Indian organizations as outlined in the Indian Health Manual, Part 2, Chapter 1. *See* INDIAN HEALTH MANUAL, pt. 2, ch. 1, § 2-1.2, *available at* https://www.ihs.gov/ihm/pc/part-1/p1c1/. Eligibility is generally based on factors such as membership in a federally recognized Indian Tribe, descent from a member of a federally recognized Tribe, or residence within a service area, among other considerations. This definition applies to all AI/AN individuals, not just those eligible for Medicaid, and is reinforced by statutory and regulatory provisions, including 25 U.S.C. § 1603(13), (28), which defines AI/AN eligibility for healthcare services; 42 C.F.R. § 136.12, which sets eligibility rules for services; and 42 C.F.R. §§ 447.51, 447.56, 457.535, which outline Medicaid and Children's Health Insurance Program protections and exemptions for AI/AN individuals under federal law, including cost-sharing exemptions and specialized reimbursement rules.

4.      Defendants' actions indicate deference to the objectives of some of the largest health insurance corporations in the United States—specifically, the owners of the five Managed Care Organizations ("MCOs") operating in the Commonwealth.

5.      These MCOs, contracted by the state to manage Medicaid services, have built a reputation for creating unnecessary barriers to care, including delays and denials of services, which can adversely affect patient outcomes. The MCOs exert significant political influence at both the state and national levels—each engages a dedicated professional lobbying firm, and they make millions of dollars of political contributions to members of the Virginia legislature. This alignment between political actors and MCOs occurs even at the expense of patient care, as these organizations aim to maximize profits, potentially leading to inadequate services for vulnerable populations. Rather than embrace a lawful, cost-effective solution that respects Tribal sovereignty, strengthens Medicaid delivery, and expands patient care in rural and underserved areas, Defendants have chosen to obstruct the Nation at every turn.

6.      In what appears to be a principal motive for Defendants' unlawful campaign— detailed more fully in paragraphs 119–122 and 184–188 below—was the Commonwealth's self-inflicted financial exposure to federal recoupment. By mistakenly assuming that all beneficiaries served by Fishing Point were AI/AN, Defendants likely improperly drew down a one hundred percent (100%) Federal Medical Assistance Percentage ("FMAP") even for non-AI/AN patients, thereby creating a substantial risk that the federal government would reclaim millions of dollars from Defendants. Simultaneously, Defendants began to question whether Personal Care Attendant ("PCA") services would qualify for reimbursement under Virginia's State Medicaid Plan—despite repeatedly receiving confirmation from federal officials that such services were properly authorized under Fishing Point's Title I Contract (often referred to as a "638 Contract")

with the federal government. Rather than admit their own errors—or disclose to the General Assembly the financial liabilities they had triggered—Defendants sought to reframe Fishing Point's services as unauthorized so they could shift any repayment obligation onto Plaintiffs. As described in the following paragraph, Defendants took the extreme step yesterday by freezing nearly all of Fishing Point's Medicaid claims, thereby weaponizing the billing process to coerce Plaintiffs into capitulating to Defendants' demands.

7.      First, on March 31, 2025, the Defendants executed an unprecedented and unlawful freeze on virtually all the Medicaid claims submitted by Plaintiffs for services already rendered, totaling approximately $1.7 million. This action placed over 7,650 valid claims into indefinite "pended" status and denied all reimbursement without lawful cause or process. Plaintiffs also learned that all of their pharmacy claims, which are processed through a separate system, were outright denied under the code "0882 — drug edit not found." These pharmacy claims total approximately 161 in number. This retaliatory act—taken specifically because Plaintiffs refused to accept unauthorized state-imposed limitations on Tribal Health Program services—lack any legitimate program integrity basis. These claims spanned every clinical and community-based service Plaintiffs provide, including primary care, laboratory, recovery, physical therapy, psychiatric and psychological care, home health and hospice, behavioral health, and telehealth services. Pended claims offer no opportunity for appeal. When Plaintiffs inquired about the Defendants' action, Defendants declined to confirm that full reimbursement will be made or when. Furthermore, Plaintiffs understand that Defendant paid a similarly situated Tribal Health Clinic for comparable claims during this same period, revealing the selective, punitive nature of Defendants' conduct. Their failure to resolve or respond to this quickly in response to Plaintiffs' urgent requests for clarification and resolution underscored that this was not an

inadvertent administrative error, but a calculated misuse of state authority to coerce a federally recognized Tribal Health Program into surrendering its lawful rights.

8.      Second, Defendants are deliberately manipulating Medicaid enrollment procedures to prevent Fishing Point from obtaining dental provider status, thereby blocking its participation in Medicaid and obstructing reimbursement for dental care to low-income families, pregnant women, and children. Defendants are keeping Fishing Point's application in indefinite "pending" status without lawful justification, offering speculative and unapproved amendments to Virginia's State Medicaid Plan as a pretext for delay. This practice constitutes an unlawful barrier that violates the Medicaid Act's requirement of "reasonable promptness," 42 U.S.C. § 1396a(a)(8); regulatory mandates for timely application processing under 42 C.F.R. Part 455; and 42 C.F.R. § 431.110, which prohibits states from imposing additional burdens on Tribal Health Programs.

9.      Third, Defendants are unlawfully withholding Medicaid reimbursement for services already rendered—including services required to be reimbursed at the Federal AIR— that are expressly authorized under Virginia's federally approved State Medicaid Plan. Defendants have refused to make any Medicaid reimbursements to Fishing Point for PCA services since October 10, 2024, and repeatedly evade direct questions about when or whether reimbursements will be made. This is in addition to the unprecedented freeze on virtually all claims that occurred on March 31, 2024, placing over 7,650 valid claims into indefinite "pended" status and denying all reimbursement without lawful cause or process. These actions constitute a *de facto* repudiation of Virginia's binding obligations under its approved State Medicaid Plan and violate 42 U.S.C. §§ 1396a, 1396c and 42 C.F.R. §§ 430.10, 431.10, which require states to administer their Medicaid programs in full compliance with federally approved terms. Despite

knowing since at least November 2024—based on federal audit findings with which Defendants expressly agreed—that Plaintiffs properly billed for PCA services at the Federal AIR and were underpaid, Defendants continue to unlawfully withhold payment in open defiance of federal law and Virginia's binding State Plan obligations.

10.    Plaintiffs, meanwhile, continue to provide uninterrupted care to both AI/AN and non-AI/AN Medicaid patients—shouldering financial burdens that the Commonwealth is legally obligated to bear. The March 31, 2024, mass freeze of virtually all Medicaid claims—totaling over $1.7 million for services already rendered—represents a financial chokehold that threatens to cripple Fishing Point's ability to sustain operations. Defendants' ongoing refusal to release funds they know are lawfully due is destabilizing a sovereign Tribal Health Program, undermining trust and treaty responsibilities owed to Tribal Nations, and placing at immediate risk Plaintiffs' capacity to support vulnerable populations in chronically underserved areas. Without prompt judicial intervention, the cumulative impact of Defendants' actions will inflict irreparable harm—not only on Fishing Point, but on the communities it was chartered to serve.

11.    Fourth, Defendants failed continuously and entirely to conduct the Tribal consultation required by federal law, including under 42 U.S.C. § 1396a(a)(73) and 42 C.F.R. § 431.408, when making amendments to plans likely to impact Tribal Health Programs and Tribal citizens directly. Instead, Defendants issued letters informing Plaintiffs of Defendants' pre-determined plans and issued retroactive "notices" of policy decisions—offering no meaningful opportunity for the Nation to engage with the Defendants in decisions that could directly affect its healthcare system and the rights of its citizens.

12.    Fifth, Defendant Youngkin endorsed a state budget provision conditioning Tribal reimbursement on the AI/AN status of individual patients, in direct violation of federal law.

Under binding federal requirements, states must reimburse Tribal Health Programs at the same rate for services furnished through an IHS- or Tribally-operated facility—regardless of whether the patient is AI/AN or non-AI/AN. Federal policy expressly recognizes that Tribal providers are entitled to "one facility, one rate," and prohibits states from creating separate reimbursement categories based only on a patients' AI/AN status. Virginia's budget amendment unlawfully conditions payment on a patient's AI/AN status, violating clear federal mandates, threatening the financial stability of Tribal Health Programs, and imposing unlawful barriers to reimbursement.

13.     Simultaneously, Defendants are pressuring Plaintiffs to "transition" into a managed care model that would subject them to onerous MCO oversight—including mandatory preauthorizations, narrower service networks, and administrative controls that compromise Fishing Point's ability to provide culturally competent, timely care to AI/AN and non-AI/AN patients. On March 24, 2025, Defendants also provided notice of a restrictive new framework purporting to limit the scope of Medicaid-reimbursable services and condition participation on narrowly defined provider types, directly conflicting with controlling federal law and CMS's 2025 SPA guidance. While states are free to engage in internal planning, they are not free to use such planning as a substitute for or an evasion of the formal consultation process required by 42 U.S.C. § 1396a(a)(73) and 42 C.F.R. § 431.408. Here, Defendants did not merely deliberate— they developed and advanced sweeping policy changes, threatened or suspended Medicaid reimbursements, and mapped out structural overhauls to Tribal healthcare delivery, all without providing notice or initiating meaningful consultation with the affected Tribal Nation. Internal emails, staff briefings, and a SharePoint folder labeled "Governor's Confidential Working Papers" reveal a strategy not of routine interagency planning, but of calculated exclusion. This financial coercion corners Plaintiffs into capitulating to MCO networks, undermines the "one

facility, one rate" policy that ensures equal Medicaid reimbursement for all patients at a Tribal facility, and dismantles the federal framework designed to protect Tribal sovereignty and ensure equitable healthcare access across Indian Country.

14.    Sixth, Defendants concealed the existence and findings of an audit completed by the federal Centers for Medicare & Medicaid Services ("CMS") that validated the legitimacy of Fishing Point's outstanding claims, and, in fact, confirmed that the Commonwealth underpaid prior claims, withholding material information that would have further exposed the unlawful nature of their actions. DMAS itself acknowledged to CMS that Fishing Point's claims were appropriate "clean claims," and were correctly submitted, but did not share this information with Fishing Point. This deceptive conduct reflects a broader pattern of administrative bad faith and disregard for the transparency and accountability required by federal Medicaid law.

15.    Each of these actions violates binding federal statutes, CMS guidance, and Supreme Court precedent protecting Tribal rights. *See, e.g.*, *Cherokee Nation v. Leavitt*, 543 U.S. 631, 638 (2005); *Harris v. McRae*, 448 U.S. 297, 301 (1980); *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 216–19 (1987); *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 148–49 (1980).

16.    The harm inflicted by Defendants is not theoretical. Virginia's refusal to pay for services already rendered is directly jeopardizing Fishing Point's financial solvency, disrupting continuity of care for AI/AN and non-AI/AN Medicaid patients, and forcing the Nation to divert critical resources from other government functions to subsidize a program that, by law, the Commonwealth is obligated to support.

17.    Even more striking is the Commonwealth's rejection of the Nation's good-faith offer to pursue a constructive path forward to address its concerns. In the proposed government-

to-government agreement, Plaintiffs would continue to serve all Medicaid patients, affirm their sovereign role in administering culturally competent care, and expand healthcare services to rural and underserved areas, while eliminating the Commonwealth's financial obligations to Plaintiffs by covering the state's share. This offer effectively relieves Virginia taxpayers of any financial liability for Plaintiffs' operations. Yet Defendants have rejected this proposal without explanation, revealing that their true motive is not fiscal prudence, but political posturing and capitulation to MCOs operating in the Commonwealth.

18.    Presented with a healthcare delivery model that respects Tribal sovereignty, operates with legal authority, and provides the Commonwealth with both financial and operational relief, Defendants rejected all the above. Instead, they launched a full-scale assault on a Tribal government's legal right to deliver care to its people and neighboring communities. Their actions are unlawful, unfair, and contrary to the foundational principles of cooperative federalism and government-to-government engagement that animate the ISDEAA, IHCIA, and the Medicaid program.

19.    Federal laws supporting and affirming healthcare sovereignty for Tribal Nations are a direct response to federal and state governments' historical use of health agency powers for genocidal purposes against Indigenous peoples. Examples abound, but few are as profound as Virginia's efforts. Under the 50-year tenure of Walter Plecker as Registrar of Virginia's Bureau of Vital Statistics, which would become the Virginia Department of Health, the Commonwealth systematically erased evidence of Native heritage, including on thousands of birth certificates and in other official documents. Plecker once bragged that his record-tending was surely superior to what Hitler was using to track Jewish people. This "paper genocide," which slowed only in the 1960s, denied Tribal Nations headquartered in Virginia their rightful recognition, resources, and

sovereignty, and was a primary reason that it was not until 2018 that those Tribal Nations, including the Nansemond Indian Nation, secured federal acknowledgement.

20.    Notwithstanding the Commonwealth's malicious campaigns against Tribal Nations in the areas of health, education, criminal justice, voting rights, and others, Tribal Nations persisted. The COVID-19 pandemic revealed to Tribal Nations that they had the right and ability to serve their citizens in the realm of healthcare at a higher quality than existing programs. And yet, while they had every reason to focus their efforts inward to only their own citizens, they instead created systems to also serve their non-Native neighbors in need. For the Nansemond, establishing a tribally operated healthcare system was not merely a pragmatic undertaking—it was a cultural imperative. The Nation's tradition of stewardship extends beyond land, flora, and fauna to encompass the well-being of the people who share that land. Thus, pursuing a healthcare model that honored this holistic responsibility was not only important—it was a natural extension of the Nansemond's longstanding commitment to community care.

21.    Virginia's Tribal Nations have numerous champions in both state and federal public office and across the partisan spectrum who engage with them in positive "government-to-government"[3] ways and who recognize that their presence is a great asset to the people of the

---

[3] Although legally meaningless, Defendant Youngkin's proposed amendment to HB2134 reflects a deliberate act of rhetorical pettiness that underscores the Commonwealth's broader hostility toward Tribal sovereignty and its bad-faith posture throughout this matter. The proposed revision to Va. Code § 2.2-6101 would modify the existing language affirming the government-to-government relationship between the Commonwealth and Virginia's federally recognized Tribal Nations. If adopted, the statute would read: *"The Commonwealth hereby acknowledges the sovereignty of federally recognized tribes within the present-day external boundaries of the Commonwealth. Nothing in this chapter alters or diminishes the sovereignty of the Commonwealth or any federally recognized tribe in Virginia, or the rights or obligations of parties under state, tribal, or federal law. The Commonwealth endeavors to maintain positive* ~~*government-to-government*~~ *relationships with the federally recognized tribes within the present-day external boundaries of the Commonwealth." See* Governor's recommendations:

Commonwealth. Defendants' actions reveal that notable exceptions remain who are willing to strike at the core of Tribal sovereignty.

22.     Plaintiffs sue to vindicate their rights, enforce federal law, and halt the Commonwealth's unlawful interference with sovereign Tribal healthcare operations. To prevent further harm and preserve the integrity of the federal framework that Congress carefully constructed to support Tribal Health Programs and the communities they serve, Plaintiffs seek declaratory and injunctive relief from this Court. Plaintiffs also seek compensatory damages to redress the financial and operational harm caused by Defendants, as well as punitive damages to hold Defendants accountable for their knowing and willful violations of federal law.

## JURISDICTION

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims arise under the Constitution, laws, and treaties of the United States, including ISDEAA, 25 U.S.C. §§ 5301–5423, IHCIA, 25 U.S.C. §§ 1601–1683, and the Medicaid Act, 42 U.S.C. §§ 1396 *et seq.*

24.     This Court has jurisdiction pursuant to 28 U.S.C. § 1362, granting federal district courts original jurisdiction over civil actions brought by federally recognized Tribal Nations arising under the Constitution, laws, or treaties of the United States.

25.     Jurisdiction is also proper under 42 U.S.C. § 1983, which provides a cause of action for the deprivation of rights secured by federal law under color of state law, including the

---

https://lis.blob.core.windows.net/files/1066988.PDF. While this revision carries no operative legal effect—creating no new rights or obligations—it signals an intent to downplay the Commonwealth's responsibilities under federal law and diminishes the spirit of partnership that the statute was intended to embody.

rights of Tribal Nations and Tribal Health Programs to operate free from unlawful state interference in the Medicaid program.

26.     This Court further has jurisdiction pursuant to 28 U.S.C. §§ 1343(a)(3) and (4), providing original jurisdiction to remedy the deprivation, under color of state law, of rights secured by federal statutes and the U.S. Constitution.

27.     Declaratory relief is sought under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, to determine the rights and legal obligations of the parties.

28.     Injunctive relief is available under the equitable authority of this Court, including as recognized by the Supreme Court in *Ex parte Young*, 209 U.S. 123 (1908), to halt continuing violations of federal law by state officials sued in their official capacities.

## VENUE

29.     Venue is proper in the Eastern District of Virginia, Norfolk Division, under 28 U.S.C. § 1391(b), because a substantial portion of the acts and omissions giving rise to the claims occurred within this judicial district. Plaintiffs Nansemond Indian Nation and Fishing Point Healthcare, LLC maintain their primary operations within this district, providing healthcare services to the Nation's citizens, AI/AN beneficiaries, and non-AI/AN Medicaid beneficiaries in Suffolk, Chesapeake, Portsmouth, Norfolk, Virginia Beach, Hampton Roads, Newport News, and Isle of Wight. The named Defendants reside and maintain their principal offices within this district, and their unlawful acts and omissions giving rise to the claims occurred substantially within the Eastern District of Virginia.

//

//

## PARTIES

30.     **Plaintiff Nansemond Indian Nation ("Nation")** is a federally recognized Tribal Nation acknowledged by the Thomasina E. Jordan Indian Tribes of Virginia Federal Recognition Act of 2017, Pub. L. No. 115–121, 132 Stat. 40 (2018). As a sovereign entity, the Nation maintains inherent authority to govern its own affairs, including protecting the health and welfare of its citizens. The Nation operates a Tribal Health Program pursuant to a Title I ISDEAA Contract with IHS of the U.S. Department of Health and Human Services ("HHS"), and provides healthcare services through its Tribally chartered entity, Fishing Point Healthcare, LLC. Fishing Point provides direct delivery of culturally competent medical care to its citizens, other AI/AN beneficiaries, and both AI/AN and non-AI/AN Medicaid beneficiaries in the Commonwealth. The Nation brings this action on its own behalf and in its *parens patriae* capacity to safeguard the rights and interests of its citizens, including their access to federally protected healthcare services.

31.     **Plaintiff Fishing Point Healthcare, LLC ("Fishing Point")** is a Tribally chartered limited liability company organized under the laws of the Nation in 2023. Fishing Point provides comprehensive healthcare services—including primary care, behavioral health, ancillary medical services, and community-based healthcare programs—in accordance with the Nation's ISDEAA Contract and its inherent sovereignty. Fishing Point qualifies as a Tribal Health Program under federal law, and is entitled to protections under ISDEAA, IHCIA, and the Medicaid Act.

32.     **Defendant Commonwealth of Virginia** is a state within the United States and a recipient of federal Medicaid funding under the Medicaid Act. The Commonwealth, acting through its agencies and officials, is responsible for the administration and implementation of the

Virginia Medicaid program in accordance with federal requirements. As a condition of receiving federal funds, the Commonwealth must comply with all applicable federal laws, including those protecting the rights of Tribal Nations and Tribal Health Programs.

33.     **Defendant Virginia Office of the Secretary of Health and Human Resources ("SHHR")** is responsible for overseeing Virginia's public health programs, including Medicaid administration, reimbursement policies, and regulatory oversight affecting Tribal Health Programs. SHHR, through its supervision of DMAS, has failed and continues to fail to prevent unlawful delays in Medicaid enrollment, unauthorized denial of federally required reimbursements, and unlawful impositions of state regulatory barriers on Plaintiffs, in violation of ISDEAA, IHCIA, and the Medicaid Act.

34.     **Defendant Virginia Department of Medical Assistance Services ("DMAS")** is the state agency responsible for administering Virginia's Medicaid program. DMAS oversees provider enrollment, claims processing, reimbursements, and audits directly impacting Tribal Health Programs. DMAS has delayed and continues to delay Plaintiffs' Medicaid dental enrollment unlawfully, refused and continues to refuse to reimburse claims at rates mandated by Virginia's federally approved Medicaid State Plan, and imposed and continues to impose additional unauthorized administrative barriers, violating ISDEAA, IHCIA, and the Medicaid Act.

35.     **Defendant Janet Kelly** is the Secretary of SHHR, the state agency responsible for oversight of Virginia's Medicaid program, including provider enrollment, reimbursement policy, and healthcare regulations impacting Plaintiffs. She is sued in her official capacity only for purposes of injunctive and declaratory relief. In her role as Secretary, Defendant Kelly has supervisory authority over the implementation and enforcement of state Medicaid policies and

practices. Despite federal mandates under the ISDEAA, IHCIA, and the Medicaid Act, Defendant Kelly has permitted and failed—and continues to permit and fail—to remedy ongoing violations of these statutes. These violations include: (1) unlawfully delaying Medicaid provider enrollment for Fishing Point in direct conflict with the Medicaid Act's "reasonable promptness" requirement, 42 U.S.C. § 1396a(a)(8); (2) withholding Medicaid reimbursements owed to Fishing Point under the federally approved Virginia Medicaid State Plan, including payments at the Federal AIR, in contravention of 42 U.S.C. §§ 1396d(b), 1396b(a)(1) and implementing regulations 42 C.F.R. §§ 447.56(a)(1)(x), 431.110(b); and (3) enforcing unauthorized regulations and practices that disproportionately burden Tribal Health Programs in violation of the Supremacy Clause and preemptive federal statutes. Plaintiffs seek prospective relief to enjoin the continuation of these unlawful policies and to compel compliance with federal law, ensuring the protection of Tribal sovereignty and the uninterrupted provision of healthcare services to AI/AN and non-AI/AN Medicaid enrollees.

36.    **Defendant Cheryl Roberts** is the Director of DMAS, the agency responsible for administering the Commonwealth's Medicaid program. In this role, Defendant Roberts oversees provider enrollment, reimbursement processes, and Medicaid policy implementation. She is sued in both her individual and official capacities. Defendant Roberts has directly participated in and continues to participate in decisions and actions that result in repeated and unlawful violations of federal law, including: (1) unlawfully delaying Medicaid provider enrollment for Fishing Point in direct conflict with the Medicaid Act's "reasonable promptness" requirement, 42 U.S.C. § 1396a(a)(8); (2) withholding Medicaid reimbursements owed to Fishing Point under the federally approved Virginia Medicaid State Plan, including payments at the Federal AIR, violating 42 U.S.C. §§ 1396d(b), 1396b(a)(1) and implementing regulations 42 C.F.R. §§

447.56(a)(1)(x), 431.110(b); and (3) enforcing unauthorized regulations and practices that disproportionately burden Tribal Health Programs in violation of the Supremacy Clause and preemptive federal statutes. Defendant Roberts has actual and constructive knowledge of federal obligations under ISDEAA, IHCIA, and the Medicaid Act. She personally approved, implemented, or failed to correct policies that she knew—or should have known—violated and continue to violate clearly established federal rights, and continues to do so. Her conduct is taken under color of state law and exhibits malice, reckless indifference, or willful disregard for the Plaintiffs' federally protected rights. As a direct result of Defendant Roberts's actions, Plaintiffs have suffered and continue to suffer significant financial harm, loss of Medicaid reimbursement, and impairment of their ability to deliver essential healthcare services. Plaintiffs seek compensatory and punitive damages against Defendant Roberts in her individual capacity and injunctive and declaratory relief in her official capacity to prevent ongoing and future violations.

37.    **Defendant Jeffrey Lunardi** is the Chief Deputy Director of DMAS, where he assists in overseeing the Commonwealth's Medicaid program, including provider enrollment processes, reimbursement policy, and Medicaid administration. He is sued in both his individual and official capacities. Defendant Lunardi directly implemented, approved, or permitted policies and practices—and continues to do so—that result in repeated and ongoing violations of federal law, including: (1) unlawfully delaying Medicaid provider enrollment for Fishing Point, in direct conflict with the Medicaid Act's "reasonable promptness" requirement, 42 U.S.C. § 1396a(a)(8); (2) withholding Medicaid reimbursements owed to Fishing Point under the federally approved Virginia Medicaid State Plan, including payments at the Federal AIR, violating 42 U.S.C. §§ 1396d(b), 1396b(a)(1) and implementing regulations 42 C.F.R. §§ 447.56(a)(1)(x), 431.110(b); and (3) enforcing unauthorized regulations and practices that disproportionately burden Tribal

Health Programs in violation of the Supremacy Clause and preemptive federal statutes. Defendant Lunardi has actual and constructive knowledge of federal obligations under ISDEAA, IHCIA, and the Medicaid Act. He personally approved, implemented, or failed to correct policies that he knew—or should have known—violated clearly established federal rights and continues to do so. Despite this knowledge, he has failed to take corrective action and instead participated and continues to participate in the enforcement of policies and practices that he knows—or should have known—violate clearly established federal rights. His conduct, taken under color of state law, exhibits malice, reckless indifference, or willful disregard for Plaintiffs' federally protected rights. As a direct result of Defendant Lunardi's actions, Plaintiffs have suffered and continue to suffer significant financial harm, loss of Medicaid reimbursement, and impairment of their ability to deliver essential healthcare services. Plaintiffs seek compensatory and punitive damages against Defendant Lunardi in his individual capacity, and injunctive and declaratory relief in his official capacity to ensure compliance with federal law and prevent further violations.

38.    **Defendant Glenn Youngkin** is the Governor of the Commonwealth of Virginia and, as the state's chief executive officer, is ultimately responsible for ensuring that all executive branch agencies—including SHHR and DMAS—operate in compliance with federal law. He is sued in both his individual and official capacities. In his role as Governor, Defendant Youngkin exercises authority over the agencies responsible for administering Virginia's Medicaid program and has permitted the continuation of policies and practices that violate clearly established federal rights, including: (1) unlawfully delaying Medicaid provider enrollment for Fishing Point, in direct conflict with the Medicaid Act's "reasonable promptness" requirement, 42 U.S.C. § 1396a(a)(8); (2) withholding Medicaid reimbursements owed to Fishing Point under the

federally approved Virginia Medicaid State Plan, including payments at the Federal AIR, violating 42 U.S.C. §§ 1396d(b), 1396b(a)(1) and implementing regulations 42 C.F.R. §§ 447.56(a)(1)(x), 431.110(b); and (3) enforcing unauthorized regulations and practices that disproportionately burden Tribal Health Programs in violation of the Supremacy Clause and preemptive federal statutes. Defendant Youngkin has actual and constructive knowledge of federal obligations under ISDEAA, IHCIA, and the Medicaid Act. Additionally, on March 24, 2025, Defendant Youngkin endorsed a state budget amendment he understood to be unlawful, which conditions Medicaid reimbursement rates for Tribal Health Programs on the AI/AN status of patients in contradiction to federal law and in direct conflict with the requirements of Virginia's federally approved State Medicaid Plan. This legislative action violates ISDEAA, IHICIA, and the Medicaid Act, and imposes eligibility and reimbursement limitations prohibited by federal Medicaid protections for Tribal Health Programs and their beneficiaries. Defendant Youngkin acts with malice, reckless indifference, or willful disregard for Plaintiffs' clearly established federal rights by failing to prevent or remedy these violations, despite having actual and constructive knowledge of applicable federal law and his constitutional and statutory duties. As a result of Defendant Youngkin's actions and inactions, Plaintiffs have suffered and continue to suffer significant financial harm, loss of Medicaid reimbursement, and impairment of their ability to deliver essential healthcare services. Plaintiffs seek compensatory and punitive damages against Defendant Youngkin in his individual capacity and declaratory and injunctive relief in his official capacity to halt ongoing violations and ensure compliance with federal law.

39.    All Defendants, through their individual and collective actions, taken under color of state law, have deprived Plaintiffs of rights secured by federal statutes and the U.S. Constitution, including those guaranteed by ISDEAA, IHCIA, and the Medicaid Act. Defendants

personally participated in or had knowledge of these violations and failed to prevent or remedy them and continue to do so. Their conduct caused and continues to cause ongoing and substantial harm to the Nation, Fishing Point, and the communities they serve.

## LEGAL AND REGULATORY FRAMEWORK

### *Federal Trust and Treaty Obligations*

40.     The United States maintains a trust responsibility toward Tribal Nations, arising from historical treaties, federal statutes, and the unique government-to-government relationship between Tribal Nations and the federal government. *See Seminole Nation v. United States*, 316 U.S. 286, 296–97 (1942). This duty includes providing healthcare services to AI/AN populations and is codified in the Snyder Act, 25 U.S.C. § 13, and reinforced by the IHCIA. Congress has declared it the policy of the United States "to ensure the highest possible health status for Indians" and to furnish all resources necessary to achieve that goal. 25 U.S.C. § 1602.

41.     The federal government's trust responsibility is not merely aspirational; it imposes a legally enforceable fiduciary obligation to protect Tribal interests, including providing essential healthcare services. *See Seminole Nation*, 316 U.S. at 296–97; *United States v. Mitchell*, 463 U.S. 206, 224–26 (1983) (recognizing enforceable fiduciary obligations where Congress has created specific trust duties). As the Bureau of Indian Affairs has explained, "[t]he federal Indian trust responsibility is a legally enforceable fiduciary obligation on the part of the United States to protect tribal treaty rights, lands, assets, and resources." U.S. DEP'T OF THE INTERIOR, BUREAU OF INDIAN AFFAIRS, FREQUENTLY ASKED QUESTIONS (2021), *available at* https://www.bia.gov/frequently-asked-questions.

42.     In 1955, Congress created the IHS, transferring Indian healthcare functions from the Department of the Interior to HHS. In 1975, Congress enacted ISDEAA, affirming the right

of Tribal Nations to assume control over federally funded programs, including health services, through self-determination contracts. The following year, Congress enacted the IHCIA to improve the health status of AI/ANs and support the development of Tribal Health Programs. The IHCIA provides the legal framework for healthcare delivery to AI/ANs and was permanently reauthorized by Congress on March 23, 2010, as part of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 10221, 124 Stat. 119, 935 (2010). Under the IHCIA, it is the policy of the United States to ensure the highest possible health status for AI/ANs and to deliver healthcare services in a manner that maximizes Tribal participation and promotes meaningful consultation. *See* 25 U.S.C. § 1602.

43.     Although the trust responsibility primarily binds the federal government, states that accept federal funding or administer federal programs impacting Tribal Nations assume corollary obligations to honor and uphold federal requirements protecting Tribal healthcare rights. *Cf. McNabb for McNabb v. N.D. Dep't of Corr. & Rehab.*, 727 F.3d 926, 931 (8th Cir. 2013) (noting that states administering federal programs must comply with controlling federal mandates).

### *The Indian Health Care Improvement Act and Federal Trust Responsibility*

44.     The IHCIA establishes a broad structure to ensure the availability of healthcare services to AI/AN populations. Congress declared that "it is the policy of this Nation, in fulfillment of its special trust responsibilities and legal obligations to Indians…to ensure the highest possible health status for Indians and urban Indians and to provide all resources necessary to effect that policy." 25 U.S.C. § 1602. Pursuant to this stated policy, IHCIA authorizes the delivery of a wide range of health services through Tribal Health Programs.

45.    IHCIA reinforces the federal government's trust obligation to provide healthcare to AI/AN communities. As the Supreme Court noted, IHS programs fulfill the government's unique duty to Indian peoples. *Lincoln v. Vigil*, 508 U.S. 182, 195 (1993). By codifying the promise of accessible, high-quality healthcare for AI/AN individuals, IHCIA confirms the centrality of Tribal Health Programs in serving Tribal citizens. Federal law also expressly provides that Tribal Nations operating under ISDEAA, which Congress explicitly enacted to reaffirm the federal commitment to Tribal self-governance and self-determination, may deliver services consistent with IHCIA. 25 U.S.C. § 5301; 25 U.S.C. § 1680c. Alongside IHCIA, a provision of the Medicaid Act dealing with state plans for medical assistance, found in 42 U.S.C. § 1396a(a)(73), ensures that states, in administering Medicaid, incorporate Tribal input and refrain from adopting policies that impede Tribal healthcare delivery. This obligation underscores the unique legal status of Tribal Health Programs, requiring that state Medicaid plans collaborate with Tribal Nations in a manner consistent with the federal trust responsibility.

### *ISDEAA's Affirmation of Tribal Self-Determination*

46.    ISDEAA was enacted to promote Tribal self-governance by empowering Tribal Nations to assume responsibility for programs—including healthcare—formerly administered by federal agencies. 25 U.S.C. § 5302. ISDEAA makes clear that when Tribal Nations operate these programs, they effectively "step into the shoes" of the federal government for the purpose of providing healthcare services, rather than functioning as mere private contractors.

47.    Because ISDEAA treats Tribal Health Programs as equivalent to IHS facilities, states have no authority to impose conditions or restrictions that they would not impose on IHS directly.

48.     Any such effort to regulate, burden, or restrict Tribal Medicaid participation or reimbursement violates ISDEAA's statutory mandate, undermines Tribal self-determination, and conflicts with the Supremacy Clause. Tribal healthcare operations under ISDEAA also cannot be subjected to state regulation absent explicit congressional authorization. 25 U.S.C. § 1642.

49.     Federal regulations codify this limitation in 42 C.F.R. § 440.90(c), which defines clinic services for Medicaid and exempts Tribal and IHS clinics from state licensure requirements. This regulation also implements a specific exception to the traditional "four walls" limitation, allowing Tribal clinics to receive Medicaid reimbursement for services delivered outside their physical facility, including by contract providers. *See* 89 Fed. Reg. 85436, 85682 (Nov. 27, 2024). Any state attempt to override this designation or impose conflicting requirements violates federal law and the Supremacy Clause.

50.     By exercising healthcare sovereignty, Tribal Nations gain full control over programs once administered by IHS. In doing so, Tribal Health Programs maintain the same rights, funding, and support that IHS facilities receive, free from additional state-imposed burdens. The federal government remains obligated to provide the financial and structural support needed to ensure that Tribal Nations are not penalized for choosing to manage their own health programs. In exercising this delegated federal authority, Tribal Nations have the same authority and entitlements as IHS itself.

51.     ISDEAA includes binding contractual obligations requiring the federal government to honor its financial commitments to Tribal Nations, thus securing the stability of Tribal Health Programs. *Leavitt*, 543 U.S. at 639. The Supreme Court reiterated in *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 194–95 (2012), that once the federal government enters these agreements, it must fully fund them, even if appropriations are insufficient. The Tenth

Circuit likewise emphasized that ISDEAA contains rights-creating language. *See Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1461 (10th Cir. 1997). These principles directly apply in the Medicaid arena, where states must treat Tribal Health Programs as Medicaid providers and adhere to their reimbursement obligations under ISDEAA.

### *Supremacy Clause and Federal Preemption in Tribal Healthcare*

52.     The Supremacy Clause of the U.S. Constitution establishes that federal law is "the supreme Law of the Land," rendering any conflicting state law or regulation null and void. U.S. CONST. art. VI, cl. 2. This principle applies with full force to any state efforts to regulate or impede Tribal Health Programs operating under federal law. Where state actions conflict with or undermine federal obligations to Tribal entities, they are preempted. *See White Mountain Apache Tribe*, 448 U.S. at 148–49; *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334 (1983).

53.     Federal courts routinely confirm that Tribal Nations and Tribal entities may seek injunctive relief to halt the enforcement of unlawful state measures. *Ex parte Young*, 209 U.S. at 155–56. For example, in *Prairie Band Potawatomi Nation v. Wagon*, 476 F.3d 818, 823 (10th Cir. 2007), the Tenth Circuit recognized the federal judiciary's power to compel state officials to comply with federal law where state regulations infringe on rights of Tribal Nations guaranteed by federal statutes.

54.     In the context of Indian law, preemption does not always hinge on an express federal statute forbidding state regulation. Rather, state laws are invalid if they "infringe on the rights of Indians to make their own laws and be ruled by them" or if they interfere with a broad federal regulatory scheme. *Williams v. Lee*, 358 U.S. 217, 220 (1959). The Supreme Court has recognized a "firm federal policy of promoting Tribal self-sufficiency and economic

development," which bars state interference with federally protected Tribal interests in self-governance. *Mescalero Apache Tribe*, 462 U.S. at 334–35.

55.     Likewise, the Court in *Ramah Navajo School Board, Inc. v. Bureau of Revenue of New Mexico*, 458 U.S. 832, 846 (1982), held that if state regulation "impedes the operation of federal statutes or infringes on the federal government's obligations to Tribes," it is preempted. Courts remedy such conflicts by enjoining the state officials' actions that violate federal law. *Prairie Band Potawatomi Nation*, 476 F.3d at 823.

56.     State participation in Medicaid is voluntary, and when a state elects to accept federal funds, it must honor all attached federal conditions. *Harris*, 448 U.S. at 301. If a state's conduct undermines these conditions—especially those benefiting Tribal Health Programs—federal law requires that state law yield. *Wilder*, 496 U.S. at 502 (holding Medicaid provisions create binding obligations enforceable against states).

57.     Federal law confers specific protections on Tribal Health Programs. For instance, 42 U.S.C. § 1396j(a) ensures that IHS and Tribal Health Programs "shall be eligible for reimbursement" for Medicaid services if they meet generally applicable standards. States may not arbitrarily exclude or impose additional burdens on such providers. 42 C.F.R. § 431.110(b) further mandates that if a Tribal or IHS facility meets standard Medicaid criteria, a state "must [accept it] as a Medicaid provider on the same basis as any other qualified provider."

58.     Additionally, the Medicaid Act provision commonly referred to as the "freedom of choice" provision—codified at 42 U.S.C. § 1396a(a)(23)—guarantees that Medicaid beneficiaries may obtain services from any qualified provider, including Tribal Health Programs, that is legally authorized to furnish the services and willing to participate in Medicaid. Courts

have enjoined states that attempt to exclude lawful providers in ways not permitted by federal law. *Planned Parenthood of Kan. & Mid-Mo. v. Moser*, 747 F.3d 814, 822–23 (10th Cir. 2014).

59.     State officials administering Medicaid must continually comply with federal requirements. Any regulation or official action that impedes a Tribal Health Program's participation or imposes conditions beyond those in federal law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," and federal courts will enjoin "recalcitrant officials" who violate these federal mandates. *See Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *Brennan v. Stewart*, 834 F.2d 1248, 1252 (5th Cir. 1988).

60.     42 C.F.R. § 447.56(a)(1)(x) mandates comparable treatment of Tribal Health Programs, limiting cost sharing for AI/AN recipients. Federal law also guarantees one hundred percent (100%) FMAP for services rendered to AI/AN patients under 42 U.S.C. § 1396d(b), (l), but the actual provider reimbursement rate remains the same regardless of the patient's AI/AN status. Under 42 U.S.C. § 1396j(d), the Medicaid Act clarifies that Tribal Nations may serve non-AI/AN beneficiaries as long as AI/ANs retain timely access to care. States must also ensure prompt payment of "clean claims" within specified timelines. 42 U.S.C. § 1396a(a)(37); 42 C.F.R. § 447.45(b).

61.     Once CMS approves a State Plan Amendment ("SPA"), it becomes binding federal law. In *California Association of Rural Health Clinics v. Douglas*, 738 F.3d 1007, 1017 (9th Cir. 2013), the Ninth Circuit held that once CMS approves a SPA, it becomes binding federal law that the state must adhere to without unilateral modification. The court also emphasized that CMS's interpretation of an approved SPA governs, and disputes over its meaning or implementation are to be resolved by CMS and the courts—not by state officials.

*Preemption of State Interference and Federal Protections*

62.    Both ISDEAA and IHCIA operate within a comprehensive federal framework, such that state laws or regulations that conflict with these federal mandates are unenforceable. *White Mountain Apache Tribe*, 448 U.S. at 148–49. Any state rule that limits reimbursement, imposes additional licensing or regulatory demands, or otherwise hinders Tribal Health Programs—beyond what IHS facilities would face—is preempted under federal law.

63.    Any state action that infringes on a Tribal Nation's right to administer its healthcare program—whether via delayed Medicaid enrollment, reduced reimbursement rates, or additional regulatory burdens—is incongruent with the self-governance principles embodied in ISDEAA and the federal trust obligations under IHCIA. In short, ISDEAA's preemptive authority and the Supremacy Clause bar any state measure that attempts to restrict Tribal Medicaid participation or payments.

64.    Violations of ISDEAA—including any state action interfering with Tribal self-governance—are actionable under federal law. Courts consistently hold that states may not impose extra requirements or financial burdens on Tribal Nations carrying out federal services under ISDEAA. *See Ramah Navajo Sch. Bd., Inc*, 458 U.S. at 840–43. Because IHCIA reinforces these principles with a clear policy mandate for high-quality, accessible healthcare in Indian Country, state-imposed obstacles similarly contravene both the text and spirit of federal Indian law.

65.    In combination, IHCIA and ISDEAA guarantee that Tribal Nations can manage their healthcare programs with minimal state interference, receiving the same federal benefits and reimbursements as IHS-operated facilities. These statutes, along with obligations found in the Medicaid Act itself in 42 U.S.C. § 1396a(a)(73), reinforce federal trust responsibility and

protect Tribal sovereign authority in administering Medicaid services. Consequently, any state policy that restricts or dilutes the rights of a Tribal Health Program violates federal law, preempting contradictory state laws or regulations under the Supremacy Clause.

***Medicaid Act Requirements***

66.    Medicaid is a federal-state partnership governed by Title XIX of the Social Security Act. While states retain administrative flexibility in implementing their Medicaid programs, their discretion is constrained by comprehensive federal statutes, regulations, and guidance issued by the CMS. This includes a categorical obligation to respect the federal status and rights of IHS facilities and Tribal Health Programs operated under ISDEAA Contracts.

67.    The Supreme Court recognizes that "although participation in the Medicaid program is entirely optional, once a State elects to participate, it must comply with the requirements of [federal law]." *Harris*, 448 U.S. at 301. States are obligated to ensure equitable access to Medicaid for eligible AI/AN members and equitable reimbursement for Tribal Health Programs, consistent with federal standards.

68.    Once CMS approves a state's Medicaid plan, the state is legally bound to administer its Medicaid program in accordance with that approved plan and federal law. 42 U.S.C. §§ 1396a, 1396c; 42 C.F.R. §§ 430.10, 431.10. Federal law requires a state plan to be a comprehensive, written statement describing the nature and scope of the program, and mandates that the state adhere to the plan's terms. If a state fails to comply, the Secretary of HHS may withhold federal Medicaid funds. In short, a participating state must implement Medicaid as federally mandated.

69.    States cannot deviate from or contradict the terms of their CMS-approved plan or constrain Tribal Health Programs in ways that conflict with federal law. Where state measures

conflict, they are preempted under the Supremacy Clause. *See White Mountain Apache Tribe*, 448 U.S. at 148–49.

71.     IHS facilities and Tribal Health Programs operating under ISDEAA enjoy a unique legal status recognized by statutes such as the IHCIA. These federal laws embody the federal trust responsibility to Tribal Nations and preempt conflicting or additional state requirements that might otherwise be imposed on non-Tribal providers.

71.     Federal law explicitly includes Tribal Health Programs in the Medicaid program. In 42 U.S.C. § 1396j, the Medicaid Act provides that a Tribal organization carrying out IHS programs "shall be eligible for reimbursement for medical assistance provided under a State plan" so long as it meets generally applicable federal Medicaid requirements. The Medicaid Act imposes clear timelines and conditions for state administration of healthcare services, requiring Medicaid-eligible individuals and providers to receive services and payments with "reasonable promptness." 42 U.S.C. § 1396a(a)(8). States cannot place additional unauthorized restrictions on Tribal Health Programs regarding enrollment, payments, or operations. 42 C.F.R. § 431.110(b).

72.     Under 42 C.F.R. § 447.45, states must pay or deny at least ninety percent (90%) of clean claims from practitioners—including Tribal Health Programs—within thirty (30) days, and ninety-nine percent (99%) within ninety (90) days. A "clean claim" is one that requires no other information for processing. Unjustified withholding or indefinite "pending" of Tribal claims violates federal provisions for prompt payment.

73.     The Medicaid Act further imposes requirements on how states set provider payment rates. For example, 42 U.S.C. § 1396a(a)(13) (the "Boren Amendment") historically required state plans to use specific methodologies to reimburse healthcare providers. Courts have

held that such Medicaid reimbursement provisions can create enforceable rights for providers. In *Wilder v. Virginia Hospital Association*, 496 U.S. 498, 510–12 (1990), the Supreme Court ruled that the Medicaid Act's mandate for "reasonable and adequate" reimbursement rates conferred a federal right on healthcare providers that was enforceable under 42 U.S.C. § 1983. Although Congress later amended the Boren Amendment, the principle remains—when Medicaid law requires states to adhere to particular payment standards or methodologies, states are bound by those standards, and providers may seek judicial relief if states violate such mandates.

74.    In 42 U.S.C. § 1396a(a)(23), the Medicaid Act gives beneficiaries freedom to choose any willing and qualified provider, including Tribal Health Programs. Additionally, to safeguard Tribal sovereignty and facilitate healthcare delivery, federal law allows Tribal Health Programs to be exempted or carved out of managed care requirements. Any state carve-out must align with federal directives on Tribal healthcare autonomy.

75.    Federal law obligates states to engage in meaningful consultation with Tribal Nations when developing or modifying Medicaid policies that affect Tribal Health Programs or Tribal communities. Under 42 U.S.C. § 1396a(a)(73), the Medicaid Act requires states to consult Tribal Nations on Medicaid policies impacting Tribal Health Programs, and 42 C.F.R. § 431.408(b) mandates consultation with federally recognized Tribal Nations *before* submission of certain Medicaid plan amendments or demonstration waivers that would affect Tribal Nations. These requirements, which reflect the government-to-government relationship recognized in IHCIA, 25 U.S.C. § 1602(6), ensure that states collaborate with Tribal Nations and IHS on policies impacting Tribal healthcare. Failure to conduct pre-decisional Tribal consultation violates federal law.

76.     Federal regulations thus compel states to seek and incorporate Tribal input before enacting Medicaid changes that would affect Tribal programs. By neglecting these consultation requirements, a state not only undermines the trust responsibility but also contravenes explicit statutory and regulatory mandates. Any such failure to engage in meaningful, pre-decisional consultation with Tribal Nations amounts to a legal violation.

77.     Moreover, a state's failure to follow the Medicaid Act's requirements—for example, by illegally withholding reimbursement of claims, delaying or denying Medicaid provider enrollment to Tribal Health Programs, or disregarding Tribal consultation obligations—violates federal law. Such violations infringe on rights secured by federal statutes and regulations and are actionable under 42 U.S.C. § 1983. Courts consistently hold that certain Medicaid provisions confer enforceable rights. *See Wilder*, 496 U.S. at 510–12; *Antrican v. Odom*, 290 F.3d 178, 186–88 (4th Cir. 2002). Most recently, in *Health & Hospital Corporation of Marion County v. Talevski*, 599 U.S. 166, 228–29 (2023), the Supreme Court reaffirmed that Spending Clause legislation such as Medicaid can be enforced through 42 U.S.C. § 1983.

***CMS Requirements and Administrative Framework***

78.     Courts have recognized the authority of federal agency interpretations in Medicaid administration. *See Pharm. Rsch. & Mfrs. of America v. Walsh*, 538 U.S. 644, 661–62 (2003). In addition, the Supreme Court has long held that federal laws enacted for the benefit of Tribal Nations must be interpreted in a manner that favors Tribal Nations. *See Cabazon Band of Mission Indians*, 480 U.S. at 208.

79.     CMS issued explicit, binding federal guidance to all state agencies administering the Medicaid program—including DMAS—confirming that Tribal Health Programs are entitled to Medicaid reimbursement for all Medicaid-eligible services provided by or through a Tribal

facility. This CMS binding guidance, rooted in the federal trust responsibilities, ensures that

Tribal Health Programs are not financially disadvantaged for treating non-AI/AN patients and

encourages them to provide care to all Medicaid enrollees. Any attempt by a state to pay a lower

rate for non-AI/AN patients would directly conflict with CMS's guidance and federal Medicaid

law.

80.    In a 2016 State Health Official Letter ("SHO #16-002") (*see* Exhibit 1 at 3) under

the section titled "Permitting a Wider Scope of Services," CMS states:

> …the scope of services that can be considered to be 'received through' an
> IHS/Tribal facility…includes any services that the IHS/Tribal facility is authorized
> to provide according to IHS rules, that are also covered under the approved
> Medicaid state plan, including long-term services and supports (LTSS). Medicaid
> coverable benefit categories include all 1905(a), 1915(i), 1915(j), 1915(k), 1945,
> and 1915(c) services set forth in the state plan, as well as any other authority
> established in the future as a state plan benefit.

81.    CMS further clarifies that "[s]tate expenditures for services covered under section

1115 demonstration authority are eligible for 100 percent FMAP as long as all of the elements of

being 'received through' an IHS or Tribal facility that are described in this SHO are present." *Id.*

at 7.

82.    This binding federal guidance establishes that Medicaid services provided by or

through a Tribal Health Program need not be separately listed in waiver documents, such as

§1915(c) waivers, to qualify for reimbursement.

83.    The CMS FAQ #11817 (2017) (*see* Exhibit 2) further clarifies the implementation

of SHO #16-002 by providing additional details on billing and facility designations. Each

IHS/Tribal facility must choose a single provider type (*e.g.*, Federally Qualified Health Center

("FQHC") or clinic) for Medicaid reimbursement, and a Tribal Health Program cannot be

reimbursed at different rates for AI/AN and non-AI/AN patients—the chosen rate must apply to

all Medicaid beneficiaries. *Id*. at 4 ("A Tribal facility may be only one type of provider (either a 'clinic services' provider or an FQHC) and receive only one reimbursement rate that applies to all Medicaid beneficiaries. Whatever rate a Tribal FQHC facility and the state Medicaid agency agree upon, whether [prospective payment system ("PPS")] or [all-inclusive rate], that same rate must be applied to all Medicaid beneficiaries who receive services through the facility.").[4]

84.    CMS reaffirmed these principles in a final rule issued on November 27, 2024, which amended 42 C.F.R. § 440.90(c) to implement a formal exception to the "four walls" limitation for Tribal and IHS clinics. Under the new regulation, Tribal Health Programs may furnish reimbursable services outside the facility's physical structure and through contract arrangements. This change formalized CMS policy and reflects the agency's recognition that Tribal Health Programs operate as a distinct provider type with specific statutory and regulatory entitlements under federal law. *See* 89 Fed. Reg. 85436, 85682–83 (Nov. 27, 2024).

85.    And where Tribal Health Programs and a state Medicaid agency agree on the Federal AIR[5] as the facility rate, the Federal AIR applies to all Medicaid visits to the Tribal facility, not just those by AI/AN Medicaid beneficiaries. *Id*.

---

[4] The CMS SHO Letter #16-002, addressed the "four walls" requirement, stipulating that services must be provided within the physical confines of a clinic to qualify for Medicaid reimbursement. Exhibit 2 at 5. However, this policy has since been revised. In a final rule effective January 1, 2025, CMS eliminated the "four walls" restriction, allowing for Medicaid payment of services furnished outside the physical premises of clinics, thereby expanding access to care beyond traditional settings. 89 Fed. Reg. 93,912 (Nov. 27, 2024) (to be codified at 42 C.F.R. pts. 406, 407, 410, 411, 416, 419, 435, 440, 457, 482, and 485).

[5] The Federal AIR is a reimbursement rate established annually by the IHS for services provided by IHS and Tribal 638 facilities. This rate is designed to streamline billing and payment processes by offering a standardized per-visit payment that encompasses all allowable costs associated with a patient encounter. The Federal AIR is published annually in the Federal Register (*e.g.*, 88 Fed. Reg. 246 (Dec. 26, 2023); 89 Fed. Reg. 5 (Jan. 8, 2024)), ensuring transparency and consistent updates.

86.     For AI/AN Medicaid patients, services received through IHS or Tribal Health Programs are reimbursed at one hundred percent (100%) of the FMAP, while services for non-AI/AN patients at the same facility are matched at the state's standard FMAP rate. *Id*. Yet the actual payment to the Tribal Health Program remains the same for both AI/AN and non-AI/AN patients; only the proportion of funding between federal and state sources differs. CMS was clear: "rates may not vary based on the applicable FMAP. States should review existing state plans to ensure compliance with the policy." *See* Exhibit 1 at 6.

87.     Pursuant to this binding CMS guidance, including SHO #16-002 and FAQ #11817, if a Tribal Health Program operating under an ISDEAA Title I contract or Title IV compact is authorized to provide a service, and that service is covered under the state Medicaid plan, the state must reimburse the Tribal Health Program at the federally mandated rate in accordance with CMS policy and federal Medicaid law. Any state-imposed restrictions, including differential payment rates based on patient AI/AN status or FMAP, or requirements beyond those established by federal law, violate federal law and are preempted under the Supremacy Clause of the U.S. Constitution, U.S. CONST. art. VI, cl. 2.

### *State Sovereign Immunity*

88.     Under the Eleventh Amendment, states generally cannot be sued by private parties in federal court. However, this immunity is not absolute. Where state officials commit ongoing violations of federal law, plaintiffs may seek prospective relief (e.g., injunctive or declaratory relief) to compel compliance, and they may also pursue money damages against officials in their personal capacities when the officials have caused injuries by violating clearly established federal rights.

89.    In *Ex parte Young*, the Supreme Court created a fundamental exception to sovereign immunity, holding that when state officials are engaged in an ongoing violation of federal law, they may be sued in their official capacities for prospective injunctive or declaratory relief. 209 U.S. at 159–60. This doctrine allows federal courts to enjoin unlawful conduct by state officials without violating Eleventh Amendment restrictions because the suit is treated as one against the official, not the state. *See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645–46 (2002) (once a complaint alleges an ongoing violation of federal law and seeks only prospective relief, the Eleventh Amendment does not bar suit).

90.    Although *Ex parte Young* targets official-capacity suits for prospective relief, 42 U.S.C. § 1983 also authorizes actions against state officials in their individual capacities for money damages. *Hafer v. Melo*, 502 U.S. 21, 30–31 (1991). Under this theory, an official who violates clearly established federal rights is personally liable for compensatory and, in appropriate circumstances, punitive damages. The Eleventh Amendment does not shield these individual-capacity claims, as any recovery is sought from the official personally rather than from the state treasury. *See Scheuer v. Rhodes*, 416 U.S. 232, 238 (1974) (explaining that "the Eleventh Amendment does not protect state officials from personal liability under § 1983").

91.    Moreover, when a state voluntarily accepts federal funds under programs such as Medicaid, it consents to meet the federal government's conditions. Courts have consistently recognized that such participation can affect a waiver of Eleventh Amendment immunity for enforcement suits, because the state, by accepting the funds, knowingly assents to abide by federally imposed standards. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (explaining that a "State's acceptance of federal funds triggers an 'agreement' to

the conditions Congress attaches"). In other words, a state cannot reap the benefits of a federal program while disclaiming its statutory responsibilities.

92.    This principle is particularly salient in the Medicaid context, where Congress imposes clear obligations designed to protect Tribal Health Programs. *Harris* underscores that "although participation in the Medicaid program is entirely optional, once a State elects to participate, it must comply with the requirements of [federal law]." 448 U.S. at 301. Likewise, *South Dakota v. Dole*, 483 U.S. 203, 207 (1987), reaffirms that Congress may condition a state's receipt of federal funds on adherence to specific standards, so long as the state is given a genuine choice whether to accept them.

93.    Thus, once a state opts to participate in Medicaid, it assumes legally binding duties—including reimbursement for Tribal Health Programs under the federally approved State Medicaid Plan, enrollment of Tribal Health Programs in Medicaid, and respect for Tribal consultation requirements. By agreeing to these conditions, the state waives its right to later assert sovereign immunity to evade compliance. In choosing to participate, the state has effectively consented to abide by the program's federal mandates, including those that shield Tribal Health Programs from state-imposed barriers.

## FACTS

### *The Nation's Inherent Sovereignty*

94.    The sovereignty of the Nansemond Indian Nation predates the founding of both the United States and the Commonwealth of Virginia. Historical records consistently affirm the Nation's continuous existence and autonomous political status, as acknowledged in numerous governmental and colonial documents. The Nation was specifically recorded in the 1669 Virginia Colony census of Indian bowmen, recognized as a sovereign entity in the 1677 Treaty

of Middle Plantation, and represented by the Virginia Colony in the 1722 Treaty of Albany.

Throughout the 17th and 18th centuries, the Nation exercised independent governance, as

evidenced by colonial grants of unique privileges—such as rights to clear land and bear arms—

conferred upon individuals especially based on their recognized Nansemond identity.

95.     As a sovereign entity, the Nation retains inherent authority to govern its internal

affairs independently from state interference. Historical treaties, federal statutes, and binding

Supreme Court precedents have consistently reaffirmed the sovereign authority of Tribal

Nations, such as the Nansemond. These inherent sovereign powers include the ability to enact

laws, administer justice, and provide for the health and welfare of its citizens, all of which

constitute essential aspects of the Nation's self-governance.

96.     Congress formally reaffirmed the sovereignty of the Nation through the

Thomasina E. Jordan Indian Tribes of Virginia Federal Recognition Act of 2017, thereby

establishing a modern, federally recognized government-to-government relationship. *See* Pub. L.

No. 115-121, § 201, 132 Stat. 40, 42 (2018). Federal recognition did not *grant* sovereignty to the

Nation; instead, it *acknowledged* the Nation's pre-existing political and legal status that was

historically recognized by colonial and state authorities. *See United States v. Wheeler*, 435 U.S.

313, 323 (1978) (holding Tribal sovereignty is inherent and exists independently of

Congressional recognition).

### *Overview of Virginia's Medicaid Program and the Federal Framework for Tribal Healthcare*

97.     Virginia's Medicaid program was established in 1966 under the Medicaid Act to

provide healthcare coverage to qualifying low-income individuals and families. As of April

2024, approximately 1.87 million Virginians—about seventeen percent (17%) of the

Commonwealth's population—were enrolled in Medicaid.

98.    In 2019, Virginia expanded Medicaid eligibility to adults aged 19–64 who meet certain income thresholds. The federal government covers ninety (90%) percent of the costs for this expansion population, with Virginia covering the remaining ten (10%) percent. In contrast, the federal share for traditional Medicaid beneficiaries in Virginia is set at fifty (50%) percent.

99.    Following federal recognition of Tribal Nations headquartered in Virginia, the Commonwealth was required to integrate IHS and Tribal Health Programs into its Medicaid system in accordance with federal law, including federal law governing Tribal healthcare.

### Virginia's Medicaid Plan and State Obligations

100.    In 2021, Virginia submitted State Plan Amendment 21-007 ("Tribal Reimbursement SPA") (*see* Exhibit 3) to CMS, acknowledging that federal law requires DMAS to file a SPA to recognize and reimburse Tribal Health Programs as Medicaid providers. CMS approved this SPA with an effective date of February 24, 2021. The Tribal Reimbursement SPA recognizes two Tribal reimbursement methodologies:

    a.  Tribal Health Clinics ("THCs") receive Federal AIR reimbursement for up to five (5) encounters per patient per day for services "provided by or through" these facilities.

    b.  Federally Qualified Health Centers ("FQHCs") operate under an Alternative Payment Methodology ensuring at least the equivalent of the Prospective Payment System rate.

101.    The Tribal Reimbursement SPA incorporates CMS's rule that Tribal Health Programs be paid a uniform rate for both AI/AN and non-AI/AN Medicaid beneficiaries. *See* Exhibits 1, 2. This structure aligns with longstanding CMS binding guidance, furthered by the "one facility, one rate" principle. Exhibits 1, 2.

102.    Virginia also submitted SPA 21-011 ("Tribal Consultation SPA") (*see* Exhibit 4) reaffirming its obligation to engage in regular, ongoing, good-faith consultation with Tribal Nations regarding changes to Medicaid that could impact Tribal Health Programs. CMS

approved this amendment, effective March 1, 2021. This SPA codifies the federal trust responsibilities to Tribal Nations and the government-to-government relationship mandated by federal law.

103.    Upon CMS approval, both SPAs became binding federal law, requiring Defendants to fully integrate Tribal Health Programs into the Virginia Medicaid program, follow federal law regarding Tribal Health Programs, reimburse Tribal Health Programs under the Tribal Reimbursement SPA, and ensure good-faith consultation with Tribal Nations before implementing Medicaid policy changes. By seeking and receiving CMS approval of the Tribal Reimbursement SPA, Defendants accepted the Federal AIR[6] annual publications as the binding reimbursement methodology for Tribal Health Programs and accepted that its Tribal Reimbursement SPA carried the force of law.

### The Nation's 638 Contract with IHS and Healthcare Services

104.    In 2023, the Nation exercised its inherent sovereign authority by entering a Title I 638 Contract with IHS under ISDEAA. *See* 25 U.S.C. §§ 5301–5423; *see* Exhibit 5. Far from a routine administrative arrangement, this contract legally affirms that the Nation may assume direct control over its healthcare system and operate independently of federal program administration.

105.    The Annual Funding Agreement ("AFA") (*see* Exhibit 6) within the Nation's Title I Contract explicitly recognizes the Nation's right to provide healthcare services to enrolled citizens, other AI/AN beneficiaries, and AI/AN and non-AI/AN Medicaid beneficiaries. *See id*., Section 4 ("[t]he Tribe may also provide health care services to ineligible persons in accordance with 25 U.S.C. § 1680c(c)(2), and Resolution No: 2022-11-08-01."). This provision underscores

---

[6] *See supra*, at note 5.

the breadth of the Nation's authority and commitment to not only AI/AN patients but also the broader community of Medicaid beneficiaries.

106.    Attachment A to the Title I Contract defines the Programs, Functions, Services, and Activities ("PFSAs") that the Nation will administer. *See* Exhibit 7. The Nation's Comprehensive Health Program provides primary care, behavioral health, dental, and community-based services through outpatient care, telehealth, and home care. Key services include lab testing, personal care assistance, rehabilitative therapies, and comprehensive dental care. The program also offers medical travel support, substance abuse recovery, and elder care services.

107.    The Nation's healthcare delivery under its Title I Contract is an exercise of sovereign authority that fulfills federal trust and treaty obligations. By entering into a Title I Contract, the Nation established itself as an independent Tribal Health Program with the authority to bill Medicaid and receive direct IHS funding. This model promotes Tribal self-governance, expands healthcare access in underserved areas, and reinforces the federal trust responsibility. Federal law protects Tribal Health Programs from unlawful state-imposed barriers, ensuring that the Nation—not external agencies—determines its healthcare structure and policies.

***Fishing Point Healthcare: Compliance and Integration Efforts***

108.    In 2023—two (2) years after the approval of the Tribal Reimbursement SPA—the Nation established Fishing Point Healthcare, LLC to fulfill the Nation's obligations under its Title I Contract, AFA, and Scope of Work. *See* Exhibits 5–7. After reviewing the Tribal Reimbursement SPA, Fishing Point selected the "Tribal Health Clinic" model as the optimal

framework for ensuring high-quality, accessible care for its patients while better aligning with its operational structure and federal requirements.

109.    Fishing Point structured its operations, financial planning, and service delivery model in reliance on the specific terms of the Tribal Reimbursement SPA and explicit assurances from Defendants that, as a "Tribal Health Clinic," it would receive the Federal AIR for up to five (5) daily encounters per patient—consistent with CMS's "one facility, one rate" mandate. *See* Exhibits 1–3.

110.    Fishing Point developed its operational framework in good faith, relying on commitments set forth in Virginia's Tribal Reimbursement SPA to establish an equitable and functioning Tribal reimbursement system. Fishing Point also relied on 42 C.F.R. § 440.90(c), which confirms that Tribal Health Programs operating under an ISDEAA contract are exempt from state licensure requirements and may receive Medicaid reimbursement for services rendered outside the physical clinic. This regulation, updated in November 2024, codifies the "four walls" exception and authorizes Tribal Health Programs to serve patients through mobile care, home-based services, and contracted personnel. *See* 89 Fed. Reg. 85436, 85682 (Nov. 27, 2024). Fishing Point's operational structure aligns with these federal authorities, and Defendants' attempt to reclassify it as another provider type directly conflicts with this binding regulation.

### *Defendants' Consistent Acknowledgments of Obligations under the Tribal Reimbursement SPA*

111.    Tribal Health Programs, including Fishing Point, operate in reliance on federal mandates requiring state Medicaid programs to reimburse services at the rates established in the CMS-approved Medicaid plan. This framework is not merely a financial mechanism; it is a federally guaranteed safeguard designed to uphold Tribal sovereignty, ensure the delivery of culturally competent healthcare, and promote equitable access to care for AI/AN communities.

The Federal AIR is a critical component of this model, providing a stable and predictable funding structure that allows Tribal Health Programs to recruit providers, expand services, and sustain operations in historically underserved areas. Without adherence to a reimbursement mandate, Tribal Health Programs face direct financial instability, jeopardizing their ability to provide essential healthcare to both AI/AN and non-AI/AN Medicaid beneficiaries.

112.    From the moment the Tribal Reimbursement SPA came into effect, Defendants explicitly recognized that Tribal Health Programs, such as Fishing Point, operate under unique federal regulatory authority. *See, e.g.*, Exhibit 8 at 6 ("Tribal providers have a unique status due to the tribe being recognized as a sovereign nation.").

113.    In a document dated September 5, 2023, (*see* Exhibit 9) Defendants specifically acknowledge:

> *Services provided by or through facilities* of the Indian Health Services (IHS) which includes, at the option of the tribe, *facilities operated by a tribe or tribal organization and funded by Title I or V of the Indian Self Determination and Education Assistance Act*, also known as Tribal 638 facilities, *are paid at the applicable IHS OMB rate published in the Federal Register or Federal Register Notices by IHS…To be included in the outpatient per visit rate are certain pharmaceutical/drugs, dental services, rehabilitative services, behavioral health services, any and all ancillary services, and emergency room services provided on-site and medical supplies incidental to the services provided to the beneficiary*. Virginia Medicaid reimburses Tribal 638 facilities in accordance with the most recently published Federal Register.

> *Id*. at 1 (emphasis added).

114.    In preparation for a meeting between Defendants and CMS in September 2023, (*see* Exhibit 10) Defendants authored internal documentation explaining:

> DMAS submitted SPAs authorizing the state to enroll and reimburse tribal providers at the All Inclusive Rate (AIR)… Per the Indian Self-Determination and Education Assistance Act and Virginia's approved State Plan, DMAS reimburses each clinic at the [Federal] AIR for up to five encounters per tribal member, per day…Because of the unique nature of tribal provider enrollment and

reimbursement, DMAS was required to create … a separate reimbursement module for tribal providers, capable of processing their claims…

*Id*. at 1.

115.    And in a December 15, 2023, letter to the Nation, Defendant Roberts explicitly recognized that changes to payment rates for PCA services under Medicaid waivers "may not have a significant impact on tribal providers" because they "are paid at the federal [AIR]." *See* Exhibit 11 at 2.

116.    These acknowledgments underscore that Defendants understood and accepted that the Tribal Reimbursement SPA required Virginia to reimburse Tribal Health Programs at the Federal AIR for all Medicaid-covered services provided by or through their facilities, including those typically authorized under waivers such as PCA services. By stating that the waiver rate adjustments would not affect Tribal Health Programs, Defendants effectively conceded that the Federal AIR applies regardless of whether a service is specifically listed in a waiver document— reinforcing that PCA services, like all other covered services, fall within the scope of the Tribal Reimbursement SPA's framework.

117.    This letter provides evidence that Defendants recognized that no separate waiver or demonstration listing was necessary to reimburse PCA services at the Federal AIR. Defendants' position in the December 15, 2023, correspondence aligns with CMS guidance, which confirms that services provided by or through a Tribal Health Program need not be individually named in a waiver to qualify for Federal AIR reimbursement. *See* Exhibits 1–2.

118.    Defendants reaffirmed this same payment structure as recently as late 2023. Exhibit 12. In the section titled "Covered Services and Limitations," for Pharmacies Defendants acknowledge:

> *Reimbursement for tribal health clinics…include[]…Services provided by or through [these facilities]…The most current published [IHS OMB] outpatient per visit rate, also known as the outpatient all-inclusive rate, is paid for up to five outpatient visits per beneficiary per calendar day for professional services…*Each prescription dispensed is defined as a separate outpatient visit for the purpose of this calculation. Tribal facility prescriptions should be billed to Medicaid fee-for-service through pharmacy point of sale for both fee-for-service and managed care members to ensure correct reimbursement. The Virginia Medicaid Common Core Formulary does not apply to members obtaining prescriptions through tribal facilities reimbursed with the above methodology.

*Id*. at 34 (emphasis added).

### *Defendants' Internal Planning to Dismantle Virginia's Tribal Reimbursement Structure Without Tribal Consultation*

119. By mid-2024, Defendants abruptly began dismantling the federally approved reimbursement structure established under Virginia's Tribal Reimbursement SPA. They took this action without amending the Medicaid State Plan or the Tribal Reimbursement SPA, without any change in federal law, and without providing prior notice or conducting the government-to-government Tribal consultation that federal law requires. Defendants' actions directly violate federal consultation mandates, multiple provisions of federal law and regulations, and the Commonwealth's own stated policies on Tribal engagement.

120. Two specific financial exposures drove Defendants' misconduct.

121. First, upon information and belief, Defendants failed to accurately identify which Medicaid beneficiaries served by Tribal Health Programs qualified as AI/AN. Defendants ignorantly assumed that Fishing Point only served AI/AN beneficiaries, despite the fact that Plaintiffs had never made this claim to Defendants. As a result, Defendants improperly claimed one hundred percent (100%) FMAP for all patients served by Fishing Point. Due to their own actions, Defendants exposed themselves to federal repayment obligations. This failure was entirely the Defendants' responsibility; Plaintiffs committed no error and only ever acted within

the requirements set forth under federal law, the State Medicaid Plan, and the guidelines provided by Defendants.

122.    Second, Defendants began to question whether PCA services qualified for Federal AIR reimbursement under the applicable Medicaid waivers or the Tribal Reimbursement SPA. This concern lacked foundation. CMS confirmed repeatedly to Defendants that PCA services were properly authorized under Plaintiffs' 638 Contract, which allowed Fishing Point to serve both AI/AN and non-AI/AN members. CMS never instructed Defendants otherwise. Internally, however, DMAS officials feared a "clawback" and sought to recast PCA services billing as unauthorized, contrary to federal direction.

123.    These two issues are directly connected. Upon information and belief, Defendants' failure to track AI/AN eligibility led to improper claims for one hundred percent (100%) FMAP from CMS and exposed the Commonwealth to likely federal repayment obligations. Rather than accept responsibility for this failure, Defendants redirected scrutiny toward PCA services, attempting to reframe them as unauthorized under the Medicaid waivers or Tribal Reimbursement SPA. By discrediting PCA billing—despite CMS's repeated confirmation that such services were authorized under Plaintiffs' 638 Contract—the Defendants sought to fabricate a legal basis to reduce or deny payments to Tribal Health Programs. This strategy served a dual purpose: it allowed Defendants to claim that the Commonwealth never owed those payments in the first place, and it opened the door for Defendants to seek recoupment from Tribal Health Programs. In that scenario, Defendants could repay CMS for its improper FMAP claims using funds it clawed back from the Tribal Health Programs—effectively shifting the financial and legal consequences of the state's mismanagement onto Plaintiffs, while masking the original violation.

124.    Yet in November 2024, CMS resolved the issue and informed Defendants of its findings. CMS confirmed that Fishing Point properly billed for PCA services under the Tribal Reimbursement SPA, maintained all required documentation, and fully complied with federal Medicaid billing requirements. CMS also found that Defendants *underpaid* Fishing Point by unlawfully capping daily encounters at three (3), despite the SPA's explicit authorization of up to five (5) encounters per day. The Defendants accepted CMS's conclusions, acknowledged that Fishing Point's billing was appropriate, and conceded that underpayments had occurred.

125.    The exchanges described below demonstrate that Defendants—despite knowing the federal laws governing Tribal Health Programs—embarked on a concerted effort to reshape Tribal participation in Medicaid. They sought to eliminate the distinct provider classification and reimbursement framework afforded to Tribal Health Programs under federal law. Defendants moved to force Tribal Health Programs into the MCO model, apply the MCO payment methodology, and treat these Programs like every other provider type—disregarding federal mandates that require separate treatment, consultation, and reimbursement at the rate set in the federally approved State Medicaid Plan and Tribal Reimbursement SPA. These efforts extended across services, including dental care and home- and community-based services, and reflected an institutional resistance to honoring the binding federal and state-approved policies governing Tribal Medicaid participation.

126.    On February 13, 2024, Brian McCormick, DMAS's Director of Legislative and Intergovernmental Affairs and designated Tribal liaison, confirmed that federal law treats each Tribe as "a sovereign nation within the Commonwealth" and authorizes distinct Medicaid treatment for both Tribal citizens and providers. *See* Exhibit 13 at 3. He explained that Tribal citizens enrolled in managed care enjoy "expanded provider choice": Unlike other enrollees, they

may access both MCOs and Tribal Health Programs. He also emphasized that Tribal Health Programs follow a different reimbursement model: they bill Medicaid per encounter and receive the Federal AIR for up to five (5) encounters per patient per day. Tribal Health Programs also maintain greater flexibility in staffing and licensure. Noting that although federal rules do not require Virginia licensure, both Tribal facilities[7] located in the Commonwealth have obtained it.

127.    Despite this internal acknowledgment of federal law, on February 20, 2024, DMAS's Chief Medical Officer Dr. Lisa Stevens questioned the scope of the Federal AIR reimbursement in a message to McCormick, Defendant Cheryl Roberts, and other senior DMAS officials. She asked whether the Federal AIR "flat rate and encounters per day apply to any Medicaid patient seen at Fishing Point *or is the assumption that this enhanced support is for tribe members*?" *Id.* at 4. Her question reflected either a misunderstanding of or resistance to the long-standing federal policy that allows Tribal Health Programs to bill the Federal AIR for all Medicaid patients, regardless of AI/AN status.

128.    On March 13, 2024, McCormick reaffirmed the applicable law. He wrote that "federal law permits Tribal providers to provide services to anyone enrolled in a federal health care program, which would include Medicaid, Medicare, Veterans Services, etc." He clarified that this policy ensures access to care and supports financial stability for Tribal Health Programs, noting that federal dollars are intended to "*help Tribes sustain access to health care for both their own Tribal members and the community at large.*" *Id*. at 1 (emphasis added).

129.    That same day, Dr. Stevens expressed skepticism. She warned that the Federal AIR's "high flat reimbursement and the allowable multiple encounters in 1 day" could create "an

---

[7] The other Tribal health facility in Virginia is Aylett Family Wellness, owned and operated by the federally recognized Upper Mattaponi Indian Tribe.

incentive to possibly over utilize services." *Id*. She admitted, "I trust that will not happen, but something to monitor." *Id*. Dr. Stevens offered no evidence of overbilling, fraud, or noncompliance. Her comments reflected an unfounded presumption of misuse and a distrustful stance toward Tribal Health Programs. By casting the Federal AIR reimbursement as a potential abuse risk, Dr. Stevens undermined the very policies Defendants must uphold.

130.    This exchange—copied to and involving Defendant Roberts—demonstrates DMAS's broader pattern of treating Tribal rights under federal law not as binding mandates, but as optional privileges subject to state-level scrutiny and control.

131.    In a May 29, 2024, email exchange with the New Mexico Human Services Department, senior DMAS official Brian McCormick described Virginia's approach to Tribal Medicaid providers in ways that revealed the agency's continued disregard for its federal obligations. McCormick acknowledged that Virginia's Tribal Health Programs operated as out-of-network Fee-for-Service ("FFS")[8] providers, served managed care enrollees, and received reimbursement at the Federal AIR for waiver services such as PCA. *See* Exhibit 14. He then labeled this lawful arrangement a potential case of "double dipping," speculating—without any evidence—that contractors might bill both the Tribal Health Program and the MCO for the same service. *Id*. at 3.

132.    In a document titled "Status Updates for Cheryl: 5/31/24," prepared by or for senior DMAS leadership, the agency listed "Tribal Payments" as one of the "Major Issues/Risks for Awareness" near the top of the briefing. *See* Exhibit 15. The note reads: *"Tribal Payments— you know the update on this, but it felt necessary [to] add here towards the top." Id*. at 1

---

[8] FFS is a payment model where healthcare providers are paid for each service they deliver to Medicaid enrollees, and the service is paid for by DMAS.

(emphasis added). By elevating this item to the top tier of concerns, Defendants signaled that Tribal Medicaid payments had become a high-priority issue warranting executive-level attention as of May 31, 2024. The phrasing further suggests that senior officials, including Defendant Roberts, were actively tracking the matter internally—even as Defendants withheld meaningful engagement or consultation with Tribal governments.

133.    On June 6, 2024, Defendant Lunardi circulated a message to more than a dozen DMAS officials outlining the "next steps" for managing the agency's relationship with Tribal Health Programs. *See* Exhibit 16. He admitted that Defendants initially "anticipated that [Tribal Health Programs] would be providing a small number of clinic services exclusively to AI/AN eligible Medicaid members," and acknowledged that the agency had designed its systems around that narrow expectation. *Id*. at 1. Defendant Lunardi noted that the "portfolio of services and the population [Tribal Health Programs] serve has expanded considerably," and concluded that DMAS policies, systems, and processes "need to be updated to align with that scope." *Id*.

134.    Defendant Lunardi also revealed that Defendants created a dedicated SharePoint folder titled "**Governor's Confidential Working Papers**," instructing staff: "The SharePoint site with the information and documents collected so far is here: Governor's Confidential Working Papers." *Id.* at 2. Working papers are not defined in the Virginia's Freedom of Information Act ("FOIA"), but courts and the Virginia FOIA Advisory Council have interpreted this term to mean documents prepared by or for the Governor (or equivalent office) for personal or deliberative use, such as to inform decision-making. The creation of this folder—intended to store internal documents related to Tribal Medicaid issues—signals that as early as June 6, 2024, Defendants had begun briefing or preparing materials for Defendant Youngkin. Labeling the folder "confidential" suggests a preemptive designation that the contents fall within the "working

papers and correspondence" exemption of Virginia's FOIA, Va. Code § 2.2-3705.7(2). The labeling implies that the materials in the folder were either prepared by the other Defendants for Defendant Youngkin's use or received from Defendant Youngkin's office, potentially to support Defendant Youngkin's deliberative process or decision-making.

135.    Rather than acknowledge that Tribal Nations operating under the express terms of their 638 Contracts, the Medicaid Act, IDSEAA, and IHCIA, Defendant Lunardi framed it as a problem requiring internal reorganization. He created four (4) cross-functional teams focused on communications, billing, managed care, and data analysis "to minimize overlap and keep us on target." *Id*. at 1–2. Defendants implemented these changes unilaterally—without informing Plaintiffs, conducting formal Tribal consultation, or recognizing binding federal obligations to reimburse services at the AIR for all Medicaid beneficiaries.

136.    Internal notes from a June 10, 2024, DMAS Monthly Operational Review meeting reflect Defendants' recognition that Tribal Health Programs in Virginia are carved out of Medicaid managed care contracts and operate exclusively on a FFS basis. *See* Exhibit 17 at 1. Defendants acknowledged that Tribal Health Programs are not included in MCO contracts. And go on to state: "*May have to eat cost for retro piece and send to Fed*?" and "[w]e have to recover federal funds for overpayment once we are aware." *Id*. (emphasis added).

137.    These statements likely refer to Defendants improper claiming of one hundred percent (100%) FMAP for services provided to non-AI/AN beneficiaries at Tribal Health Programs. Because Defendants failed to track and report beneficiary status in accordance with federal requirements, the state drew down an inflated federal share. Once this overpayment came to light, Defendants understood they would be obligated to repay the federal government. This

further evidences both their awareness of applicable FMAP distinctions under 42 U.S.C. §
1396d(b).

138.    On June 11, 2024, Defendant Lunardi sent a follow-up email to the same internal
group, including Defendant Roberts, to report that Elevance Health (Anthem's parent company)[9]
had provided Defendants with a summary of how other states handle Tribal Medicaid programs.
*See* Exhibit 16 at 1. Defendants flagged Oklahoma, New Mexico, Texas, and North Carolina as
"potentially useful comparisons." *Id*. Rather than treat the issue as a matter of federal
compliance—as required by the CMS-approved Tribal Reimbursement SPA mandating Federal
AIR reimbursement—Defendants treated it as a policy question subject to discretionary
benchmarking. Defendant Roberts responded directly: "I will see if their directors can help." *Id*.
Her remark likely referred to state agency or MCO directors in the flagged comparison states,
suggesting that Defendants were seeking guidance from external actors rather than consulting
with the Tribal governments headquartered within the Commonwealth or CMS. This comment
underscores Defendants' pattern of looking outward for administrative solutions while excluding
the very Tribal Nations whose rights and services were under review.

139.    On or before July 2024, internal planning materials created by Defendants reflect
their ongoing effort to restructure Tribal Health Programs in ways that diverge from existing
Tribal Reimbursement SPA. *See* Exhibit 18 at 1. Defendants organized Tribal services into three
categories: (1) traditional clinic services; (2) dental and behavioral health services that the State
Plan already authorizes for reimbursement at the Federal AIR but for which billing has not yet

---

[9] In Virginia, Elevance Health, formerly known as Anthem, operates through its affiliated health
plans, including Anthem HealthKeepers Plus, which is a Medicaid MCO.

begun; and (3) home health services, currently billed under a single "hospice" code, which are provided outside the four walls of the facility. *Id.*

140.    The document states that for dental—identified as "most pressing"—and behavioral health, "*the language of our current SPA authorizes [these services] to be reimbursed at the AIR, but...we don't have the authority to spend state funds and... because of state budget impact, we will probably have to scale back the reimbursement in the new SPA.*" *Id.* (emphasis added). Defendants admit they "don't want to expand and then yank away again," and propose interim solutions that depart from federal requirements, such as enrolling Tribal providers at lower reimbursement rates. Similarly, for home health services, Defendants concede "we still don't have clarity about whether we have to allow that under our current state plan," despite the federal requirement that "received through" services are reimbursable at the Federal AIR under 42 C.F.R. § 440.90 and long-standing CMS guidance.

141.    Defendants further note that Tribal providers are currently carved out of managed care and reimbursed via fee-for-service, but state that "we need to move Tribal provider payment into managed care so the Tribal providers are billing the plans." *Id.* This proposal, which includes discussions about modifying the managed care contract, 1915(b) waiver, and Tribal Reimbursement SPA, evidences Defendants' intent to shift Tribal reimbursement to MCOs without clarity on how such a transition would preserve compliance with federal protections, including 25 U.S.C. § 1621t and 42 U.S.C. § 1396a(a)(8).

142.    On July 2, 2024, DMAS leadership compiled an internal document titled "[Executive Leadership Team] 7/2/24" to review unresolved policy and operational issues related to Tribal Health Programs. *See* Exhibit 19. The document admits that the Commonwealth's Medicaid Plan lacks a documented process to support claims for services

"received through" Tribal facilities—despite federal requirements mandating such a process. *Id.* at 3. It further notes that Defendants had not received confirmation from CMS on whether § 1915(c) waiver services, such as PCA, could be billed at the Federal AIR by Tribal Health Programs when delivered as "received through" or "outside the four walls" services. *Id.* These admissions demonstrate that, even while planning significant changes to Tribal billing and reimbursement, Defendants had not resolved foundational compliance issues or secured necessary federal guidance—yet nonetheless proceeded without informing or consulting the impacted Tribal Nations.

143.    On July 10, 2024, senior DMAS officials—including Defendant Lunardi— exchanged internal emails discussing the removal of the "MCO bypass edit" for Tribal Health Programs. *See* Exhibit 20 at 1–2. Staff proposed implementing this change via an Executive Work Order, which would cause claims from Tribal Health Programs to be denied under edit code 45: "Bill MCO." *Id.* They acknowledged that this change would reduce payments to Tribal Health Programs and potentially limit Tribal citizens' access to care, particularly where Tribal Health Programs had not joined MCO networks. *Id.* at 2. DMAS staff further noted the need to identify "Tribal members" to apply appropriate managed care protections and to claim the correct FMAP. *Id.* at 2.

144.    On July 12, 2024, Allie Atkeson, Senior Program Advisor in the DMAS Director's Office, sent an internal email to Adrienne Fegans, DMAS Deputy Director of Programs and Operations, summarizing key updates from the Executive Leadership Team meeting held the previous day. *See* Exhibit 21 at 1. Under a section attributed to "Jeff" (believed to refer to Defendant Lunardi), Atkeson reported: "*Messy process on how to fix the tribal problems, decision points and clarity.*" *Id.* (emphasis added). That same section also identified a

"goal to stop major payments by Sept 1," and referenced an upcoming meeting with the Attorney General and ongoing discussions with SHHR. *Id.* These remarks show that Defendants framed Tribal healthcare issues as "problems" to fix and set an internal deadline to halt substantial payments to Tribal Health Programs—without any indication of notice to Plaintiffs or required consultation under federal law.

145.    They recommended adding a modifier to claims and an indicator on the eligibility file to identify "Tribal members." Defendant Lunardi targeted September 1, 2024, as the implementation date for the change, with a draft plan due by July 15, 2024. *Id.*

146.    In a July 15, 2024, internal presentation titled "Tribal Providers: Proposed Solutions," Defendants identified federal reporting and budget management as key challenges associated with Tribal Health Programs. *See* Exhibit 22 at 1–2. The presentation emphasized that *Defendants* must ensure accurate FMAP claiming and admitted that the current system lacks a reliable mechanism to distinguish between services provided to AI/AN and non-AI/AN beneficiaries. This distinction directly affects FMAP accuracy, as services to AI/AN members qualify for one hundred percent (100%) federal funding, while those to non-AI/AN members do not. Defendants also acknowledged the absence of necessary documentation and system processes to comply with federal reporting standards and to support lawful FMAP claims.

147.    The same presentation flagged the risk of outsized General Fund spending as a major budgetary concern. When discussing rate-setting authority, the presentation noted: "We can set the tribal providers' FFS rate (*but our SPA already sets this out, so we'd have to negotiate change in consultation w/tribes*)." *Id.* at 7 (emphasis added). This admission reveals Defendants' awareness that altering reimbursement rates would require formal consultation

under federal law—yet underscores the agency's desire to reduce spending by modifying Tribal payment structures.

148.    On July 16, 2024, Defendants prepared a Decision Package Request form, which—upon information and belief—they submitted to Defendant Youngkin's office. In that request, Defendants sought "authority to make managed care contract changes and amend the Medicaid and [Children's Health Insurance Program] State Plans and/or waivers as necessary to come into compliance with federal requirements for Tribal provider reimbursement and reporting." *See* Exhibit 8; *see also* Exhibit 23. Defendants pursued this authority without conducting any prior Tribal consultation, further confirming their pattern of excluding Tribal governments from decisions directly affecting their rights under federal law.

149.    On July 22, 2024, Defendants internally acknowledged that Virginia's Tribal Health Programs were relying on the existing reimbursement structure, including the federally mandated Federal AIR, for their financial planning and operational expansion. *See* Exhibit 24. The email links to a publicly available article announcing the grand opening of Fishing Point Healthcare, operated by the Nation, and describing its plans to expand into additional locations in Newport News and Norfolk. The article highlights the Nation's commitment to serving both Native and non-Native Medicaid beneficiaries in underserved areas. DMAS officials explicitly noted these expansion plans and acknowledged that the Tribe was making strategic and financial decisions based on the current reimbursement model.

150.    In response to this email, Defendant Lunardi wrote, "*I'm personally itching to communicate with both tribes the magnitude of changes that are coming, especially given the clear financial planning that they're doing based on the current operating and reimbursement model.*" *Id*. at 1 (emphasis added). However, Defendant Lunardi confirmed that DMAS

leadership had decided to delay communication with the Tribes until "at least after the CMS call" because they were still finalizing key decisions and "need[ed] CMS's guidance…in order to nail them down." *Id*. at 1.

151.    In a document dated July 25, 2024, Defendants acknowledged, in internal communications and planning documents, their awareness of federal requirements regarding Tribal Health Program reimbursement, provider type selection, and Medicaid managed care carve-outs. Exhibit 25 at 1.

152.    Defendants drafted internal notes, representing their understanding that "Virginia's two Tribal providers, Aylett Family Wellness (Upper Mattaponi Indian Tribe) and Fishing Point Healthcare (Nansemond Indian Nation), are both health care facilities owned and operated by the tribe under a Tribal 638 agreement." *Id*. In the same document, Defendants lay out questions they intend to pose to CMS and demonstrate that, as early as July 2024, Defendants understood that: (1) Tribal Health Programs may elect their own Medicaid provider type; (2) the Commonwealth must honor the reimbursement methodology consistent with that election, including Federal AIR; (3) reimbursement for both AI/AN and non-AI/AN Medicaid members must occur at the same rate if the Federal AIR is applicable; (4) "received through" services provided outside the four walls of the facility remain covered under the AIR methodology; (5) MCO carve-outs for Tribal providers may be necessary to preserve proper reimbursement; (6) and Tribal Health Programs may voluntarily pay the non-federal share for non-AI/AN members under federally permissible arrangements.

153.    During a key call with CMS on July 25, 2024, Defendant Lunardi directly asked whether the Federal AIR rate applies to non-AI/AN Medicaid members. CMS responded unequivocally: "*Yes. One facility, one rate. This is long-standing policy.*" Exhibit 26 at 2

(emphasis added). This response confirmed that CMS requires states to reimburse Tribal clinics at the same AIR for all Medicaid beneficiaries, regardless of their AI/AN status.

154.    After the call, Defendants prepared a document titled "Key Takeaways," which reaffirmed CMS's guidance. The document stated: "[R]egardless of the populations served, the state should pay tribal clinic providers…the same all-inclusive rate (AIR) for AI and Non-AI members. FMAP is only available for AI/AN members." *Id*. at 1. Defendants also acknowledged that "[c]onsultation should be meaningful and give fair consideration to tribal concerns. States should be consulting with tribes on correct billing practices, if they are not billing correctly." *Id*. at 1.

155.    These internal records demonstrate that Defendants clearly understood both CMS's "one facility, one rate" policy and the federal requirement for meaningful Tribal consultation. Despite this, they continued to pursue policy shifts affecting Tribal Health Programs without engaging in good-faith consultation or honoring established federal standards. These actions reflect a knowing disregard for CMS's directives and for the procedural rights of Tribal governments under federal law.

156.    On July 30, 2024, DMAS Dental Program Manager Justin Gist confirmed that Plaintiffs intended to begin offering dental services to its members in October 2024. *See* Exhibit 27. Defendants had previously met with Plaintiffs, who requested credentialing paperwork to enroll a dental provider in the Medicaid program. Despite Plaintiffs' clear readiness and proactive engagement, Defendants abruptly halted progress on the enrollment process.

157.    Instead of moving forward with provider enrollment, DMAS staff internally reclassified the initiative as something to be "fold[ed]…into the broader tribal consultation process," without providing any clear standards, next steps, or timeline. *Id*. at 2. That same day,

in internal discussions that included Defendant Lunardi, senior DMAS official Hope Richardson directed the agency to "hold off on discussion/planning of new tribal services for now," citing an ongoing period of "consultation with the tribes." *Id*. Tribal consultation on dental never occurred. This was either an intentional misrepresentation of communications with Tribal representatives, or it highlights Defendants' gross misunderstanding of what true and meaningful Tribal consultation entails.

158.    These delays occurred despite months of prior planning and the provider's readiness to proceed. Defendants issued no notice to Plaintiffs, failed to conduct any actual or meaningful consultation, and ignored Virginia's own federally approved SPA—which expressly authorizes AIR reimbursement for dental services furnished by Tribal Health Programs. *See* Exhibit 3.

159.    On July 31, 2024, DMAS official Daniel Plain acknowledged that Plaintiffs planned to join the DentaQuest network. However, he stated that the provider "would be paid like any network dental provider," effectively refusing to recognize Plaintiffs' entitlement to the Federal AIR. *See* Exhibit 27 at 2. Plain then stated that he would direct DentaQuest to "sit tight with any movement on the provider," thereby unilaterally delaying Plaintiffs' ability to launch its dental services. *Id*. He issued this instruction without informing Plaintiffs, without engaging in consultation, and in direct violation of federal law and Virginia's binding State Plan requirements.

160.    In a July 31, 2024, internal email to Defendant Lunardi, DMAS official Hope Richardson confirmed that CMS had directed the agency to track and report which Medicaid services are provided to AI/AN beneficiaries versus non-AI/AN beneficiaries. *See* Exhibit 28. Richardson wrote: "*We received confirmation from CMS that we must track and report to the*

*federal government which services are provided to AI/AN tribal members and non-AI/AN tribal members. Given the large number of non-tribal members served, it has implications for the state budget, and we are required to track data to know when it should be 100% federal funds and when the state is responsible for sharing the cost.*" *Id.* at 1 (emphasis added). Her statement makes clear that Defendants understood both its federal reporting obligations and the financial implications of serving non-AI/AN members.

161.    Richardson also acknowledged that the decision to serve non-AI/AN beneficiaries rests with the Tribal Health Program—not the state. She cited 25 U.S.C. § 1680c as the governing authority. *Id.* at 2. Defendants recognized that the Tribal Nations headquartered in Virginia, including the Nation, had formally elected to serve non-AI/AN beneficiaries. Their ISDEAA 638 Contracts with IHS/HHS confirmed this authority and cited 25 U.S.C. § 1680c(c)(2), 25 C.F.R. Part 900, and related federal regulations. *Id.*

162.    Richardson further cited CMS SHO Letter #16-002, which states: "A state agency cannot establish one rate for services furnished by the facility to AI/AN beneficiaries and another for the same services provided by that facility to non-AI/AN Medicaid beneficiaries." *Id.* CMS guidance reinforced that Tribal facilities must be reimbursed using a single rate applied uniformly across all Medicaid beneficiaries, regardless of eligibility category. *Id.* at 2–3.

163.    In a Health Care Services Division Weekly Report for the period of August 2–8, 2024, Defendants documented an internal policy shift on the future structure of Tribal Health Programs. *See* Exhibit 29. Under the section titled "Projects/Tasks," the report states: "*DMAS staff have figured out how correct payment should be made. DMAS staff have determined that the Tribal Clinics should become FQHCs.*" *Id.* at 10 (emphasis added). This recommendation marked a formal internal decision to push Tribal Health Programs into a FQHC classification,

despite federal recognition of their distinct provider status. The language reflects a fundamental misunderstanding or misrepresentation of the difference between provider type and payment methodology under federal law.

164.    The same report's section on Managed Care Program Administration included heavily redacted content, withheld under FOIA. *Id*. at 4–5. Even so, the structure and placement suggest that Defendants were actively planning or implementing changes affecting Tribal Health Programs during this period—without disclosure to Plaintiffs or consultation with affected Tribal Nations.

165.    On August 8, 2024, CMS Health Insurance Specialist Nancy Grano sent an email confirming multiple federal legal and policy positions applicable to Virginia's Tribal Health Programs. *See* Exhibit 30. First, she reiterated that "tribal health care facilities are not required to be in-network providers to provide and be reimbursed for Medicaid services." *Id*. at 1.

166.    Grano further confirmed that CMS's Division of Tribal Affairs had verified with the IHS Nashville Area Office that both of Virginia's enrolled Tribal Health Programs are authorized to provide home- and community-based services, including PCA and chore services, under their ISDEAA 638 Contracts. *Id*. CMS also confirmed that Plaintiffs formally elected to serve non-AI/AN beneficiaries, and that this decision was properly documented in its 638 Contract. *Id*.

167.    On August 13, 2024, Defendant Lunardi forwarded this confirmation to Defendant Roberts. *Id*. Despite receiving clear affirmation from CMS regarding the legality of Tribal Health Program operations, Defendants continued to pursue changes inconsistent with federal law and failed to initiate meaningful consultation with Tribal governments.

*Defendants' Unilateral and Unapproved Imposition of New Directives*

168.    On August 14, 2024—just minutes before 5:00 p.m.—Defendant Lunardi notified Fishing Point of three (3) sweeping policy changes, all to be implemented immediately and without prior notice, Tribal consultation, or required CMS approval. *See* Exhibit 31. These unilateral actions violated multiple federal obligations and blindsided Plaintiffs with disruptive operational demands.

169.    First, Defendants ordered Fishing Point to implement a new protocol to identify AI/AN beneficiaries for each Medicaid service, claiming the requirement was necessary so that Defendants could "track and report" payments to AI/AN versus non-AI/AN members. *Id*. at 1. This tracking relates to the state's obligation to determine the appropriate FMAP it can claim from the federal government—one hundred percent (100%) for services provided to AI/AN members, and a lower match rate for others. Federal law assigns that responsibility squarely to the state, not to Tribal Health Programs. By shifting this administrative burden onto the Tribal Health Programs, Defendants attempted to offload a state obligation and imposed new compliance demands with no legal basis. This move also violated CMS's long-standing "one facility, one rate" policy, which ensures Tribal Health Programs are reimbursed consistently regardless of the beneficiary's AI/AN status.

170.    Second, Defendants told Fishing Point they would need to "work together" with Defendants to transition from a FFS arrangement into a MCO setup. *Id*. This proposed shift would strip Tribal Health Programs of their federally protected status as out-of-network, direct-bill providers, recognized under federal law and the current State Medicaid Plan. By pushing this transition, Defendants sought to bring Tribal Health Programs under the state's general Medicaid

structure, treating them like any other provider type and nullifying the distinct federal safeguards that Congress and CMS designed specifically to protect Indian health care delivery.

171.    Third, Defendants declared that PCA services covered under Virginia's 1915(c) waiver "are not included in the scope of services for tribal FQHCs," and therefore would no longer qualify for AIR reimbursement. *Id*. at 1–2. Defendants told Fishing Point to reclassify as the "appropriate provider type" and to bill at the state's standard Medicaid personal care rates. They also admitted they could not guarantee continuity of coverage, service hours, or existing provider arrangements for affected beneficiaries. This change threatened immediate service disruptions for vulnerable Medicaid members and imposed a massive financial penalty on Tribal Health Programs for delivering federally authorized services under 638 Contracts. In essence, Defendants sought to disqualify PCA services from AIR reimbursement without CMS approval—despite clear federal confirmation that these services fell within the Tribe's 638 Contract.

172.    The next day, Plaintiffs, including representatives from Fishing Point and the Nation, met with Defendants, including Defendant Lunardi. Plaintiffs objected to these unilateral changes, asserting that Defendants had neither engaged in the government-to-government consultation required by federal law and regulation, nor obtained CMS approval of any modification to the Tribal Reimbursement SPA. Plaintiffs explained that changing the terms of the Tribal Reimbursement SPA without CMS approval violated federal law and threatened the continued operation of Fishing Point.

173.    Plaintiffs also informed Defendants that shifting the burden of AI/AN beneficiary identification on Tribal Health Programs unlawfully transferred to the Nation the state's duty to track beneficiary status for FMAP purposes.

174.    Plaintiffs also advised Defendants that they were not an FQHC but a "Tribal Health Clinic," and that any attempt to require Fishing Point to enroll as an FQHC violated federal law and CMS guidance, including SHO #16-002 (Feb. 26, 2016) and CMS FAQ #11817 (Jan. 18, 2017), which recognize that Tribal Health Programs may choose whether to enroll as FQHCs, clinics, or other provider types. Plaintiffs maintained that Defendants lack authority to compel one provider type at the exclusion of others, and that this mandate impermissibly disregards Tribal sovereignty and the self-determination principles under federal law.

175.    Plaintiffs reminded Defendants that PCA services are within Fishing Point's 638 Contract and within the scope of the Tribal Reimbursement SPA. Plaintiffs underscored that Defendants' abrupt reversal and change in policy contravened the Tribal Reimbursement SPA and Defendant's longstanding implementation of the Tribal Reimbursement SPA. Plaintiffs further reminded Defendants that modifying coverage or reimbursement methodologies without a formal SPA approved by CMS and meaningful Tribal consultation violates federal law.

176.    Notwithstanding Plaintiffs' clear references to state and federal law, Defendants did not reconcile their directive with Virginia's existing Tribal Reimbursement SPA. Defendants did not rescind their stated plan to ignore the Tribal Reimbursement SPA for PCA services.

177.    On or about August 16, 2024, Defendants created a planning document titled "DMAS – Leadership Projects," which reflects internal policy considerations regarding Tribal health care. Exhibit 32. The document includes a section titled "Tribal health," stating: "The 2024 Supreme Court ruling appeared to buttress the argument for all federally recognized tribes operating their own healthcare programs. How is Virginia coordinating efforts with Tribal Nations and their self-determination ability? What are some of the attainable goals in the next 3–5 years?," linking to an article on *Becerra v. San Carlos Apache Tribe*, 602 U.S. ___ (2024),

available here https://www.scotusblog.com/2024/06/supreme-court-rules-u-s-must-pay-more-for-native-american-tribes-health-care/. *Id.* at 5. This document reflects the Defendants' recognition that federal law affirms Tribal self-determination and supports direct operation of Tribal Health Programs.

178.    On August 17, 2024, Fishing Point sent Defendants a formal letter referencing the August 14 discussion and demanding meaningful, government-to-government Tribal consultation under 42 C.F.R. § 431.408(b) before they implemented any changes to the Tribal Reimbursement SPA. *See* Exhibit 33. In that letter, Fishing Point underscored that Defendants' newly proposed policies conflicted with longstanding federal protections for Tribal Health Programs, posed a risk of unfair treatment toward the Nation, Fishing Point, and its patients, and threatened to disrupt essential, competent care that non-Tribal Health Programs cannot replicate. Fishing Point also requested a detailed, written explanation for Defendants' abrupt policy reversal and emphasized that full Tribal consultation and CMS approval were prerequisites to any lawful modification of existing Medicaid arrangements.

179.    On August 27, 2024, CMS Director of the Division of Tribal Affairs, Kitty Marx, emailed Defendant Roberts and Defendant Lunardi to request clarification regarding the status of Medicaid reimbursement for personal care services delivered by Tribal Health Programs. *See* Exhibit 34. CMS asked: "Has the state advised the tribal programs to hold personal services care service claims/billing until we resolve these issues or is the state holding the claims?" *Id*. at 1.

180.    On August 28, 2024, Defendant Lunardi responded that Defendants had not instructed Tribal Health Programs to stop submitting personal care claims and was holding off pending further CMS guidance. *Id*. He wrote: "We have not taken that step, as we wanted to wait and confirm with CMS what the correct interpretation is on the personal care issue. Additionally,

we have developed a plan to transition the members receiving services to ensure continuity of care if we do have to put a hold on these services, as we want to ensure Members aren't adversely impacted. We have communicated with the tribes about this as a planning step, but have not stopped billing at this time." *Id*.

181.    This exchange confirms that Defendants were actively contemplating a halt in reimbursement for services already being delivered by Tribal Health Programs, including those explicitly authorized under their 638 Contracts. It further demonstrates that Defendants had not provided clear or timely assurances to Tribal Health Programs regarding payment continuity for authorized personal care services, despite their ongoing provision to Medicaid members.

182.    On September 16 and 17, 2024, Defendants, including Defendant Roberts and Defendant Lunardi, met with CMS to discuss Medicaid policies directly affecting Virginia's Tribal Health Programs. *See* Exhibit 35. The September 17 agenda included a section titled "Virginia Indian Tribes," listing discussion points such as "Updates," "Successes/Challenges," "DMAS Discussion Topics," and "How can CMS be of assistance to DMAS?" *Id.* at 7. Despite the focus on Tribal healthcare, no representatives from any of Virginia's federally recognized Tribal Nations were invited to attend or participate in these discussions.

183.    This meeting occurred while Defendants were actively scheming to restructure Tribal Medicaid reimbursement, including plans to scale back federally authorized rates, shift Tribal billing into MCOs, and withhold critical information from Tribal Nations until DMAS finalized its internal strategy.

184.    On October 3, 2024, Chris Gordon, Chief Financial Officer at DMAS, emailed Defendant Lunardi—copying Defendant Roberts and other senior staff—to outline how Defendants should account for potential financial exposure related to Tribal Medicaid payments.

*See* Exhibit 36. Gordon framed the issue through the lens of "contingent liability," a financial accounting concept used to describe situations where a loss may occur in the future, depending on the outcome of uncertain events.

185.    Gordon explained that because Virginia had drawn down FMAP for services provided by Tribal Health Programs—specifically services (such as PCA) that might not be covered under Virginia's CMS-approved Medicaid State Plan—Defendants could be at risk for a federal deferral or disallowance. *Id*. at 1–2. He described this as a "reasonably possible" liability. *Id.* at 1. He also confirmed that Defendants could estimate the amount of exposure tied to those retroactive payments but, under accounting standards, did not have to include it in the forecast unless the loss became "probable."

186.    The next morning, October 4, 2024, Defendant Roberts responded to Gordon and Defendant Lunardi with a revealing and highly strategic comment. She wrote:

> The hard part is that we have no example where CMS asked states or tribes to do anything that did not support the tribes as the public good goal dominated… And we have never seen this behavior—silence etc.—from CMS. So many firsts and unknowns.

> *Id.* at 1.

187.    Plaintiffs reasonably infer from this statement that Defendant Roberts recognized the Commonwealth had likely drawn down one hundred percent (100%) FMAP for services—such as PCA service—that were, in fact, authorized under the Tribal Reimbursement SPA and the 1915(c) waiver. Defendant Roberts appeared to understand that if CMS confirmed those services were within scope, Defendants would be responsible for reimbursing Plaintiffs at the appropriate rate and would potentially be liable for repaying the federal government for improperly claimed FMAP percentage.

188.    Plaintiffs further infer that Defendant Roberts had previously hoped CMS would disallow the services—not to ensure legal or policy clarity, but to minimize Defendants' financial liability by shifting repayment obligations onto Tribal Health Programs. In that scenario, Defendants could attempt to recoup all of the funds directly from the Tribal Health Programs. CMS's ongoing silence, however, signaled the possibility that CMS would ultimately confirm the services were covered—an outcome that would place the financial burden on Defendants rather than Tribal Health Programs.

189.    Plaintiffs further infer that Defendant Roberts's frustration with CMS's historic pattern of supporting Tribal Health Programs ("as the public good goal dominated") reveals more than personal discontent. Plaintiffs reasonably infer that her remarks reflect a broader institutional resistance to honoring Tribal rights and obligations under federal law. In this moment, Defendant Roberts was not merely expressing disagreement with CMS policy—she was reckoning with the personal and political consequences of Defendants' failure to comply with Medicaid requirements and the likelihood that those failures would be exposed.

190.    On October 4, 2024, Defendants convened a meeting with MCOs to initiate planning for the transfer of personal care services away from one of the other Tribal Health Programs in the Commonwealth, Aylett Family Wellness, operated under the federally recognized Upper Mattaponi Tribe. *See* Exhibit 37. The meeting invitation stated: "Dear MCOs: During this meeting, we will discuss the preparation for the transition of personal care services from the tribal providers to managed care providers. Please forward this invite to operations staff and care management staff who will be responsible for overseeing this work." *Id*. at 3. This action demonstrates Defendants' attempt to shift non-AI/AN Medicaid beneficiaries from Tribal

Health Programs to MCOs to avoid reimbursing Tribal Health Programs at the Federal AIR for services rendered to non-AI/AN Medicaid enrollees.

191.    On October 9, 2024, Defendant Lunardi emailed colleagues about the agency's planned overhaul of Medicaid reimbursement for Tribal Health Programs. He wrote: "I just need to find a way to translate what we know about how the future setup should look so that you can get a visual for it and can help think through the right workstreams/resources." *See* Exhibit 38 at 1; Exhibit 39. He attached a side-by-side outline comparing the "current" and "future" state of Tribal Medicaid reimbursement—confirming that Defendants had already mapped out a structural transition without consulting Tribal governments. Exhibit 39.

192.    Defendant Lunardi showed that under the current model, Defendants operate on a FFS basis, verify member enrollment, do not apply MCO system edits, and pay Tribal Health Programs the federal AIR—up to five (5) encounters per day. *Id.* at 1.

193.    Defendant Lunardi showed that in the proposed "future" model, Defendants plan to impose a provider manual with defined encounter types and service parameters. MCOs would manage care and reimburse Tribal Health Programs based on state-defined waivers or SPA terms. Payments would vary by provider type, service category, and whether the Medicaid member is AI/AN—effectively eliminating the consistency and parity that federal policy requires through the "one facility, one rate" framework. *Id*. at 2.

194.    Defendants produced, pursuant to the Virginia FOIA, an undated internal document titled "Tribal Providers Weekly Mtg," which outlines agenda items, planning notes, and summaries of interagency discussions concerning Medicaid reimbursement and systems planning for Tribal Health Programs. *See* Exhibit 40. While the document lacks a date, its reference to a "CMS site visit on the 17th" suggests it was created prior to October 10, 2024.

195.    The document shows that Defendants were actively researching how other states structure Tribal Medicaid programs and identified several key areas of concern, including dental reimbursement, PCA service transitions, and potential SPA revisions. Defendants noted that Tribal Health Programs planned to begin offering dental services—including orthodontia—by October and acknowledged that existing SPA language referenced "certain dental services" without clearly defining them. *Id.* at 2. Staff admitted that Defendants "appears obligated to allow them to bill" for these services and needed to "work out guidance." *Id.* The notes also reference anticipated system changes, training, and technical support to facilitate changes to PCA service delivery and integration into managed care.

196.    In another undated FOIA-produced document, titled "Strategic Planning – Tribal Health," Defendants discussed how to manage the legal, fiscal, and political implications of Tribal Medicaid participation. *See* Exhibit 41. Contextual references indicate the document was prepared before October 10, 2024.

197.    Defendants candidly acknowledged core legal constraints. The agency confirmed: "*If the tribes opt to serve non-tribal members, they can. That is their choice, we don't have any choice in the matter*," and "*We have to pay them the same rate for non-tribal members that we pay for tribal members, which is currently the AIR rate.*" *Id*. at 1 (emphasis added). Defendants went on to describe the lack of one hundred percent (100%) FMAP for non-AI/AN services as a financial liability to the state. *Id.*

198.    Rather than accept that outcome as the result of federal law, Defendants outlined internal strategies—or "policy levers"—to limit state financial exposure. These included cutting off AIR reimbursement for waiver services delivered "outside the four walls" and requiring

Tribal Health Programs to bill MCOs directly for services to Medicaid managed care enrollees.

*Id.*

199.    The document plainly stated:

We no longer think it is a good idea to allow them to continue to provide waiver services because they could opt to go in-network and under our current SPA/arrangement for received through services, ultimately the state would be on the hook for half the cost of paying the clinic at the AIR rate for non-tribal members.

*Id.*

200.    This statement reflects a calculated attempt to avoid financial responsibility by limiting lawful Tribal participation—despite knowing such restrictions would conflict with existing federal policy and the Tribal Reimbursement SPA.

201.    The author emphasized the agency's strategic priority, writing: "*I'm going to start with managed care* because I keep putting it last and as a result I think we haven't been able to have an in-depth discussion about it, but *it is the most important piece*." *Id*. (emphasis added). Defendants made clear that transitioning Tribal Health Programs into managed care networks— despite their distinct legal status—was a central policy objective.

202.    At the same time, Defendants acknowledged the legal protections afforded to both AI/AN members and Tribal Health Programs, stating: "It's important for us to proceed in this with the awareness of the managed care protections that the tribal providers and tribal members have and the requirements around tribal consultation in decision making." *Id*. at 2. Despite recognizing these obligations, Defendants did not initiate consultation prior to pursuing structural changes.

203.    The same document discussed the possibility that Tribal Health Programs could limit services to AI/AN members while remaining out of network, but warned that this choice could shift in the future: "They could choose to provide waiver services at the AIR rate to only

tribal members and remain out of network. *But then if they change their mind down the road and want to be in-network and start providing services to non-AI/AN members, we would be back in a similar situation*." *Id*. (emphasis added). Defendants treated this lawful Tribal discretion as a budgetary threat to be contained.

204.　　In another undated internal planning document produced under FOIA, Defendants confirmed its intent to restructure Medicaid reimbursement policies for Tribal Health Programs. *See* Exhibit 42. The document acknowledges that Defendants initially assumed Tribes would provide "mostly traditional FQHC/clinic services in the Tribal 638 facility, serving mainly tribal members," but observed a "rapid expansion of services, particularly services outside [the] four walls" and a "high percentage [of] non-AI/AN" patients. *Id*. at 1.

205.　　Staff concluded that the state must work with Tribes, the legislature, and other decision-makers to craft a funding approach that aligns with state budget priorities. Rather than acknowledge the federal framework in place, Defendants described the expansion of services as a problem needing a "solution" to reduce state financial exposure. *Id.*

206.　　The document lays out Defendants' plan to end AIR reimbursement for § 1915(c) waiver services, such as PCA, provided by Tribal Health Programs. It states: "1915c waiver services are not covered as a facility service in Virginia's current tribal reimbursement SPA. Tribal 638 clinics (whether FQHC or clinic services provider) are not listed as a provider type for provision of personal care services under our 1915(c) waiver." *Id*. at 2.

207.　　Defendants then confirmed its course of action:

> Based on this information, we are planning to stop reimbursing the tribal facilities for 1915c waiver services (i.e., personal care) at the facility rate (AIR) as an outside the four walls service. We have informed the tribal providers that they can enroll with DMAS as a normal personal care provider type with reimbursement at the regular rate/payment methodology for this service.

208.    Despite proposing a major policy reversal, Defendants claimed it did not need federal approval: "*Because this is based on our read of the current SPA language, our stance is that we do not require additional federal authority to do this*. We are requesting confirmation from CMS that Virginia can take this action under our current State Plan." *Id*. (emphasis added)

209.    Defendants also confirmed its intention to issue new guidance to Tribal Health Programs before CMS approved any SPA or waiver amendment: "*Our short-term goal is to clarify what instructions DMAS can give to the tribal providers that may represent a change from current practices, prior [to] submission and approval of a new SPA and/or waiver amendment*." *Id*. at 1 (emphasis added).

210.    In another internal planning document, Defendants analyzed how Tribal Health Programs might still receive AIR reimbursement without enrolling in Medicaid or becoming FQHCs. *See* Exhibit 43. The author wrote:

> TRIBES COULD POTENTIALLY FAVOR THIS ARRANGEMENT IF NOT BILLING FOR 'RECEIVED THROUGH' SERVICES AND ONLY SERVING AI/AN MEMBERS AND FFS NON-AI/AN MEMBERS. SO IF WE TAKE THOSE TWO OPTIONS OFF THE TABLE, THERE WOULD BE MINIMAL INCENTIVE FOR THEM TO ENROLL WITH MCOs AS A NETWORK PROVIDER.

*Id.* at 1.

211.    This statement reveals Defendants' deliberate effort to dismantle the lawful billing structure available to Tribal Health Programs and coerce them into MCO participation by eliminating their viable alternatives under federal law.

***Unilateral Suspension of Personal Care Reimbursements in Violation of Federal Requirements and Tribal Sovereignty***

212.    Despite actively developing internal policy positions and planning unilateral changes to Medicaid reimbursement for Tribal Health Programs, Defendants failed to respond to

Plaintiff's August 17, 2024, letter and subsequent follow-up communications. This correspondence was met with an extended period of silence lasting nearly two (2) months, during which Defendants continued to formulate and advance their policy agenda without engaging the affected Tribal Nations.

213.    On October 10, 2024, Defendants—through a letter bearing Defendant Roberts's signature—abruptly informed Fishing Point that PCA services authorized under Virginia's § 1915(c) home and community-based services waiver fell outside the scope of the Tribal Reimbursement SPA. *See* Exhibit 44. Although Defendants pledged to seek more guidance from CMS, Defendant Roberts directed Fishing Point to cease billing for these PCA services with immediate effect. Defendants warned that any new claims would be pended ("not paid") during their so-called "review" period, yet the letter cited no legal basis for suspending reimbursements and offered no administrative recourse for challenging this abrupt mandate. *Id*. at 1.

214.    Adding to the gravity of the situation, in the same letter, Defendants announced their "expectation" that Fishing Point terminate all PCA services—whether rendered by Fishing Point staff or through contracted providers, and regardless of AI/AN status. Defendants then declared they would devise a "transition plan" to shift beneficiaries away from Fishing Point to MCOs, ostensibly to avoid perceived liability while awaiting additional federal guidance. *Id*.

215.    Defendants issued these directives without engaging in any government-to-government consultation with Fishing Point or the Nation and without receiving CMS approval. By ignoring the Nation's sovereignty and self-governance rights, Defendants effectively undermined Fishing Point's capacity to deliver a Medicaid-covered service, pending a promised—but not yet initiated—federal review by CMS.

216.    Defendants further insisted that Fishing Point produce a list of all Tribal citizens, purportedly for federal reporting purposes. Conspicuously absent from Defendants' letter, however, was any acknowledgement of Fishing Point's central contention: that Defendants had unlawfully disregarded the Tribal Reimbursement SPA that required the state to pay the Federal AIR for PCA services without undertaking the necessary amendment to that SPA, and they also failed to follow laws requiring Tribal consultation, including the separate SPA specifically covering Tribal consultation obligations (*see* Exhibit 3) before issuing unilateral directives.

217.    And the letter neglected to explain why PCA services—a service authorized under the Nation's 638 Contract and the Virginia Medicaid Plan—would now be held in abeyance while Defendants unilaterally questioned their legitimacy before CMS.

218.    Immediately upon receiving the October 10 communication, Plaintiffs contacted Defendants to discuss their concerns and to request clarification on the legal authority supporting the Commonwealth's proposed drastic actions.

219.    Plaintiffs requested a meeting with Defendants, which Defendant Lunardi scheduled without first confirming Plaintiffs' availability. The meeting, initially set for October 15, was subsequently canceled by Defendants. *See* Exhibits 45–47.

220.    On October 11, 2024, Plaintiffs' counsel submitted a Virginia FOIA request seeking transparency regarding DMAS policies, explicitly naming sixteen (16) DMAS employees. *See* Exhibit 48.

221.    On October 16, 2024, counsel for Plaintiffs and Defendants engaged in a phone discussion. During this call, Plaintiffs' counsel sought clarification on the legal justification for Defendants' actions detailed in the October 10 letter; however, Defendants provided no explanation. Plaintiffs' counsel also inquired about Defendants' contingency plans for restoring

Medicaid beneficiaries to Fishing Point's care if CMS found the transition directives unlawful. Plaintiffs' counsel further questioned how Defendants planned to execute such a transition, given their limited data identifying which Medicaid members are AI/AN. Without accurate identification, AI/AN beneficiaries faced potential loss of statutory and regulatory protections ensuring their care through Tribal Health Programs. Defendants did not offer a clear response; instead, they conceded that once patients were transitioned away from Fishing Point, federal "freedom of choice" mandates would prevent automatically returning patients to Fishing Point's care. Essentially, Defendants confirmed that reversing an erroneous transition could only occur via court order, while also acknowledging they had no established plan or mechanism to correct such an error should federal authorities validate Fishing Point's claims.

222.    Because Defendants could not ensure AI/AN beneficiaries' legally protected access to care at Tribal Health Programs—and because Plaintiffs viewed Defendants' ultimatum as a bullying tactic designed to coerce Fishing Point into relinquishing these patients, thereby capitulating to Defendants will in blatant disregard of Tribal sovereignty—Fishing Point did not transition its patients over to the MCOs.

223.    On October 17, 2024, as follow-up to the prior day's phone conference, Plaintiffs' counsel emailed Defendants' counsel to paper Plaintiffs' ongoing concerns about the legal justifications and procedural deficiencies surrounding Defendants' proposed transition of all PCA Medicaid beneficiaries away from Fishing Point's care and into MCOs. *See* Exhibit 49.

224.    On October 21, 2024, Fishing Point formally demanded immediate reimbursement from DMAS for PCA services rendered. Fishing Point emphasized that these services were rendered in full compliance with the existing Tribal Reimbursement SPA and all relevant federal and state Medicaid laws and regulations. Fishing Point clarified that the delayed

payments lacked a lawful basis and exacerbated the significant financial strain caused by

Defendants' withholding of payments. Fishing Point requested that DMAS make payment by

October 28, 2024, to avoid further disruptions and potential legal actions. *See* Exhibit 50.

Defendants did not pay.

225.    On October 24, 2024, just hours before a scheduled in-person meeting between

Plaintiffs and Defendants, Defendants' taxpayer-funded outside law firm sent an email outlining

their rationale for refusing to issue the required reimbursements. Defendants claimed that under

42 C.F.R. § 438.14 and relevant waiver programs, Fishing Point was not entitled to

reimbursement for services provided to non-AI/AN Medicaid beneficiaries outside the MCO

networks. This position was promptly disputed by Plaintiffs. *See* Exhibit 51.

226.    That same day, Fishing Point officials and leadership from the Nation engaged

directly with senior Commonwealth officials, including several named Defendants, to address

Plaintiffs' concerns. Fishing Point and the Nation proactively proposed viable financial and

operational arrangements intended to alleviate the Commonwealth's budgetary concerns related

to the Federal AIR for non-AI/AN beneficiaries, minimize potential liabilities, and ensure

continued adherence to federal Medicaid standards and Tribal sovereignty. At this meeting,

Plaintiffs' counsel noted that in Virginia, the Cardinal Care Managed Care Contract[10]

specifically includes a Tribal healthcare "carve-out," exempting it from managed care and

allowing it to continue receiving Federal AIR for services. *See, e.g.,* Cardinal Care Managed

Care Contract §§ 7.2.13, 12.2.2 (2025) available here:

---

[10] The Cardinal Care Managed Care Contract is an agreement between DMAS and selected
MCOs. This contract outlines the MCOs' obligations to deliver Medicaid services, including
medical, behavioral health, and long-term support services, to eligible individuals statewide.

https://www.dmas.virginia.gov/media/lspjeswx/cardinal-care-managed-care-contract-fy2025-mid-year-amendment.pdf.

227.    Despite Plaintiffs' genuine efforts to engage in collaborative negotiations, Defendants abruptly ended discussions after Plaintiffs presented their initial proposal, asserting the parties were "too far apart" to continue productive talks. Defendants refused to engage further with Plaintiffs, thereby dismissing Plaintiffs' sincere attempts to craft a lawful, cooperative, and financially viable solution aligned with federal Medicaid laws and regulations and respectful of Tribal sovereignty. This termination of negotiations eliminated the possibility of reaching a potentially cost-neutral and mutually beneficial arrangement.

228.    Because settlement discussions ceased, Plaintiffs informed Defendants that they would no longer agree to stay the production of the FOIA documents.

229.    On October 28, 2024, Plaintiffs' counsel provided Defendants with a comprehensive legal analysis addressing Defendants' interpretation of federal laws and regulations, specifically challenging their misapplication of 42 C.F.R. § 438.14. *See* Exhibit 52. This detailed memo explained that Defendants' position contradicted explicit federal statutes and regulations, including key provisions of the Medicaid Act, IHCIA including 42 U.S.C. §§ 1396j and 1396a(a)(23), the Indian Canons of Construction, and ISDEAA. Plaintiffs firmly asserted that Defendants' attempts to restrict reimbursement and limit non-AI/AN Medicaid beneficiaries' access to Tribal Health Programs violated established federal law and principles of Tribal sovereignty. *Id.*

230.    Upon information and belief, as early as November 2024, CMS explicitly informed Defendants that Fishing Point was billing correctly for PCA services, and that Defendants were systematically underpaying Fishing Point for these services. Defendants did not

contest CMS's determination and, in fact, acknowledged to CMS that Fishing Point's claims for

PCA services were billed correctly and that an underpayment had occurred.

231.    Defendants, however, did not inform Plaintiffs of this determination by CMS and

continue to keep all PCA service claims "pended."

232.    Between November 5 and November 26, 2024, Defendants repeatedly invoked

procedural extensions to the FOIA request while largely failing to produce documents.

233.    On December 2, 2024, Defendants provided Fishing Point's counsel with an

invoice for the search of the FOIA records, totaling six thousand five hundred and twenty-five

dollars and fifty-three cents ($6,525.53). Fishing Point paid the invoice.

234.    On December 9, 2024, Defendants released a limited number of records, many of

which were duplicates.

235.    On December 20, 2024—immediately before a prolonged holiday period—

Defendants informed counsel for Plaintiffs of their intention to amend the State Medicaid Plan,

significantly reducing Medicaid reimbursements at the Federal AIR for essential healthcare

services provided by Tribal Health Programs, including pharmacy, dental, transportation, and §

1915(c) waiver services such as personal care. *See* Exhibit 53. The written notice (*see* Exhibit

54) was improperly sent to the Nation at "contact@nansemond.gov," contrary to established

consultation procedures explicitly outlined on the Nation's official consultation webpage. *See*

https://nansemond.gov/consultation/.

236.    Upon receiving verbal notice of the planned change, Plaintiffs' counsel

immediately objected, citing procedural violations, including Defendants' failure to consult

Tribal Nations and the IHS prior to formulating the proposed SPA. This notification directly

contravened federal consultation requirements under 42 U.S.C. § 1396a(a)(73), 42 C.F.R. § 431.408(b), and Virginia's federally approved Tribal Consultation SPA.

237.    Because Defendants issued the initial notice before fully complying with Plaintiffs' outstanding FOIA request—and in light of Defendants' continued FOIA noncompliance—counsel for Plaintiffs prepared a writ of mandamus to compel production of the necessary documents, providing a copy of the writ to Defendants before filing in accordance with Virginia state law.

238.    On December 24, 2024, Plaintiffs were informed that Defendants had retained yet another taxpayer-funded outside law firm, McGuireWoods LLP, to represent them in connection with the routine FOIA dispute. In his initial communication, new counsel for Defendants wrote: "Perhaps we can speak very soon after the holiday so that we can resolve this matter amicably and expeditiously, without the need for time-consuming litigation (especially around the holiday season)." *See* Exhibit 55. Counsel for Plaintiffs responded: "I have to admit I am a little surprised the Attorney General's office needs to utilize outside counsel to handle a FOIA dispute. I am happy to discuss a resolution after Christmas, but need you to understand that, based on DMAS's actions, my client has lost trust in DMAS's ability to honor its commitments." *Id.* at 1.

239.    The decision to retain outside counsel for such a routine administrative matter is highly unusual and raises concerns about the Commonwealth's approach to transparency and litigation strategy, particularly given the minimal legal complexity of the underlying request.

240.    On January 2, 2025, Defendants offered to extend the comment period on the proposed SPA to sixty (60) calendar days following completion of the FOIA production and committed to meeting in person with the Nation—so long as that meeting occurred within the

extension window. Defendants stated that the in-person meeting would need to take place on or before the thirtieth (30th) day of the sixty (60) day extension period. *See* Exhibit 56.

241.    Although Defendants have made productions in response to Plaintiffs' FOIA request, several material issues remain unresolved. Defendants have not satisfied their statutory obligations under the Virginia FOIA, yet nonetheless reissued their policy notice and unilaterally set a new public comment deadline of April 25, 2025—despite knowing that Plaintiffs lacked access to key documents necessary to meaningfully evaluate and respond to the proposed changes.

242.    The February 18, 2025, "Notice of Opportunity for Tribal Comment" to the proposed SPA, signed by Defendant Roberts, improperly characterized substantial policy changes as mere "clarifications." *See* Exhibit 57. This misrepresentation is all the more egregious given that, as early as November 2024, Defendants was aware that CMS had provided definitive guidance confirming that no clarification was needed regarding the permissibility of PCA services under the Tribal Reimbursement SPA. Moreover, services such as dental care were already explicitly covered under the existing Tribal Reimbursement SPA—rendering Defendants' stated need for "clarification" both inaccurate and misleading.

243.    In addition to mischaracterizing the substance of the proposed changes, the February 18, 2025, notice was once again improperly transmitted—this time only to the generic email address "administrator@nansemond.gov." This communication failed to comply with the Nation's posted consultation protocols and designated contact information, violating both federal consultation requirements and the Commonwealth's own Tribal Consultation SPA.

244.    On March 10, 2025, counsel for Defendants informed Plaintiffs' counsel that it had not decided whether to submit the proposed SPA for approval to CMS. At the same time,

Defendants placed the burden on Plaintiffs to affirmatively request an in-person consultation—despite the federal mandate requiring states to proactively engage in meaningful consultation with Tribal governments prior to initiating material Medicaid policy changes. *See* 42 U.S.C. § 1396a(a)(73); 42 C.F.R. § 431.408.

245.    Despite these procedural failures and ongoing uncertainty, Fishing Point continues to provide PCA services to eligible AI/AN and non-AI/AN Medicaid beneficiaries in accordance with the Tribal Reimbursement SPA. In clear retaliation for Plaintiffs' assertion of their legal rights, Defendants continue to withhold all related PCA reimbursement since October 10, 2024—depriving Plaintiffs of payments they are legally entitled to under federal Medicaid law and compounding the financial and operational harm inflicted by Defendants' ongoing noncompliance.

### *Requests for Government-to-Government Consultation with Governor Youngkin*

246.    On February 6, 2025, the Chief of the Nation formally requested government-to-government consultation with Governor Youngkin's office, specifically requesting engagement with the Secretary of the Commonwealth, Kelly Gee, who acts as the Governor's representative on Tribal affairs. *See* Exhibit 58. Governor Youngkin's office confirmed a meeting for February 25. Yet on February 24, after business hours, Secretary Gee abruptly canceled the scheduled consultation without providing any explanation. *See* Exhibit 59.

247.    Then, on February 25, 2025, Defendants' outside legal counsel instructed Plaintiffs' attorneys via email that the Nation's government should cease direct communications with DMAS and Secretary Gee regarding Medicaid and related healthcare matters, stating that all future communications must be directed through McGuireWoods. *See* Exhibit 60.

248.    Counsel for both Plaintiffs and Defendants subsequently met on February 26, 2025.

249.    On February 28, 2025, Plaintiffs learned from Defendants that CMS had completed its Payment Error Rate Measurement ("PERM") audit concerning PCA services provided by Fishing Point. *The CMS PERM auditors determined that not only had Fishing Point billed DMAS correctly for PCA services, but also that DMAS had underpaid Fishing Point for those same PCA services*, payments which had been appropriately billed at the Federal AIR.

250.    CMS's finding of an underpayment necessarily confirms that the PCA service claims submitted by Fishing Point were authorized under the applicable Tribal Reimbursement SPA and that payment at the Federal AIR was mandatory. These payments thus required no additional approvals, SPAs, waivers, or involvement of MCOs.

251.    On March 1, 2025, Plaintiffs' informed Defendants' that they had learned of CMS's findings on February 28, 2025, and emphasized that CMS's position eliminated any uncertainty regarding the authorization and scope of PCA services under the Tribal Reimbursement SPA. Plaintiffs stated clearly that all pending PCA payments needed to be immediately processed and paid. Plaintiffs also proposed a straightforward solution to address Defendants' budgetary concerns, offering to pay the Commonwealth's FMAP share, a practice adopted by multiple other states.

252.    On March 10, 2025, the parties met again. Yet none of the outstanding issues were resolved. Defendants declined to address CMS's conclusions from the PERM audit, the identified underpayments, or Plaintiffs' proposal to cover the Commonwealth's FMAP share.

253.    On March 11, 2025, Plaintiffs discovered that Defendants had knowledge of the CMS PERM audit findings as early as November 2024. Despite being aware of CMS's clear

determination regarding PCA service reimbursements and Defendants' obligations under the

Tribal Reimbursement SPA, Defendants continue to withhold the reimbursement and have not

addressed the underpayments.

254.    As of the date of this complaint, Defendants have failed to release any of the

pending PCA service reimbursements or address the underpayment issue, and they have

provided no explanation or justification for the ongoing delay, causing substantial harm to

Plaintiffs and beneficiaries relying on these essential healthcare services.

255.    Fishing Point has made numerous attempts since March 11, 2025, to contact

Defendants about the CMS PERM audit findings and the unresolved PCA underpayment issues.

*See* Exhibit 61. Defendants have provided no substantive response.

256.    On March 12, 2025, Fishing Point submitted a written request under the Virginia

FOIA to DMAS. *See* Exhibit 62. The request sought routine agency records and communications

related to the Nation, Fishing Point, and other Tribal Health Programs. It specifically requested

documents concerning the CMS PERM audit conducted by CMS. Fishing Point limited the

request to the relevant time frame and directed it to several known sources, including DMAS,

CMS, legislative budget staff, and Empower AI.

257.    Rather than treat the FOIA request as a routine administrative matter, Defendants

escalated its response by again retaining a taxpayer-funded outside law firm, McGuireWoods

LLP. On March 19, 2025, McGuireWoods notified counsel for Fishing Point that it would

represent DMAS in responding to the FOIA request. *See* Exhibit 63. DMAS bypassed its in-

house FOIA coordinator and introduced private counsel into the process, despite the routine

nature of the request.

258.    Defendants' decision to retain private counsel for a basic FOIA response reflects a deliberate and disproportionate response. DMAS does not typically take similar action when non-Tribal Health Programs submit public records requests. By engaging private counsel, Defendants signaled that it viewed Fishing Point—and by extension, the Nation—not as a collaborative healthcare partner but as a legal adversary. This action exemplifies how Defendants continue to treat Tribal entities with hostility, suspicion, and heightened legal defensiveness.

259.    Through this unnecessary escalation, Defendants further demonstrated their pattern of obstructing transparency and retaliating against Tribal Health Programs who attempt to assert their rights under federal and state law. Defendants' response to the FOIA request reinforces their broader practice of using state power to deter Tribal participation in the Medicaid program and to suppress scrutiny of their unlawful actions and treatment of Tribal Health Programs.

**Pending Purgatory: Defendants' "Pending" of Fishing Point's Dental Application**

260.    On or about January 17, 2025, Defendant Lunardi notified Fishing Point via email that Defendants had placed Fishing Point's application for enrollment as a Medicaid dental provider into a "pending" status. *See* Exhibit 64. Defendant Lunardi explicitly stated Defendants' intention to amend Virginia's Medicaid State Plan to exclude Tribal dental services from receiving the Federal AIR and that the application would remain stalled until this amendment was completed. Lunardi wrote:

> … DMAS intends to amend its state plan to clarify that dental services provided by tribal clinics are not reimbursed at the all-inclusive rate … we are pending your request until that process is complete.

> *Id.* at 1.

261.    By assigning Fishing Point's dental enrollment application to an indefinite "pending" status, Defendants intentionally obstructed Fishing Point's ability to provide critical dental healthcare services to Tribal citizens, other AI/AN beneficiaries, and AI/AN and non-AI/AN Medicaid recipients. This indefinite suspension—without issuing a formal denial or providing a clear resolution timeline—is deliberately structured to deprive Fishing Point of a formal decision that it could administratively appeal or otherwise challenge.

262.    Defendant Lunardi's January 17, 2025, email also misleadingly implied an alternative enrollment pathway, suggesting Fishing Point could enroll through DentaQuest, DMAS's dental program administrator, stating, "If you wish to enroll as a dental provider before the plan amendment is finalized, you can enroll through DentaQuest…and be reimbursed at the posted Virginia DentaQuest rates."

263.    This assertion was false. Fishing Point had already followed Defendants' earlier directive and submitted its application through DentaQuest. But Defendants and DentaQuest lacked any existing administrative procedure or infrastructure to facilitate enrollment for Tribal Health Programs. Consequently, DentaQuest was forced to develop entirely new administrative processes specifically for Fishing Point's application. Even after completing these administrative adjustments, DentaQuest ceased responding to Fishing Point's numerous follow-up inquiries, effectively shutting down communication and leaving Fishing Point unable to complete its enrollment.

264.    These delays were not accidental. On July 31, 2024, Defendants indicated they were going to tell DentaQuest to "sit tight" and refrain from taking any further steps on Plaintiffs' application—effectively predetermining that the application would not proceed. *See* Exhibit 27. By the time of Defendant Lunardi's January 17, 2025, email, Defendants had also

acknowledged that Tribal Health Programs intended to begin offering dental services, including orthodontia, by October 2024, and noted that the existing Tribal Reimbursement SPA referenced "certain dental services." Defendants concluded that it appears "obligated to allow [Tribal Health Programs] to bill" for dental services yet failed to take any action to support enrollment. *See* Exhibit 40 at 2.

265.    Defendants' representation of an "alternative" enrollment pathway through DentaQuest was thus a procedural mirage. Plaintiffs complied fully with each step prescribed by Defendants, only to remain systematically excluded from participation. Defendants' deliberate creation of administrative obstacles—combined with their refusal to respond or provide a meaningful path forward—reflects a calculated strategy to bar Plaintiffs from Virginia's Medicaid dental program, thereby denying Medicaid-eligible individuals access to essential dental care.

266.    This situation extends beyond an ordinary administrative delay—it represents a targeted and strategic effort by Defendants to exclude a Tribal Health Program from a public program designed explicitly to serve vulnerable populations. Defendants' indefinite suspension of Fishing Point's application is a clear attempt to circumvent due process, depriving Fishing Point of the administrative right to challenge a formal denial or final determination.

267.    Plaintiffs' dental facility is already complete, fully equipped, and fully staffed with a licensed dentist, dental hygienist, and support team. The clinic has four (4) dental chairs and can serve forty-eight (48) patients per day. The clinic is prepared to begin serving patients immediately, yet is unable to do so. The consequences of Defendants' indefinite "pending" status are immediate and severe. Tribal citizens—including children and elders—and other Medicaid-eligible patients in underserved areas are being deprived of crucial dental care. Without timely

access to dental services, children suffer preventable oral health problems, elders endure

untreated dental conditions, and other patients face escalating dental emergencies—harms that

directly result from Defendants' deliberate withholding of Fishing Point's enrollment, including

Defendant Youngkin, whose personal net worth of an estimated $440 million likely precludes his

need to worry about affordable dental care.

268.    Moreover, Defendants' actions illegally deprive Plaintiffs of the Federal AIR for

dental services. Fishing Point, as a Tribal Health Program operating under ISDEAA and

recognized by Virginia's Medicaid State Plan, is entitled by federal law to receive the Federal

AIR for services provided to Medicaid beneficiaries, including dental services, a fact known by

Defendants. *See* Exhibit 40.

269.    By preventing Plaintiffs from obtaining approved provider status, Defendants

have blocked Plaintiffs' receipt of legally mandated federal payments. This withholding creates

significant financial strain on Plaintiffs, undermining its ability to sustain and expand vital

healthcare services for Tribal communities and other Medicaid beneficiaries.

270.    Defendants' reliance on speculative future policy changes—such as the

unapproved and uncertain amendment to the State Medicaid Plan—as justification for

indefinitely holding Plaintiffs' application violates established federal Medicaid law. Federal

regulations explicitly require states to promptly enroll eligible providers and prohibit states from

imposing unauthorized conditions or delays based on anticipated or unapproved policy

amendments. 42 U.S.C. § 1396a(a)(8) (requiring Medicaid services to be provided with

'reasonable promptness'); and 42 C.F.R. § 431.110(b) (prohibiting states from imposing

unauthorized enrollment restrictions or conditions). Defendants' actions amount to an improper

attempt to assume federal authority, effectively bypassing the oversight of CMS and Congress in

Medicaid policy-making. Rather than pursuing legitimate federal approval for State Plan Amendments, Defendants have chosen to evade the regulatory process by indefinitely suspending Plaintiffs' enrollment, obstructing lawful avenues for challenge, and undermining federally mandated Tribal healthcare protections under the Medicaid Act, ISDEAA and IHCIA.

271.    Defendants' conduct reveals an intent to disrespect the Nation's sovereignty and treat Tribal Health Programs as inferior participants in Virginia's Medicaid program. By deliberately withholding enrollment, misleading Fishing Point with false procedural assurances, and denying any meaningful administrative recourse, Defendants blatantly disregard established federal statutes designed specifically to protect Tribal sovereignty and healthcare access.

272.    Defendants' intentional obstruction through procedural manipulation and non-responsiveness demonstrates a blatant disregard for federal Medicaid requirements and foundational principles of federal Indian law. Defendants' actions systematically undermine the ability of Tribal Health Programs like Fishing Point to deliver critical healthcare services, directly harming the health and welfare of Tribal citizens and other vulnerable Medicaid beneficiaries.

273.    To date, Defendants have not unpended Plaintiffs dental application and Defendants will not return Plaintiffs' calls related to this dental application.

### *Virginia's Budget Amendment: A Legally Deficient and Intentional Attack on Tribal Healthcare Rights*

274.    On February 4, 2025, the Virginia Senate released the half-sheet for their proposed budget amendment, requiring Tribal Health Clinics to be reimbursed at the rates paid to non-Tribal health providers unless the funding was a one hundred percent (100%) FMAP. *See* Exhibit 65.

275.     In response to this proposed amendment, Plaintiffs promptly provided comprehensive educational materials and explanations to every member of the Virginia House and Senate budget committees. *See, e.g.*, Exhibit 66. Plaintiffs highlighted significant issues posed by this amendment and reiterated their willingness to help the Commonwealth address any budgetary concerns. The amendment purports to allow Defendants to enact funding reductions "upon passage of this Act, and prior to the completion of any regulatory process," clearly intending to evade federal scrutiny, Tribal consultation requirements, and CMS approval.

276.     Despite Plaintiffs' substantial advocacy and educational efforts, the Virginia House and Senate proceeded to pass the budget amendment with slight modifications. The General Assembly included this amendment in Item 288 #16c of House Bill 1600. Exhibit 67.

277.     On March 24, 2025, Defendant Youngkin returned House Bill 1600 to the General Assembly with a recommendation to insert additional language imposing further restrictions on reimbursement for Tribal Health Programs. Specifically, he proposed: "If the above rate structure is not approved by the Centers for Medicare and Medicaid Services, then DMAS shall seek approval to reimburse IHS facilities, tribal clinics and tribal FQHCs at the standard Medicaid rate for all services."

278.     Defendant Youngkin states in the explanation that this proposed language "clarifies that services provided to non-tribal members should be paid based on the DMAS standard rate methodology," rather than the Federal AIR. However, this amendment—like the prior version to which it seeks to add—continues to impose an impermissible payment distinction based on whether a patient is characterized as "tribal" or "non-tribal." Although "tribal" is not a legally accurate term of art, the proposed amendment merely repackages the same legally flawed approach: reimbursing Tribal Health Programs at different rates depending

on whether the patient is AI/AN. As such, it raises the same legal concerns as the original budget provision, including violations of federal law. The amendment and proposed language are publicly available at: https://budget.lis.virginia.gov/amendment/2025/1/HB1600/Enrolled/GR/.

279.    Defendant Youngkin proposed this restrictive language without conducting the required consultation with affected Tribal Nations or IHS, and without seeking or securing federal approval from CMS. These amendments, including Defendant Youngkin's additional language, violate numerous provisions of the Medicaid Act, ISDEAA, IHCIA, and federal regulations. Defendant Youngkin's proposal reflects a deliberate attempt to circumvent federal law. Rather than removing the unlawful rate distinction based on whether a patient has AI/AN status—a provision he evidently recognized as legally indefensible—he attempted to replace it with a similarly unlawful reimbursement limitation aimed at achieving the same unlawful objective. His actions reflect a deliberate and informed effort to impose reimbursement restrictions on Tribal Health Programs that are not permitted under federal law.

280.    Defendant Youngkin also rejected Plaintiffs' lawful and practical proposal to address Virginia's budgetary concerns by offering to cover the state's FMAP share, confirming that the true objective behind the amendment is to reduce federally mandated Medicaid reimbursements to Tribal Health Programs rather than achieving genuine fiscal responsibility.

281.    This endorsed amendment substantially changes Medicaid reimbursement structures by limiting Federal AIR reimbursements exclusively to AI/AN Medicaid beneficiaries eligible for one hundred percent (100%) FMAP. Non-AI/AN Medicaid patients at Tribal facilities will now be reimbursed at lower "standard" Medicaid rates. This bifurcated system directly conflicts with federal law, specifically the "one facility, one rate" policy designed to ensure comprehensive Tribal healthcare services for all Medicaid beneficiaries.

282.    The Virginia General Assembly misleadingly characterized this significant policy shift as a "clarification," and so did Defendant Youngkin. Similarly, Defendants' February 18, 2025, Notice of Opportunity for Tribal Comment falsely depicted their proposed SPA as a mere clarification, inaccurately claiming Federal AIR reimbursement had never applied to pharmacy, dental, transportation, and 1915(c) waiver services. This proposed SPA was contrary to Defendants' prior practice of reimbursing these services at the Federal AIR and contradicted the CMS PERM findings that Plaintiffs correctly billed for PCA services, which Defendants had underpaid.

283.    Defendant Youngkin's characterization of this significant reimbursement policy change as a mere clarification is both factually inaccurate and legally indefensible. The amendment introduces new reimbursement restrictions that explicitly violate Virginia's federally approved State Medicaid Plan and federal Medicaid statutes and severely undermine Tribal Health Programs.

284.    By labeling this significant policy shift as a "clarification," Defendant Youngkin aimed to bypass federally mandated consultation procedures and regulatory oversight.

285.    The fiscal impact of the amendment underscores its true nature as a major budget cut specifically targeting Tribal Health Programs. Virginia's financial estimates indicate reductions totaling thirty million forty thousand dollars ($30.4 million) from the general fund and six million ninety thousand dollars ($6.9 million) from non-general funds in FY2026, shifting significant costs onto Tribal Health Programs and forcing potential reductions in essential healthcare services.

286.    Moreover, this amendment improperly shifts the administrative responsibility for identifying AI/AN Medicaid enrollees onto Tribal healthcare providers, a duty legally and

administratively assigned to the state Medicaid agency. *See* 42 U.S.C. § 1396a(a)(5); 42 C.F.R.

§§ 435.902, 435.907(a), 435.910(a); CMS SHO #21-004 (Sept. 28, 2021). This shift seeks to use

Tribal Health Programs as a scapegoat for administrative errors made by DMAS, exacerbating

the Commonwealth's existing funding shortfalls.

287.    Defendant Youngkin's actions reflect a clear failure to meet federal consultation

obligations and an intention to circumvent federal law. Federal law explicitly requires

meaningful consultation with Tribal Nations before Medicaid policy changes affecting Tribal

Health Programs. Defendant Youngkin's disregard for this obligation has created confusion and

instability within Tribal Health Programs.

288.    These administrative deficiencies and errors could have been addressed had

Defendant Youngkin conducted the required Tribal consultation and legal reviews. Instead, the

amendment was rushed through the legislative process without necessary scrutiny, demonstrating

procedural negligence.

289.    The restriction placed solely on Tribal Health Programs directly violates federal

policy objectives under ISDEAA, IHCIA, and the Medicaid Act, which aim to ensure equitable

healthcare access for all Medicaid beneficiaries.

***March Madness - Retaliation by Red Tape***

290.    On March 24, 2025, Defendants provided notice to Plaintiffs that it was again

seeking to impose a restrictive framework on Tribal Health Programs that arbitrarily limits the

scope of Medicaid-reimbursable services and conditions participation on enrollment in narrowly

defined provider types. *See* Exhibit 68–69. Specifically, the Commonwealth asserts that "[c]linic

services are limited to outpatient medical and behavioral health services," and that "[d]ental,

pharmacy, home health, hospice, physical therapy, occupational therapy, speech language

pathology, transportation, 1915(c) waiver services, and community mental health services" are categorically excluded unless the provider "enroll[s] as the correct provider type and abide[s] by the state plan requirements for those services." Exhibit 68 at 1–2.

291.    This policy exceeds Defendants' lawful authority under federal Medicaid law and directly conflicts with the CMS most recent interpretive guidance, including the 2025 SPA template and associated documentation, as described in Exhibit 70.

292.    The SPA template in Exhibit 70 was developed to assist states in implementing the optional clinic service benefit authorized under 42 U.S.C. § 1396d(a)(9) and its implementing regulation, 42 C.F.R. § 440.90. While states may elect to offer this benefit, nothing in the guidance permits a state to unilaterally narrow the federally authorized scope of services provided by IHS or Tribal Health Programs. The CMS guidance expressly recognizes that services furnished by Tribal Health Programs under ISDEAA, are eligible for Medicaid reimbursement outside the four walls of the clinic pursuant to 42 C.F.R. § 440.90(c).

293.    Contrary to Defendants' position, Exhibit 70 makes clear that the SPA template is a facilitative administrative tool, not a mandatory directive nor a source of substantive limitations on the services that Tribal Health Programs may provide under federal law. The document was issued to assist states in updating their Medicaid state plans to reflect new coverage flexibilities authorized by CMS in the final rule published at 89 Fed. Reg. 85436, 85682 (Nov. 27, 2024) (CMS-1809-FC). That rule codified the "four walls" exceptions at 42 C.F.R. § 440.90(c)–(e), expressly recognizing that Medicaid coverage extends to clinic services furnished by personnel outside the physical premises of Tribal, behavioral health, and certain rural clinics, when provided under the direction of a physician.

294.    Exhibit 70 does not authorize states to curtail or condition the scope of federally guaranteed services offered by Tribal Health Programs. Nor does it allow states to refuse reimbursement for such services based on internal definitions of clinic provider types or enrollment categories. Instead, it confirms that Tribal Health Programs operating under ISDEAA are entitled to coverage for offsite clinic services, and that states must reflect this coverage in their SPAs only to the extent necessary to implement federal requirements. Nothing in the SPA template permits states to exclude covered services, impose duplicative provider enrollment standards, or restrict Tribal Health Programs from accessing Medicaid reimbursement for services authorized under 42 C.F.R. § 440.90(c) and related federal law.

295.    Despite this, Defendants have mischaracterized both the purpose and legal effect of Exhibit 70. Defendants assert: "In the completed SPA template, DMAS is required to define the scope of tribal clinic services and to confirm that clinic services can be provided outside of the four walls of the clinic. DMAS intends to clarify that the scope of tribal clinic services is the same as for non-tribal clinics. DMAS will also confirm in the completed SPA template that IHS and tribal clinic services can be provided outside of the clinic." Exhibit 69 at 2. This statement is legally erroneous and internally contradictory. First, the SPA process described in Exhibit 70 does not require states to define Tribal clinic services identically to those of non-Tribal clinics. Tribal Health Programs are entitled under federal law to provide and be reimbursed for a broader scope of services—including offsite services—by operation of 42 C.F.R. § 440.90(c) and ISDEAA, irrespective of whether the state covers such services under its general clinic benefit. Second, while Defendants claim to "confirm" that IHS and Tribal clinics may provide offsite services, they simultaneously state an intent to equate the scope of Tribal and non-Tribal clinic services—an approach that would effectively negate the mandatory federal protections that apply

exclusively to Tribal clinics. This contradiction underscores Defendants' unlawful effort to subordinate federal rights to state-defined categories and enrollment constructs.

296.    Accordingly, Defendants' attempt to use the SPA process to limit the scope of Tribal clinic services or impose duplicative enrollment barriers is not only unauthorized—it is preempted under the Supremacy Clause and violates multiple provisions of federal law, including: 25 U.S.C. § 1621t, which prohibits states from imposing licensure requirements on Tribal health professionals that are not imposed on IHS providers; 42 U.S.C. § 1396a(a)(8), requiring that assistance be provided with reasonable promptness to all eligible individuals; 42 U.S.C. § 1396a(a)(30)(A), requiring equal access to care and services; and 42 C.F.R. § 440.90(c), which mandates coverage for offsite services furnished by Tribal clinic personnel under physician direction.

297.    Defendants' position undermines the federal policy framework designed to ensure equitable access to Medicaid services for AI/AN communities and interferes with the statutory rights of Tribal Health Programs to operate free from unlawful state constraints.

298.    Defendants' effort to use the SPA template as a mechanism to roll back the availability of federally guaranteed protections for Tribal Health Programs to an artificial effective date of January 1, 2025 further underscores the unlawfulness of their position. The rights of Tribal Health Programs to furnish offsite services under 42 C.F.R. § 440.90(c) are not contingent on state SPA filings or on CMS-1809-FC's effective date. Rather, they flow directly from federal law and became enforceable upon finalization and codification of the rule. Any attempt by Defendants to delay, condition, or retroactively deny reimbursement for federally authorized Tribal services provided after that date violates federal law and frustrates the purpose of the regulatory protections adopted by CMS.

299.    **On March 31, 2024, Defendants took an unprecedented and egregiously unlawful action: they froze virtually every Medicaid claim submitted by Plaintiffs, totaling approximately $1.7 million for just one week of services rendered by Fishing Point**. These claims were not hypothetical or anticipatory—they reflected medical and behavioral health services already furnished to Medicaid beneficiaries by Plaintiffs. Defendants placed these claims into an indefinite "pended" status, halting all reimbursement without lawful cause or process. This was not an administrative oversight or technical malfunction. It was a deliberate act of retaliation taken in response to Plaintiffs' assertion of their federal legal rights, including their refusal to submit to unlawful limitations on Tribal Health Program services imposed by Defendants in contravention of federal law. The freeze was a coercive attempt to pressure Plaintiffs into compliance by depriving them of critical operating revenue.

300.    Defendants did not identify any fraud, billing anomaly, or program integrity concern that could justify withholding payment. Instead, they deliberately exploited the claims system to freeze over 7,650 valid claims, without issuing any formal denial, written notice, or access to appeal. Their stated reason—"unable to assign object code"—is both vague and demonstrably pretextual, as substantively identical claims had been routinely paid in the weeks prior. *See* Exhibit 71. In addition, Plaintiffs learned that all of their pharmacy claims, which are processed through a separate system, were outright denied under the code "0882 — drug edit not found." These pharmacy claims total approximately 161 in number. When Plaintiffs inquired about the state's action, Defendants declined to confirm that full reimbursement will be made or when.

301.    Upon information and belief, the Upper Mattaponi Tribe's Tribal Health Program was paid for comparable claims submitted during the same week, further underscoring the arbitrary and retaliatory nature of Defendants' conduct.

## CLAIM I – VIOLATION OF THE SUPREMACY CLAUSE

302.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 302 as if fully set forth herein.

303.    The Supremacy Clause, U.S. CONST. art. VI, cl. 2, establishes that federal law is the "supreme Law of the Land," preempting any conflicting state law, regulation, or administrative action. State officials cannot lawfully enforce policies that contravene federal law or undermine congressionally mandated protections.

304.    A claim under the Supremacy Clause requires: (1) a federal law governing Medicaid or ISDEAA contracts; (2) a state law, regulation, or official act that conflicts with and is preempted by federal law; (3) an ongoing violation of federal law by state officials; and (4) harm to Plaintiffs resulting from the conflicting state action.

305.    Federal laws governing Medicaid and Tribal healthcare include: (1) the Medicaid Act, 42 U.S.C. §§ 1396 *et seq*., which mandates prompt and equitable reimbursement for covered services, including through provisions such as 42 U.S.C. §§ 1396a(a)(8), (13)(A), and (37); (2) ISDEAA, 25 U.S.C. §§ 5301–5423, which protects Tribal self-governance and prohibits state interference with Tribal Health Programs, including 25 U.S.C. §§ 5302, 5321(a)(1), and 5326; (3) IHCIA, 25 U.S.C. §§ 1601–1683, which ensures comprehensive Tribal healthcare delivery, including 25 U.S.C. §§ 1621e, 1621t, 1642, and 1680c; (4) federal Medicaid regulations that mandate Tribal Health Program participation without additional state-imposed burdens,

including 42 C.F.R. §§ 431.110(b), 431.408(b), 447.45, 447.56(a)(1)(x), and 438.14; (5) 42

C.F.R. § 440.90(c), which recognizes Tribal and IHS clinics as distinct Medicaid provider types,

exempts them from state licensure requirements, and implements the "four walls" exception,

permitting reimbursement for services furnished outside the physical clinic, including by contract

providers; (6) 42 C.F.R. § 455.104, which governs provider screening and enrollment standards

and prohibits arbitrary delays in provider participation; (7) 42 U.S.C. § 1396a(a)(23), which

guarantees Medicaid beneficiaries the freedom to choose any qualified provider, including Tribal

Health Programs; (8) 42 U.S.C. § 1396a(a)(5), which requires a single state agency to administer

the Medicaid program and bars delegation of core responsibilities to outside entities; (9) 42

U.S.C. § 1396a(a)(73) and 42 C.F.R. § 431.408(b), which require states to engage in meaningful

Tribal consultation prior to Medicaid policy changes affecting Tribal Health Programs; (10) 25

U.S.C. § 1680c(c)(2), which authorizes Tribal Health Programs to serve both AI/AN and non-

AI/AN Medicaid beneficiaries without penalty or loss of reimbursement; (11) binding federal

guidance, including SHO Letter #16-002 (Feb. 26, 2016) and CMS FAQ #11817 (Apr. 2017),

which confirm that Tribal Health Programs may receive reimbursement at the Federal AIR, must

be treated as a distinct provider type, and may not be subject to duplicative licensure or

reclassification requirements imposed by states; and (12) Virginia's State Medicaid Plan,

including the Tribal Reimbursement SPA.

    306.    Defendants have enacted and enforced and continue to enforce conflicting state

actions, including:

    a.  Beginning on or about October 10, 2024, Defendants began unlawfully withholding

        Medicaid reimbursements for PCA services furnished by Fishing Point. Fishing Point

        submitted these claims in accordance with its designation as a "Tribal Health Clinic"

under Virginia's CMS-approved Tribal Reimbursement SPA and consistent with federal law. The Medicaid Act requires payment for services at a rate consistent with efficiency, economy, and quality of care. *See* 42 U.S.C. § 1396a(a)(13)(A). Tribal Health Programs operating under an ISDEAA agreement are entitled to reimbursement under the state plan. *See e.g.*, 42 U.S.C. § 1396j(d). CMS policy—articulated in SHO #16-002 (Feb. 26, 2016) and CMS FAQ #11817 (Apr. 2017)—reaffirms that Tribal clinics billing at the Federal AIR must receive payment at that rate for all Medicaid services provided, regardless of the beneficiary's AI/AN status.

b. Fishing Point submitted valid, correctly coded "clean claims" for PCA services, and by November 2024, Defendants had acknowledged internally that these claims were legally sound and eligible for payment at the Federal AIR. Despite that knowledge, Defendants continued to hold the claims in "pending" status indefinitely and refused and continue to refuse to issue payments. These actions violate not only the federal reimbursement mandate but also CMS regulations requiring timely processing and payment of clean claims. *See* 42 C.F.R. §§ 447.45, 455.104. They further conflict with 42 C.F.R. § 440.90(c), which confirms that Tribal Health Programs must be reimbursed for services rendered under their federal designation and exempts them from additional state-imposed requirements. Defendants' continued withholding of payment constitutes an intentional violation of federal law, with no legal justification, and imposes substantial financial harm on Fishing Point.

c. Since at least January 17, 2025, Defendants have unlawfully blocked Fishing Point's enrollment as a Medicaid dental provider by placing its application in indefinite "pending" status. Defendants claim this delay stems from an anticipated amendment to

Virginia's Medicaid State Plan—a proposal that remains unapproved by CMS and has no legal effect. The Medicaid Act prohibits such open-ended enrollment delays and requires states to act with reasonable promptness in processing provider applications. *See* 42 U.S.C. § 1396a(a)(8); *see also* 42 C.F.R. § 431.107 and § 455.104.

d. Fishing Point qualifies as a Medicaid provider under federal law and CMS guidance. As a Tribal Health Program operating under an ISDEAA contract, Fishing Point holds federal authority to deliver outpatient services—including dental care—without duplicative state licensure. *See* 25 U.S.C. §§ 1621t, 1642; 42 C.F.R. § 440.90(c). Defendants' indefinite delay violates these authorities and unreasonably prevents Fishing Point from delivering essential dental services to both AI/AN and non-AI/AN Medicaid beneficiaries, contrary to the rights guaranteed under 42 U.S.C. § 1396a(a)(23) and 25 U.S.C. § 1680c(c)(2). The delay also directly undermines Virginia's approved State Medicaid Plan and Tribal Reimbursement SPA, which obligates the Commonwealth to reimburse Fishing Point for all qualified services at the Federal AIR.

e. On March 24, 2024, Defendant Governor Youngkin endorsed Virginia's biennial budget amendment (Item 288 #16c, HB1600), which unlawfully restricts Medicaid reimbursement for Tribal Health Programs based on the AI/AN status of the patient. The amendment conditions payment at the Federal AIR on the patient's AI/AN status—an approach that Congress expressly prohibited. *See* 42 U.S.C. § 1396j(d); 25 U.S.C. § 1680c(c)(2); SHO #16-002; FAQ #11817.

f. In adopting this amendment, Defendants failed to engage in meaningful Tribal consultation, as required by 42 U.S.C. § 1396a(a)(73) and 42 C.F.R. § 431.408(b).

Defendants also failed to obtain CMS approval, as required before implementing any change to Tribal reimbursement policy under the State Plan. These failures render the amendment unenforceable under federal law. By attempting to condition payment on patient status and bypassing required federal procedures, Defendants have acted in direct violation of the Supremacy Clause, Medicaid Act, ISDEAA, IHCIA, and applicable CMS regulations.

g. Beginning on or about March 31, 2025, Defendants began unlawfully withholding virtually all Medicaid reimbursements for services furnished by Fishing Point by placing the associated claims in indefinite "pending" status without legal justification. These services were furnished in compliance with Fishing Point's designation as a Tribal Health Program under an ISDEAA agreement and submitted as valid, clean claims in accordance with federal billing and reimbursement requirements. The Medicaid Act mandates prompt and accurate payment of such claims. *See* 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 447.45(d)(2). Moreover, CMS regulations prohibit states from imposing additional requirements on Tribal Health Programs or delaying payment based on unapproved changes to the State Plan. *See* 42 C.F.R. §§ 431.107(b), 455.104, 440.90(c). Defendants' blanket withholding of payment—without any identified deficiency in the claims or lawful basis for delay—constitutes an intentional and ongoing violation of federal law, resulting in severe financial harm to Fishing Point and impeding the delivery of critical health services to Medicaid beneficiaries.

307.     The U.S. Supreme Court has consistently affirmed federal preemption of state policies interfering with Tribal sovereignty and Medicaid administration, particularly in *White Mountain Apache Tribe*, 448 U.S. at 148–49; *Ramah Navajo School Board*, 458 U.S. at 843–44;

and *Cabazon Band of Mission Indians*, 480 U.S. at 216–19. Federal courts uniformly hold that states must strictly adhere to federally approved Medicaid plans. *See Harris*, 448 U.S. at 301; *Wilder*, 496 U.S. 498, 510–12; *Antrican*, 290 F.3d, at 186–88.

308.    Defendants have implemented—and continue to implement—significant Medicaid policy changes without engaging in the mandatory Tribal consultation required under 42 U.S.C. § 1396a(a)(73) and 42 C.F.R. § 431.408(b), and without securing the required prior approval from CMS. In each instance, Defendants materially altered the eligibility, classification, or reimbursement terms applicable to Fishing Point without providing notice to the Nation, without conducting the consultation mandated by federal law, and without obtaining CMS approval for any State Plan amendment. Specifically, by November 2024, CMS PERM auditors explicitly confirmed that Fishing Point's PCA claims were correctly billed and underpaid. Despite that confirmation, Defendants continue to withhold reimbursement for those services in violation of the Medicaid Act and the approved Tribal Reimbursement SPA. Defendants also continue to block Fishing Point's enrollment as a dental provider, maintaining its application in indefinite "pended" status based on a speculative policy change that remains unapproved by CMS. At no point have Defendants reversed or rescinded these unauthorized policies. Instead, they continue to enforce them against Fishing Point, in ongoing violation of federal consultation requirements and the Supremacy Clause.

309.    Defendants' unlawful encroachments have caused and continue to cause substantial, ongoing, and irreparable harm to Plaintiffs, directly undermining the Nation's sovereign healthcare authority and significantly impairing Fishing Point Healthcare's financial stability and operational capacity. These harms continue to accrue daily.

310.    Defendants' continued withholding of Medicaid reimbursements has triggered severe financial instability, forcing Plaintiffs to divert scarce Tribal resources from critical patient care to sustain basic operations. This financial hardship directly results in staffing shortages, disruption of essential healthcare services, and the suspension or significant delay of previously planned facility expansions, directly undermining the provision of culturally competent care to AI/AN beneficiaries and Medicaid patients.

311.    Defendants' unlawful and prolonged enrollment delays have prevented Plaintiffs from operationalizing fully equipped dental facility. This deprivation has resulted in substantial revenue loss and a pronounced gap in essential dental healthcare services, disproportionately impacting AI/AN Medicaid beneficiaries and exacerbating health disparities in direct contradiction of the purposes of ISDEAA.

312.    Defendants' actions fundamentally erode the Nation's inherent sovereign authority to independently administer healthcare programs, a right explicitly guaranteed by federal law. By encroaching upon these federally protected rights, Defendants have inflicted ongoing harm to the Nation's governance capabilities and compromised its ability to effectively manage healthcare delivery to its citizens.

313.    Since October 10, 2024, Fishing Point has experienced acute financial and operational distress directly attributable to Defendants' actions, including: (a) significant and accumulating losses due to withheld Medicaid reimbursements; (b) persistent financial uncertainty causing delays in critical hiring processes and disruptions to planned expansions of healthcare services; (c) forced diversion of limited Tribal funds away from patient care toward sustaining operational viability; and (d) delayed or canceled employment of essential healthcare providers, severely impacting service continuity and quality of patient care.

314.    Defendants' continued unlawful interference, including unlawful Medicaid enrollment practices and refusal to reimburse at federally mandated rates, has created severe and ongoing harm to Plaintiffs, resulting in: (a) persistent staffing shortages and reductions in available medical services; (b) prolonged denial of Medicaid dental provider enrollment, significantly restricting access to necessary dental care; (c) amplified healthcare disparities for AI/AN patients due to interrupted access to culturally competent and essential healthcare services; (d) fundamental infringement upon Tribal sovereignty and federally recognized authority, directly obstructing the Nation's right and ability to manage and operate healthcare services autonomously, as mandated by Congress.

315.    Defendants' ongoing enforcement of these unlawful policies undermines Tribal sovereignty, contradicts federal healthcare mandates, and violates clear federal law, warranting immediate judicial intervention.

316.    Sovereign immunity does not protect Defendants from suit in this case. By electing to participate in the federal Medicaid program, Defendants waived immunity with respect to claims enforcing conditions attached to federal funding, including the obligation to reimburse Tribal Health Programs in accordance with the federally approved Tribal Reimbursement SPA specifying the Federal AIR. *See Arlington Cent. Sch. Dist.*, 548 U.S. at 296. Sovereign immunity also does not extend to state officials or agencies acting *ultra vires*, beyond the limits of their lawful authority under federal law. *See Papasan v. Allain*, 478 U.S. 265, 277 (1986). Defendants' refusal to pay the required rate conflicts with federal Medicaid law and the approved State Plan. Moreover, where Congress occupies the field—such as in Indian healthcare—state policies that interfere with or undermine federal statutes like ISDEAA and IHCIA are preempted. *See White Mountain Apache Tribe*, 448 U.S. at 148.

317.     Plaintiffs respectfully request that this Court issue a declaratory judgment finding that Defendants' policies, practices, and budget amendment (Item 288 #16c) violate the Supremacy Clause by conflicting with and being preempted by controlling federal statutes, regulations, and CMS guidance, including the Medicaid Act, 42 U.S.C. §§ 1396j(d), 1396a(a)(5), (8), (13)(A), (23), and (73); ISDEAA, 25 U.S.C. §§ 5302, 5321(a)(1), and 5326; IHCIA, 25 U.S.C. §§ 1601–1683, including 25 U.S.C. §§ 1621e, 1621t, 1642, and 1680c(c)(2); and applicable federal regulations, including 42 C.F.R. §§ 431.110(b), 431.408(b), 440.90(c), 447.45, 455.104, binding CMS guidance (SHO #16-002, FAQ #11817), and Virginia's State Medicaid Plan and Tribal Reimbursement SPA (*see* Exhibit 3).

318.     Plaintiffs respectfully request that this Court issue immediate and permanent injunctive relief prohibiting Defendants from: (a) denying, withholding, delaying, or reducing Medicaid reimbursements owed to Fishing Point at the Federal AIR under Virginia's federally approved Tribal Reimbursement SPA (*see* Exhibit 3); (b) continuing to hold Fishing Point's Medicaid provider enrollment, including its dental provider application, in indefinite "pended" status based on speculative or unapproved State Plan Amendments; (c) enforcing any aspect of Virginia's budget amendment (Item 288 #16c) that conditions or limits reimbursement based on a patient's AI/AN status or FMAP eligibility; and (d) implementing or continuing to enforce any Medicaid policy change affecting Tribal Health Programs without first conducting meaningful and timely Tribal consultation in compliance with 42 U.S.C. § 1396a(a)(73), 42 C.F.R. § 431.408(b), and governing CMS policy.

319.     Plaintiffs respectfully request that this Court issue immediate injunctive relief directing Defendants to: (a) unpend all claims; (b) pay all outstanding and unlawfully withheld clean claims submitted by Fishing Point, including those for PCA services that CMS confirmed

were correctly billed and underpaid; (c) make an immediate and final determination on Fishing Point's pended dental provider application; and (d) refrain from initiating or enforcing any further policies or practices that conflict with federal law or violate Fishing Point's rights under the approved Tribal Reimbursement SPA.

320.    Plaintiffs respectfully request that the Court award their attorneys' fees and litigation costs pursuant to applicable federal law.

321.    Plaintiffs further respectfully request such other and further equitable relief as the Court deems just and proper.

### CLAIM II – INTERFERENCE WITH INDIAN SELF-DETERMINATION AND EDUCATION ASSISTANCE ACT (ISDEAA) CONTRACT

322.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 302 and 310–315 as if fully set forth herein.

323.    Congress enacted ISDEAA explicitly to support Tribal sovereignty and self-governance, allowing federally recognized Tribal Nations to assume responsibility for federal healthcare programs previously administered by IHS. Under ISDEAA, Tribal Health Programs such as Fishing Point operate pursuant to a 638 Contract that confer the legal authority to deliver services independently of state control. *See* 25 U.S.C. §§ 5302, 5321(a)(1); *see also* 25 U.S.C. § 5304(l) (defining "Tribal organization" authorized to contract with the federal government).

324.    Federal law prohibits states from interfering with the lawful operation of ISDEAA programs. *See* 25 U.S.C. § 1642 (barring states from imposing conditions on Tribes that would not apply to IHS directly). ISDEAA programs must be treated as equivalent to IHS facilities for purposes of Medicaid participation. *See* 42 U.S.C. § 1396j(d) (requiring that state plans reimburse services provided by Tribal organizations operating under ISDEAA contracts). These

protections extend to all patients served by Tribal Health Programs, regardless of their AI/AN status. *See* 25 U.S.C. § 1680c(c)(2).

325.    CMS regulations and policy further reinforce these statutory protections. *See* 42 C.F.R. § 440.90(c) (recognizing Tribal and IHS clinics as a distinct Medicaid provider type exempt from state licensure and eligible for reimbursement for services furnished beyond the physical facility); *see also* 42 U.S.C. § 1396a(a)(5) (prohibiting states from delegating core Medicaid administrative responsibilities to providers). CMS guidance likewise prohibits states from undermining Tribal Health Program status or interfering with Tribal access to the Federal AIR. *See* SHO Letter #16-002 (Feb. 26, 2016); CMS FAQ #11817 (Apr. 2017).

326.    To establish an ISDEAA interference claim, Plaintiffs must demonstrate: (a) the existence of a valid ISDEAA Title I Contract; (b) specific state actions interfering with the execution of the Contract; (c) direct conflict between the state actions and federal law; and (d) the resulting harm to the Tribal Nation or its healthcare operation(s).

327.    The U.S. Supreme Court has long recognized federal preemption of state actions that infringe on federal laws protecting Tribal self-governance, including ISDEAA agreements. *See White Mountain Apache Tribe*, 448 U.S. at 149; *Ramah Navajo Sch. Bd., Inc.*, 458 U.S. at 843–44.

328.    Sovereign immunity does not protect Defendants from suit in this case. By electing to participate in the federal Medicaid program, Defendants have waived immunity with respect to claims enforcing conditions attached to federal funding, including the obligation to reimburse Tribal Health Programs in accordance with the federally approved Tribal Reimbursement SPA specifying the Federal AIR. *See Arlington Cent. Sch. Dist.*, 548 U.S. at 296. Sovereign immunity also does not extend to state officials or agencies acting *ultra vires*, beyond

the limits of their lawful authority under federal law. *See Papasan*, 478 U.S. at 277. Defendants' refusal to pay the required rate conflicts with federal Medicaid law and the approved State Plan. Moreover, where Congress has occupied the field—such as in Indian healthcare—state policies that interfere with or undermine federal statutes like ISDEAA and IHCIA are preempted. *See White Mountain Apache Tribe*, 448 U.S. at 148.

329.     On or about January 1, 2023, the Nation entered into a valid Title I ISDEAA Contract with IHS, authorizing the Nation—through Fishing Point—to provide comprehensive healthcare services, including primary care, dental care, behavioral health services, and PCA services, under Attachment A and the Annual Funding Agreement of that contract. *See* Exhibits 5–7.

330.     Fishing Point's ISDEAA Title I Contract explicitly authorizes it to provide healthcare services to the Nation's citizens, to other AI/AN beneficiaries, and to both AI/AN and non-AI/AN Medicaid beneficiaries. Federal law treats ISDEAA contractors as legal successors to IHS for purposes of healthcare delivery and program administration. *See* 25 U.S.C. §§ 5302, 5321(a)(1). Under ISDEAA, Fishing Point exercises the same federal authority that IHS would otherwise hold, and its operations are insulated from state laws, regulations, and administrative barriers that would interfere with its federally delegated responsibilities. *See* 25 U.S.C. § 5331(a) (providing for federal enforcement of ISDEAA rights); 25 U.S.C. § 1642 (prohibiting states from imposing additional conditions on Tribes); and 25 U.S.C. § 1680c(c)(2) (permitting Tribal clinics to serve non-AI/AN patients without loss of federal reimbursement rights).

331.     Federal regulations likewise prohibit states from obstructing or interfering with the participation of federally authorized Tribal Health Programs in Medicaid. *See* 42 C.F.R. § 431.110(b) (states must not place restrictions on federally qualified providers); and 42 C.F.R. §

431.408(b) (requiring consultation with Tribes prior to Medicaid policy changes). CMS policy further confirms that Tribal Health Programs may serve as either clinics or FQHCs, bill at the Federal AIR, and are not required to obtain additional licensure or reclassification to participate in Medicaid. *See* SHO Letter #16-002; CMS FAQ #11817. These authorities collectively establish that Fishing Point's legal status as an ISDEAA contractor entitles it to operate free from state-imposed obstacles that contradict federal law.

332.    Defendants, through a pattern of ongoing and systematic conduct, have unlawfully interfered with—and continue to impede—Fishing Point's lawful execution of its ISDEAA Title I Contract by taking actions that directly conflict with federal statutes, regulations, and binding federal guidance. These actions undermine Fishing Point's authority to operate as a federally recognized Tribal Health Program and violate Congress's intent to support Tribal self-governance in the administration of healthcare services:

a. Beginning on or about October 10, 2024, and continuing to the present, Defendants have unlawfully withheld Medicaid reimbursements owed to Fishing Point at Federal AIR for PCA services provided under its ISDEAA contract and Virginia's federally approved Tribal Reimbursement SPA. These services were properly rendered and billed in accordance with federal requirements. Defendants' refusal to reimburse these claims violates multiple federal authorities, including 25 U.S.C. § 1621e (authorizing recovery of reasonable charges for services provided by Tribal Health Programs); 42 U.S.C. § 1396j(d) (requiring that state Medicaid plans reimburse ISDEAA-contracted Tribal Health Programs); 42 U.S.C. § 1396a(a)(13)(A) (mandating Medicaid payment methodologies consistent with efficiency, economy, and quality of care); 42 C.F.R. §§ 440.90(c), 447.45, and 455.104 (recognizing Tribal clinics as a distinct provider type

exempt from licensure and entitled to timely payment for clean claims); and CMS policy statements, including SHO Letter #16-002 (Feb. 26, 2016) and CMS FAQ #11817 (Apr. 2017) (confirming Tribal clinics billing at the AIR must be reimbursed at that rate for all Medicaid services, regardless of the patient's AI/AN status).

b. Since at least January 17, 2025, Defendants have also obstructed Fishing Point's enrollment as a Medicaid dental provider by maintaining its application in indefinite "pended" status based on a speculative and unapproved State Plan Amendment. This delay violates multiple federal provisions, including 42 U.S.C. § 1396a(a)(8) (requiring states to furnish Medicaid assistance with reasonable promptness); 42 C.F.R. §§ 431.107 and 455.104 (establishing clear timelines and criteria for provider enrollment and screening); 25 U.S.C. §§ 1621t and 1642 (prohibiting state licensure and regulatory burdens on Tribal Health Programs); and 42 C.F.R. § 440.90(c) (permitting reimbursement for services furnished by Tribal clinics without regard to state-imposed enrollment or location-based limitations).

c. Defendants also repeatedly fail to meet their obligation to engage in meaningful Tribal consultation before implementing changes to Medicaid policies that affect Plaintiffs. These consultation requirements are mandated under 42 U.S.C. § 1396a(a)(73) (requiring consultation with Indian Tribes regarding Medicaid matters affecting them); 42 C.F.R. § 431.408(b) (establishing specific procedural obligations for Tribal consultation); CMS Tribal Consultation Policy (2011) (requiring states to ensure Tribal input and participation in Medicaid program changes); and Virginia's Tribal Consultation SPA (approved by CMS), which mandates consultation with Tribes prior

to implementing any Medicaid policy or reimbursement changes affecting Tribal Health Programs.

d. Beginning on or about March 31, 2025, Defendants began unlawfully withholding virtually all Medicaid reimbursements for services furnished by Fishing Point by placing the associated claims in indefinite "pended" status without legal justification. These services were furnished in compliance with Fishing Point's designation as a Tribal Health Program under an ISDEAA agreement and submitted as valid, clean claims in accordance with federal billing and reimbursement requirements. The Medicaid Act mandates prompt and accurate payment of such claims. *See* 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 447.45(d)(2). Moreover, CMS regulations prohibit states from imposing additional requirements on Tribal Health Programs or delaying payment based on unapproved changes to the State Plan. *See* 42 C.F.R. §§ 431.107(b), 455.104, 440.90(c). Defendants' blanket withholding of payment—without any identified deficiency in the claims or lawful basis for delay—constitutes an intentional and ongoing violation of federal law, resulting in severe financial harm to Fishing Point and impeding the delivery of critical health services to Medicaid beneficiaries.

e. Despite these obligations, Defendants failed to consult with Plaintiffs before: (1) withholding Medicaid payment for PCA services at the Federal AIR; (2) indefinitely delaying Fishing Point's dental provider enrollment; (3) endorsing Virginia's budget amendment (Item 288 #16c, endorsed March 24, 2024), which unlawfully limits reimbursement based on AI/AN status; and (4) pended virtually of Medicaid reimbursement owed to Fishing Point on March 31. These actions violate the federal

consultation framework and further infringe upon the Nation's rights under ISDEAA and IHCIA.

333.     As detailed extensively in Paragraphs 310–15, Defendants' violations have caused substantial and continuing harm, including severe financial instability, disruption of essential healthcare services, and infringement upon Tribal sovereignty.

334.     Defendants' unlawful interference directly subverts the fundamental federal policies supporting Tribal sovereignty and healthcare self-determination codified in ISDEAA and IHCIA, setting a harmful precedent undermining Tribal Nations' federally protected healthcare rights.

335.     Plaintiffs respectfully request this Court issue a declaratory judgment finding that Defendants' actions—including the unlawful pended and withholding of Medicaid reimbursements owed at the Federal AIR, the indefinite delay of Fishing Point's Medicaid dental provider enrollment, and the endorsement of Virginia's budget amendment (Item 288 #16c)—unlawfully interfere with Plaintiffs' valid ISDEAA contract and violate federal law, including 25 U.S.C. §§ 1621e, 1642, and 1680c(c)(2); 42 U.S.C. §§ 1396j(d), 1396a(a)(5), (8), (13)(A), and (23); 42 C.F.R. §§ 440.90(c), 447.45, 455.104; binding federal guidance, including SHO Letter #16-002 (Feb. 26, 2016) and CMS FAQ #11817 (Apr. 2017); and Virginia's State Medicaid Plan including the Tribal Reimbursement SPA (*see* Exhibit 3).

336.     Plaintiffs respectfully request this Court issue immediate and permanent injunctive relief prohibiting Defendants from: (a) denying, withholding, or delaying Medicaid reimbursements owed to Fishing Point under Virginia's approved Tribal Reimbursement SPA (*see* Exhibit 3), including payments for PCA and other healthcare services authorized under Fishing Point's ISDEAA contract; (b) maintaining Fishing Point's Medicaid dental provider

enrollment in indefinite "pended" status based on speculative or unapproved State Plan Amendments; (c) enforcing any provision of Virginia's budget amendment (Item 288 #16c) that conditions, limits, or otherwise restricts Tribal Health Program reimbursement in conflict with federal statutes, regulations, and CMS guidance; and (d) implementing or continuing to enforce Medicaid policy changes affecting Fishing Point or other Tribal Health Programs without first conducting meaningful and timely Tribal consultation, as required by 42 U.S.C. § 1396a(a)(73), 42 C.F.R. § 431.408(b), CMS Tribal Consultation Policy (2011), and Virginia's approved Tribal Consultation SPA.

337. Plaintiffs respectfully request this Court issue immediate injunctive relief directing Defendants to: (a) unpend and pay all clean claims submitted by Fishing Point for PCA services in accordance with 42 C.F.R. §§ 447.45 and 455.104, including any outstanding underpayments acknowledged by CMS auditors; (b) make an immediate final determination on Fishing Point's Medicaid dental provider enrollment application in accordance with 42 C.F.R. §§ 431.107 and 455.104; and (c) refrain from taking any further actions inconsistent with federal law or that interfere with Fishing Point's federally protected rights under its ISDEAA contract and Virginia's approved Tribal Reimbursement SPA.

338. Plaintiffs respectfully request that the Court award their attorneys' fees and litigation costs pursuant to applicable federal law.

339. Plaintiffs further respectfully request such other and further equitable relief as the Court deems just and proper.

//

//

## CLAIM III – INFRINGEMENT ON TRIBAL SOVEREIGNTY

**(Unlawful Encroachment on the Nation's Self-Governance and Healthcare Authority)**

340.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 302 and 310–315 as if fully set forth herein.

341.     Federally recognized Tribal Nations possess inherent sovereignty, which includes authority to independently govern internal affairs, such as the administration of healthcare programs. Federal common law and preemption doctrines strictly prohibit states from interfering in areas where Congress has comprehensively regulated or where state interference undermines Tribal self-governance. *See White Mountain Apache Tribe*, 448 U.S. at 149; *McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164, 173–79 (1973).

342.     Plaintiffs must demonstrate the following elements to establish infringement on Tribal sovereignty: (1) the Tribal Nation's inherent sovereignty and federal protections over Tribal authority; (2) congressional enactment of a comprehensive federal regulatory scheme preempting state involvement; (3) unlawful state interference or encroachment on the Tribal Nation's self-governance authority; and (4) concrete harm resulting from the state interference.

343.     The Nation is a federally recognized Tribe with inherent sovereign authority to manage its internal affairs, including healthcare programs. In January 2023, the Nation exercised this authority by entering into a valid Title I ISDEAA self-determination Contract with IHS. 25 U.S.C. § 5321(a)(1). Under this federally authorized Contract, the Nation established Fishing Point as its Tribal Health Program, authorized to provide a full range of services including medical, dental, behavioral health, and personal care assistance. *See* Exhibits 5–7. As a Title I Contractor, Fishing Point operates with the same federal authority as IHS and is entitled to all statutory and regulatory protections afforded to IHS and ISDEAA programs, including immunity

from state licensure requirements and eligibility for reimbursement under federally approved State Medicaid Plans. *See* 25 U.S.C. §§ 1642, 1680c(c)(2); 42 U.S.C. § 1396j(d); 42 C.F.R. § 440.90(c).

344.    Congress enacted ISDEAA and IHCIA to affirm and protect the sovereign right of Tribal Nations to assume control over healthcare delivery. These statutes establish a federal policy of promoting Tribal self-governance and prohibit states from imposing regulatory barriers that interfere with the operation of Tribally administered health programs. ISDEAA empowers Tribes to assume responsibility for health services previously operated by the federal government, while IHCIA ensures federal funding and support for comprehensive health services and prohibits states from conditioning reimbursement on duplicative licensure or restrictions that would not apply to IHS. *See* 25 U.S.C. §§ 1621t, 1642, 1680c(c)(2). Together, these statutes occupy the field of Indian healthcare and shield Tribal Health Programs like Fishing Point from conflicting state regulation.

345.    Congress has enacted a comprehensive regulatory framework under ISDEAA and IHCIA to govern healthcare delivery by Tribal Nations and explicitly preempt state regulations that interfere with Tribal healthcare management. Through ISDEAA, Congress authorized Tribal Nations to assume control over federal healthcare services previously administered by IHS and vested them with the same legal authorities as IHS itself. *See* 25 U.S.C. §§ 5301–5423. IHCIA complements this authority by affirming the federal responsibility to provide comprehensive healthcare to AI/AN people and by prohibiting states from imposing licensure or reimbursement restrictions on Tribal clinics. *See* 25 U.S.C. §§ 1601–1683, including §§ 1621t, 1642, and 1680c(c)(2).

346.    Federal regulations further confirm that Tribal Health Programs are a distinct provider type under Medicaid, exempt from state licensure and entitled to reimbursement for services furnished both within and outside clinic walls. *See* 42 C.F.R. § 440.90(c). These authorities make clear that Congress intended to occupy the field of Indian healthcare and prohibit state interference with Tribal operations. *See* 42 U.S.C. §§ 1396j(d), 1396a(a)(5). The U.S. Supreme Court has consistently upheld the preemptive force of federal law in matters affecting Tribal sovereignty and Indian program administration. *See White Mountain Apache*, 448 U.S. at 148–49 (preempting state regulation where federal interests in Tribal self-governance are comprehensive and pervasive); *Ramah Navajo Sch. Bd., Inc.* 458 U.S. at 843–44; *Cabazon Band of Mission Indians*, 480 U.S. at 216–19.

347.    Defendants continue to unlawfully encroach upon the Nation's sovereign authority to manage and operate its healthcare program through specific, ongoing actions that directly conflict with ISDEAA, IHCIA, the Medicaid Act, and binding CMS policy. These actions constitute direct interference with the Nation's exercise of federally delegated healthcare authority and threaten the viability of its Tribal Health Program:

a.  Since at least January 17, 2025, Defendants have obstructed Fishing Point's enrollment as a Medicaid dental provider by indefinitely placing its application in "pended" status. Defendants justify this delay based on a speculative and unapproved State Plan Amendment, which has no legal effect. This indefinite delay violates the Medicaid Act's reasonable promptness requirement, which mandates that eligible providers be enrolled and allowed to participate without unnecessary delay. *See* 42 U.S.C. § 1396a(a)(8); 42 C.F.R. §§ 431.107, 455.104. It also violates 25 U.S.C. §§ 1621t and 1642, which prohibit states from imposing licensure or participation restrictions on

Tribal Health Programs that would not apply to IHS. By blocking Fishing Point's provider enrollment, Defendants have directly interfered with the Nation's ability to deliver essential dental care under its ISDEAA Contract and have impaired the federal reimbursement mechanisms on which the program relies.

b. Since October 10, 2024, Defendants have knowingly and systematically withheld Medicaid reimbursements at the Federal AIR for PCA services furnished by Fishing Point. These services were provided in accordance with the Nation's ISDEAA Contract and billed as clean claims under Virginia's CMS-approved Tribal Reimbursement SPA. A CMS PERM audit confirmed that Fishing Point's PCA claims were correctly billed and underpaid. CMS guidance—SHO Letter #16-002 (Feb. 26, 2016) and CMS FAQ #11817 (Apr. 2017)—further affirms that Tribal Health Programs must be reimbursed at the same rate for all Medicaid services provided, without regard to the AI/AN status of the patient. Defendants' continued withholding of these payments violates 42 U.S.C. §§ 1396j(d) and 1396a(a)(13)(A), 42 C.F.R. §§ 440.90(c) and 447.45, and undermines the Nation's federally protected ability to finance and sustain its health program operations in furtherance of self-governance.

c. On March 24, 2024, Defendant Governor Youngkin endorsed Virginia's biennial budget amendment (Item 288 #16c, HB1600), which unlawfully conditions reimbursement at the Federal AIR on whether the Medicaid beneficiary is an AI/AN individual. This policy directly contradicts 25 U.S.C. § 1680c(c)(2), which affirms that Tribal Health Programs may serve non-AI/AN beneficiaries without penalty or loss of reimbursement. It also violates 42 U.S.C. § 1396j(d), which prohibits states from imposing eligibility criteria that would restrict reimbursement to ISDEAA Contractors,

and contradicts CMS guidance in SHO #16-002 and FAQ #11817. The amendment was endorsed without meaningful Tribal consultation as required by 42 U.S.C. § 1396a(a)(73), 42 C.F.R. § 431.408(b), CMS's 2011 Tribal Consultation Policy, and Virginia's own Tribal Consultation SPA. Defendants' adoption and enforcement of this amendment unlawfully infringes on the Nation's sovereign right to determine whom it serves and how it manages its healthcare program under federal law.

d. Beginning on or about March 31, 2025, Defendants began unlawfully withholding virtually all Medicaid reimbursements for services furnished by Fishing Point by placing the associated claims in indefinite "pended" status without legal justification. These services were furnished in compliance with Fishing Point's designation as a Tribal Health Program under an ISDEAA agreement and submitted as valid, clean claims in accordance with federal billing and reimbursement requirements. The Medicaid Act mandates prompt and accurate payment of such claims. *See* 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 447.45(d)(2). Moreover, CMS regulations prohibit states from imposing additional requirements on Tribal Health Programs or delaying payment based on unapproved changes to the State Plan. *See* 42 C.F.R. §§ 431.107(b), 455.104, 440.90(c). Defendants' blanket withholding of payment—without any identified deficiency in the claims or lawful basis for delay—constitutes an intentional and ongoing violation of federal law, resulting in severe financial harm to Fishing Point and impeding the delivery of critical health services to Medicaid beneficiaries.

348.    As detailed extensively in Paragraphs 310–315, Defendants' violations have caused substantial and continuing harm, including severe financial instability, disruption of essential healthcare services, and infringement upon Tribal sovereignty.

349.    Sovereign immunity does not protect Defendants from suit in this case. By electing to participate in the federal Medicaid program, Defendants have waived immunity with respect to claims enforcing conditions attached to federal funding, including the obligation to reimburse Tribal Health Programs in accordance with the federally approved Tribal Reimbursement SPA specifying the Federal AIR. *See Arlington Cent. Sch. Dist.*, 548 U.S. at 296. Sovereign immunity also does not extend to state officials or agencies acting *ultra vires*, beyond the limits of their lawful authority under federal law. *See Papasan*, 478 U.S. at 277. Defendants' refusal to pay the required rate conflicts with federal Medicaid law and the approved State Plan. Moreover, where Congress has occupied the field—such as in Indian healthcare—state policies that interfere with or undermine federal statutes like ISDEAA and IHCIA are preempted. *See White Mountain Apache Tribe*, 448 U.S. at 148–49.

350.    Plaintiffs respectfully request this Court declare that Defendants' obstruction of Fishing Point's Medicaid provider enrollment, unlawful withholding of federally mandated Medicaid reimbursements, and endorsement of Virginia's budget amendment (Item 288 #16c) constitute unlawful encroachments upon the Nation's sovereign right to operate its healthcare program under federal law. These actions violate the Supremacy Clause of the U.S. Constitution, federal common-law principles protecting Tribal self-governance, and binding provisions of ISDEAA, 25 U.S.C. §§ 5302, 5321(a)(1), 1642, and 1680c(c)(2); IHCIA, 25 U.S.C. §§ 1601–1683; the Medicaid Act, 42 U.S.C. §§ 1396a(a)(5), (8), (13)(A), (23), and (73), and 1396j(d); applicable federal regulations, including 42 C.F.R. §§ 431.107, 431.408(b), 440.90(c), 447.45, and 455.104; binding CMS policy guidance including SHO Letter #16-002 (Feb. 26, 2016) and CMS FAQ #11817 (Apr. 2017); and Virginia's State Medicaid Plan including the Tribal Reimbursement SPA (*see* Exhibit 3).

351.    Plaintiffs respectfully request this Court issue immediate and permanent injunctive relief prohibiting Defendants from: (a) denying, withholding, or delaying Medicaid reimbursements owed to Fishing Point under the federally approved Tribal Reimbursement SPA (*see* Exhibit 4), including payments for PCA and other ISDEAA-authorized healthcare services; (b) maintaining Fishing Point's Medicaid dental provider enrollment in indefinite "pended" status based on speculative or unapproved State Plan Amendments; and (c) enforcing any provision of Virginia's budget amendment (Item 288 #16c) that conditions or limits reimbursement based on a patient's AI/AN status, FMAP classification, or other criteria that conflict with federal protections established under ISDEAA, IHCIA, the Medicaid Act, and applicable federal guidance.

352.    Plaintiffs respectfully request this Court issue immediate injunctive relief directing Defendants to: (a) unpend and pay all clean claims submitted by Fishing Point for all services, including PCA services, including all outstanding underpayments, in accordance with 42 C.F.R. §§ 447.45 and 455.104 and CMS guidance; (b) make an immediate final determination on Fishing Point's pended Medicaid dental provider enrollment application in compliance with 42 C.F.R. §§ 431.107 and 455.104; and (c) refrain from taking any further action that is contrary to federal law or interferes with the Nation's right to operate its healthcare program pursuant to its ISDEAA Contract and federal regulatory authority.

353.    Plaintiffs respectfully request that the Court award their attorneys' fees and litigation costs pursuant to applicable federal law.

354.    Plaintiffs further respectfully request such other and further equitable relief as the Court deems just and proper.

## CLAIM IV – VIOLATION OF 42 U.S.C. § 1983 (DEPRIVATION OF FEDERAL RIGHTS UNDER COLOR OF STATE LAW)

*(Against Individual Defendants in Their Official and Personal Capacities)*

355.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 302 and 310–315 as if fully set forth herein.

356.    42 U.S.C. § 1983 provides a cause of action against individuals who, acting under color of state law, deprive others of rights secured by the Constitution or federal statutes.

357.    To establish a claim under § 1983, Plaintiffs must demonstrate: (1) deprivation of a clearly established federal right; (2) action taken under color of state law; (3) a direct causal connection between Defendants' actions and the deprivation; and (4) resulting harm.

358.    Federally protected rights at issue include:

a. Fishing Point's right, as a Tribal Health Program under 42 C.F.R. § 440.90(c), to operate as a distinct provider type exempt from state licensure requirements and to receive Medicaid reimbursement for services furnished outside the physical clinic— including through contract personnel, mobile services, and home-based care—as codified in CMS's final rule implementing the "four walls" exception, 89 Fed. Reg. 85436, 85682 (Nov. 27, 2024).

b. Fishing Point's right, as an ISDEAA-contracted Tribal Health Program, to receive Medicaid reimbursement at the Federal AIR for covered services, as guaranteed by 42 U.S.C. §§ 1396a(a)(8) (reasonable promptness), 1396a(a)(13)(A) (reasonable and adequate payment methodology), 1396j(d) (entitlement to reimbursement under State Plan), and the CMS-approved Tribal Reimbursement SPA (*see* Exhibit 3).

c. Fishing Point's right to freedom from enrollment delays and discriminatory participation criteria under 42 U.S.C. § 1396a(a)(5) (single state agency requirement),

§ 1396a(a)(8) (prompt enrollment), § 1396a(a)(23) (freedom of choice of provider), and 42 C.F.R. §§ 431.107, 431.110(b), and 455.104 (provider screening, enrollment, and administrative integrity requirements).

d. Fishing Point's independent right, as a Medicaid provider, to enforce the terms of Virginia's federally approved State Medicaid Plan under Section 1983, as recognized in *Wilder*, 496 U.S. at 520–24; *Antrican*, 290 F.3d at 186–87; and reaffirmed in *Health & Hosp. Corp. of Marion Cnty.*, 599 U.S. at 180–81.

e. The Nation's sovereign right to operate Fishing Point free from state interference in its federally delegated functions, including its right to serve non-AI/AN Medicaid beneficiaries without penalty, as protected by 25 U.S.C. § 1642 (state preemption in licensure), § 1680c(c)(2) (authorization to serve non-AI/ANs), and 42 U.S.C. § 1396j(d) (prohibition on additional conditions imposed on ISDEAA programs).

f. The Nation's and Fishing Point's right to meaningful and timely Tribal consultation prior to implementation of any Medicaid policy or reimbursement changes, as required by 42 U.S.C. § 1396a(a)(73), 42 C.F.R. § 431.408(b), the CMS Tribal Consultation Policy (2011), and Virginia's CMS-approved Tribal Consultation SPA (*see* Exhibit 3).

g. The Nation's right, under its ISDEAA contract, to act with the full legal authority of IHS to provide healthcare services, and to be free from conflicting state regulation under 25 U.S.C. §§ 5302, 5321(a)(1), and 5331(a).

### Defendant Cheryl Roberts (DMAS Director) – Official and Personal Capacities

359.    Defendant Cheryl Roberts, acting under color of state law in her official capacity as Director of DMAS, and in her personal capacity, knew of the governing federal laws and nonetheless personally facilitated, authorized, ratified, or failed to prevent multiple violations of

those laws, resulting in ongoing harm to Plaintiffs. These actions directly contributed to the unlawful denial of Plaintiffs' federally protected rights and ongoing harm to Plaintiffs. Her conduct includes:

a. Beginning on or about October 10, 2024, and continuing to the present, Defendant Roberts knowingly withheld Medicaid reimbursements owed to Fishing Point at the Federal AIR for PCA services, despite explicit confirmation from CMS PERM auditors in November 2024 that the submitted claims were properly billed clean claims and reimbursable under Virginia's federally approved Tribal Reimbursement SPA. In doing so, Defendant Roberts violated federal mandates, including 42 U.S.C. §§ 1396j(d), 1396a(a)(13)(A), 1396a(a)(8), 42 C.F.R. §§ 440.90(c), 447.45, and 455.104, as well as binding CMS guidance in SHO Letter #16-002 (2016) and FAQ #11817 (2017).

b. On or after January 17, 2025, Defendant Roberts personally authorized and continues to maintain an indefinite delay in processing Fishing Point's Medicaid dental provider enrollment application. This delay is based on a speculative and unapproved amendment to Virginia's State Plan and violates federal requirements for timely enrollment and participation by qualified providers. *See* 42 U.S.C. § 1396a(a)(8); 42 C.F.R. §§ 431.107, 431.110(b), and 455.104. Defendant Roberts acted with knowledge of repeated written notifications from Fishing Point identifying these specific violations and requesting immediate resolution.

c. In November 2024, after CMS PERM auditors notified Defendants that Fishing Point's PCA claims were lawfully billed and payable at the Federal AIR, Defendant Roberts failed to disclose these findings to Fishing Point. This deliberate concealment extended

Fishing Point's financial hardship and demonstrated willful indifference to Plaintiffs' federally protected rights under ISDEAA and the Medicaid Act.

d. Throughout 2024 and 2025, Defendant Roberts knowingly authorized and enforced Medicaid policy changes affecting Fishing Point—including the withholding of reimbursements, the obstruction of provider enrollment, and modifications to reimbursement criteria—without conducting the federally mandated Tribal consultation required under 42 U.S.C. § 1396a(a)(73) and 42 C.F.R. § 431.408(b), and in contravention of Virginia's CMS-approved Tribal Consultation SPA and CMS's 2011 Tribal Consultation Policy.

e. During 2024 and into early 2025, Defendant Roberts also personally approved DMAS strategies to divert Fishing Point's Medicaid patients into MCOs, thereby undermining the Nation's operational autonomy and ability to provide services under its ISDEAA Contract. These efforts violated CMS protections specific to Indian healthcare providers, including 42 C.F.R. § 438.14, which requires state Medicaid agencies to ensure Indian health providers can continue serving AI/AN and non-AI/AN Medicaid beneficiaries without coercive redirection into MCO networks.

f. Beginning on or about March 31, 2025, Defendants—under the direction and approval of Defendant Roberts—began unlawfully withholding virtually all Medicaid reimbursements for services furnished by Fishing Point by placing the associated claims in indefinite "pended" status without legal justification. These services were delivered consistent with Fishing Point's status as a Tribal Health Program operating under an ISDEAA agreement, and the claims were submitted as valid, clean claims in accordance with applicable federal requirements. The Medicaid Act mandates that

states provide medical assistance with reasonable promptness and process clean claims expeditiously. *See* 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 447.45(d)(2). CMS regulations further prohibit states from delaying payment based on unapproved State Plan amendments or imposing additional licensure or enrollment requirements on Tribal Health Programs. *See* 42 C.F.R. §§ 431.107(b), 455.104, 440.90(c). Defendant Roberts, in his capacity as Director of DMAS, had direct oversight of the claims adjudication process and approved the policy decision to withhold payment. These actions reflect a deliberate violation of federal law and have inflicted substantial financial harm on Fishing Point, while unlawfully restricting access to Medicaid-funded care.

360.    Defendant Roberts's conduct is intentional, malicious, and ongoing. Her actions demonstrate a reckless disregard for Plaintiffs' rights under the Constitution, ISDEAA, IHCIA, the Medicaid Act, applicable federal regulations, and binding CMS guidance. Defendant Roberts's repeated failure to comply with federal mandates has caused and continues to cause substantial and irreparable harm to Fishing Point and the Nation.

***Defendant Jeffrey Lunardi (DMAS Chief Deputy Director) – Official and Personal Capacities***

361.    Defendant Jeffrey Lunardi, acting under color of state law in his official capacity as Chief Deputy Director of DMAS, and in his personal capacity, knew of the governing federal laws and nonetheless personally facilitated, authorized, ratified, or failed to prevent multiple violations of those laws, resulting in ongoing harm to Plaintiffs. These actions directly contributed to the unlawful denial of Plaintiffs' federally protected rights and ongoing harm to Plaintiffs. His conduct includes:

a.    Beginning on or about October 10, 2024, Defendant Lunardi approved or knowingly permitted Defendants to withhold Medicaid reimbursements owed to Fishing Point at

the federal AIR for PCA services, despite explicit validation by CMS PERM auditors in November 2024 that the claims were properly billed clean claims and payable under Virginia's Tribal Reimbursement SPA. Defendant Lunardi concealed the audit findings from Fishing Point and failed to take corrective action, thereby prolonging the financial harm to the Tribal Health Program and violating federal law, including 42 U.S.C. §§ 1396j(d), 1396a(a)(13)(A), and 1396a(a)(8), and 42 C.F.R. §§ 440.90(c), 447.45, and 455.104, as well as binding CMS guidance in SHO Letter #16-002 and CMS FAQ #11817.

b. Since at least January 17, 2025, Defendant Lunardi has personally overseen or ratified Defendants' indefinite delay in processing Fishing Point's Medicaid dental provider enrollment application. This unjustified delay is based on an unapproved and legally ineffective State Plan Amendment and directly violates the reasonable promptness requirement under 42 U.S.C. § 1396a(a)(8) and the provider enrollment obligations under 42 C.F.R. §§ 431.107, 431.110(b), and 455.104. Despite receiving multiple written notifications from Fishing Point detailing these violations, Defendant Lunardi has taken no action to resolve the unlawful delay.

c. Throughout 2024 and into 2025, Defendant Lunardi repeatedly approved or failed to prevent Medicaid policy changes affecting Fishing Point—including reimbursement restrictions, enrollment delays, and reinterpretations of clinic classification—without engaging in the Tribal consultation process required by 42 U.S.C. § 1396a(a)(73), 42 C.F.R. § 431.408(b), CMS's 2011 Tribal Consultation Policy, and Virginia's approved Tribal Consultation SPA. His failure to initiate or demand consultation occurred despite the Nation's repeated formal requests for engagement.

d.  Defendant Lunardi also actively permitted or ratified DMAS policies designed to steer Fishing Point's Medicaid patients into MCOs, undermining Fishing Point's operational model and violating patient choice protections under 42 U.S.C. § 1396a(a)(23) and 42 C.F.R. § 438.14. These actions obstruct Fishing Point's ability to serve its beneficiaries under its ISDEAA contract and federal program designation.

e.  Beginning on or about March 31, 2025, Defendants—acting under the direction and with the involvement of Defendant Lunardi—began unlawfully withholding virtually all Medicaid reimbursements for services furnished by Fishing Point by placing the associated claims in indefinite "pended" status without legal justification. These services were provided pursuant to Fishing Point's status as a Tribal Health Program operating under an ISDEAA agreement, and the submitted claims met all applicable federal requirements as clean claims. The Medicaid Act requires states to furnish assistance with reasonable promptness and mandates timely payment of properly submitted claims. See 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 447.45(d)(2). Federal regulations also prohibit states from imposing unauthorized conditions or delaying payment based on changes to the State Plan that have not received CMS approval. *See* 42 C.F.R. §§ 431.107(b), 455.104, 440.90(c). Defendant Lunardi, in his role overseeing provider enrollment and claims adjudication at DMAS, was directly involved in implementing and maintaining the policy to hold Fishing Point's claims in pended status. These actions constitute a knowing and ongoing violation of federal law, causing significant financial harm to Fishing Point and obstructing its ability to deliver Medicaid services to eligible patients.

362.     Defendant Lunardi's conduct is intentional, malicious, and ongoing. His failure to comply with binding federal statutes, regulations, and CMS policy demonstrates a reckless disregard for the Nation's sovereignty and Fishing Point's rights as a federally recognized Tribal Health Program. His actions have caused—and continue to cause—significant and irreparable harm to Plaintiffs' operations, finances, and the delivery of care to Medicaid beneficiaries

### *Defendant Glenn Youngkin (Governor) – Official and Personal Capacities*

363.     Defendant Glenn Youngkin, acting under color of state law in his official capacity as Governor of the Commonwealth of Virginia, and in his personal capacity, knew of the governing federal laws and nonetheless personally facilitated, authorized, ratified, or failed to prevent multiple violations of those laws, resulting in ongoing harm to Plaintiffs. These actions directly contributed to the unlawful denial of Plaintiffs' federally protected rights and ongoing harm to Plaintiffs. His conduct includes:

a. On March 24, 2025, Defendant Youngkin knowingly endorsed Item 288 #16c (HB1600)—a biennial budget amendment that unlawfully conditions Medicaid reimbursement at the Federal AIR on the AI/AN status of patients. This policy directly conflicts with the federally approved Tribal Reimbursement SPA (*see* Exhibit 3), violates 42 U.S.C. § 1396j(d) (requiring that ISDEAA-contracted Tribal Health Programs be reimbursed under the State Plan), and contravenes 25 U.S.C. § 1680c(c)(2) (authorizing Tribal Health Programs to serve non-AI/AN beneficiaries without penalty). The amendment also conflicts with binding federal policy in SHO Letter #16-002 (Feb. 26, 2016) and CMS FAQ #11817 (Apr. 2017), which confirms that Tribal Health Programs must be reimbursed the same rate regardless of patient status. Defendant Youngkin approved this policy without first engaging in the

mandatory Tribal consultation required under 42 U.S.C. § 1396a(a)(73), 42 C.F.R. § 431.408(b), the CMS Tribal Consultation Policy (2011), or Virginia's approved Tribal Consultation SPA (*see* Exhibit 4).

b. Throughout 2024 and into 2025, Defendant Youngkin knowingly permitted and failed to intervene in DMAS's efforts to divert Medicaid beneficiaries—including patients served by Fishing Point—into MCOs, thereby undermining Fishing Point's ability to deliver services under its ISDEAA Contract and in violation of patient choice protections under 42 U.S.C. § 1396a(a)(23) and 42 C.F.R. § 438.14. These efforts further encroached on the Nation's sovereign authority to operate its healthcare program independently and serve both AI/AN and non-AI/AN Medicaid patients as authorized under federal law.

c. Beginning on or about March 31, 2025, Defendants—acting under the direction and with the approval of Defendant Governor Youngkin—began unlawfully withholding virtually all Medicaid reimbursements for services furnished by Fishing Point by placing the associated claims in indefinite "pended" status without legal justification. These services were furnished consistent with Fishing Point's designation as a Tribal Health Program operating under an ISDEAA agreement, and the claims were submitted as clean claims in accordance with federal requirements. The Medicaid Act mandates that states provide medical assistance with reasonable promptness and process clean claims without undue delay. *See* 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 447.45(d)(2). CMS regulations further prohibit states from withholding reimbursement based on unapproved State Plan changes or from imposing unauthorized licensure or enrollment requirements on Tribal Health Programs. *See* 42 C.F.R. §§ 431.107(b),

455.104, 440.90(c). As the chief executive of the Commonwealth, Defendant Youngkin exercises ultimate authority over the Medicaid program administered by DMAS and approved the continued implementation of policies that block payment for services legally required to be reimbursed. His direction and approval of these unlawful actions constitute a continuing violation of federal law, resulting in severe financial harm to Fishing Point and restricting access to critical Medicaid services.

### Defendant Janet Kelly (SHHR Secretary) – Official Capacity Only

364.    Defendant Kelly, acting under color of state law in her official capacity as Secretary of SHHR, knew of the governing federal laws and nonetheless personally facilitated, authorized, ratified, or failed to prevent multiple violations of those laws, resulting in ongoing harm to Plaintiffs. These actions directly contributed to the unlawful denial of Plaintiffs' federally protected rights and ongoing harm to Plaintiffs. Her conduct includes:

a. Defendant Kelly knowingly permitted DMAS to continue unlawfully withholding Medicaid reimbursements owed to Fishing Point at the Federal AIR and to delay processing of Fishing Point's Medicaid dental provider enrollment application. These violations persisted despite explicit notice from CMS PERM auditors in November 2024 confirming that Fishing Point's PCA claims were properly billed and underpaid, and despite multiple formal communications from Plaintiffs identifying specific legal and regulatory violations. Defendant Kelly's failure to act allowed ongoing violations of 42 U.S.C. §§ 1396j(d), 1396a(a)(8), and 1396a(a)(13)(A); 42 C.F.R. §§ 431.107, 440.90(c), 447.45, and 455.104; and binding CMS guidance, including SHO Letter #16-002 (2016) and FAQ #11817 (2017).

b. Defendant Kelly also permitted the continued implementation of Medicaid policy changes throughout 2024 and 2025 that materially affected Fishing Point's operations—such as withholding AIR reimbursements, obstructing enrollment, and redefining reimbursement eligibility—without the mandatory Tribal consultation required under 42 U.S.C. § 1396a(a)(73) and 42 C.F.R. § 431.408(b). These failures also violated CMS's 2011 Tribal Consultation Policy and Virginia's CMS-approved Tribal Consultation SPA (*see* Exhibit 4). Defendant Kelly's inaction directly contributed to the imposition of policies that conflict with federal protections for ISDEAA-contracted Tribal Health Programs and caused ongoing harm to Fishing Point and the Nation.

c. Beginning on or about March 31, 2025, Defendants—acting under the direction and with the involvement of Defendant Kelly—began unlawfully withholding virtually all Medicaid reimbursements for services furnished by Fishing Point by placing the associated claims in indefinite "pended" status without legal justification. These services were delivered consistent with Fishing Point's designation as a Tribal Health Program operating under an ISDEAA agreement, and the submitted claims met all applicable federal standards as clean claims. The Medicaid Act requires states to furnish assistance with reasonable promptness and mandates the timely processing and payment of valid claims. *See* 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 447.45(d)(2). Federal regulations further prohibit states from delaying payment based on unapproved changes to the State Medicaid Plan or imposing unauthorized requirements on Tribal Health Programs. *See* 42 C.F.R. §§ 431.107(b), 455.104, 440.90(c). Defendant Kelly, in his leadership role overseeing DMAS and the state's broader Medicaid program,

directly participated in the decision to maintain the pended status of Fishing Point's

claims and failed to take corrective action despite having knowledge of the federal

violations. His conduct constitutes an ongoing breach of federal law and has caused

significant financial harm to Fishing Point while unlawfully obstructing the delivery of

Medicaid-funded care to eligible patients.

365.    As detailed extensively in Paragraphs 310–315, Defendants' violations have

caused substantial and continuing harm, including severe financial instability, disruption of

essential healthcare services, and infringement upon Tribal sovereignty.

366.    Plaintiffs respectfully request that this Court enter a declaratory judgment finding

that Defendants Roberts, Lunardi, and Youngkin (in both their official and personal capacities),

and Defendant Kelly (in her official capacity), acting under color of state law, have violated

Plaintiffs' federally protected rights under the Medicaid Act, ISDEAA, and IHCIA, in violation

of 42 U.S.C. § 1983.

367.    Plaintiffs respectfully request that this Court issue permanent injunctive relief

prohibiting Defendants, in their official capacities, from:

a. Withholding, delaying, or denying Medicaid reimbursements owed to Fishing Point at

the Federal AIR as required by Virginia's federally approved State Medicaid Plan,

including the Tribal Reimbursement SPA (*see* Exhibit 3), and in accordance with 42

U.S.C. §§ 1396j(d), 1396a(a)(8), and (13)(A); 42 C.F.R. §§ 440.90(c), 447.45, and

455.104; and binding CMS guidance including SHO Letter #16-002 (2016) and FAQ

#11817 (2017).

b. Continuing to hold Fishing Point's Medicaid provider enrollment applications,

including its dental provider application, in indefinite "pended" status based on

speculative or unapproved amendments to Virginia's State Plan, in violation of 42 U.S.C. § 1396a(a)(8) and 42 C.F.R. §§ 431.107, 431.110(b), and 455.104.

c. Enforcing any provision of Virginia's budget amendment (Item 288 #16c, HB1600) that conditions or limits reimbursement based on AI/AN patient status, FMAP eligibility, or any other criteria that conflict with 25 U.S.C. §§ 1642 and 1680c(c)(2), 42 U.S.C. § 1396j(d), or CMS policy as set forth in SHO Letter #16-002 and FAQ #11817.

d. Implementing or continuing to enforce any Medicaid policy changes that are contrary to federal law—including ISDEAA, IHCIA, and the Medicaid Act—without first conducting meaningful Tribal consultation in accordance with 42 U.S.C. § 1396a(a)(73), 42 C.F.R. § 431.408(b), the CMS Tribal Consultation Policy (2011), and Virginia's Tribal Consultation SPA (*see* Exhibit 4).

368.   Additionally, Plaintiffs respectfully request that this Court issue permanent injunctive relief directing Defendants to:

a. Immediately unpend and pay all clean claims submitted by Fishing Point for PCA services and other covered Medicaid services at the Federal AIR, including outstanding underpayments, with applicable interest;

b. Make an immediate and final determination on Fishing Point's Medicaid dental provider enrollment application; and

c. Refrain from taking any further action inconsistent with federal law or the rights guaranteed under Fishing Point's ISDEAA contract and the approved State Medicaid Plan.

*Specific Compensatory Damages Requested (Against Defendants Roberts, Lunardi, and Youngkin in their Personal Capacities)*

369.    Plaintiffs respectfully request an award of compensatory damages against Defendants Roberts, Lunardi, and Youngkin, jointly and severally, in their personal capacities, in an amount to be proven at trial, including but not limited to:

a.  All Medicaid reimbursements improperly withheld from Fishing Point at the Federal AIR for PCA services and other eligible Medicaid services rendered from October 10, 2024, through the date of judgment, including accrued interest under applicable federal or state law.

b.  Lost Medicaid revenue and operational losses directly resulting from Defendants' obstruction of Fishing Point's enrollment as a dental provider, including revenue lost due to the inability to operate dental clinics during the period of indefinite pending from January 17, 2025, through final judgment.

c.  Costs arising from increased administrative burdens and compliance obligations, including legal and consulting fees, additional staffing costs, and time diverted from core healthcare operations—caused by Defendants' concealment of CMS audit findings, failure to conduct required Tribal consultation, and improper interference with Fishing Point's provider status.

d.  Financial losses due to decreased patient volume and corresponding revenue, resulting from Defendants' coercive efforts to divert Medicaid beneficiaries away from Fishing Point into state-controlled managed care organizations, in violation of 42 U.S.C. § 1396a(a)(23) and 42 C.F.R. § 438.14.

e.  Reimbursement for the diversion of limited Tribal financial resources away from critical patient care, public health services, and infrastructure development, all necessitated by Defendants' unlawful and reckless conduct.

f.  Medicaid reimbursements improperly withheld beginning on or about March 31, 2025, for all clean claims submitted by Fishing Point for services provided in accordance with its federal designation as a Tribal Health Program, including but not limited to primary care, dental, and behavioral health services—along with accrued interest and damages resulting from delayed access to revenue critical to ongoing healthcare operations.

***Specific Punitive Damages Requested (Against Defendants Roberts, Lunardi, and Youngkin in their Personal Capacities)***

370.    Plaintiffs respectfully request an award of punitive damages against Defendants Roberts, Lunardi, and Youngkin in their personal capacities, in an amount sufficient to punish each Defendant for their misconduct and deter future violations of federally protected rights. Punitive damages are warranted because Defendants' actions:

a.  Demonstrate deliberate malice or reckless indifference toward Plaintiffs' clearly established rights under the Medicaid Act and ISDEAA, including knowingly withholding federally mandated reimbursements after CMS confirmed Fishing Point's entitlement.

b.  Include the intentional suppression of CMS PERM audit findings in November 2024, which validated Fishing Point's claims and confirmed Defendants' legal obligations, thereby compounding the harm to Plaintiffs.

c.  Reflect willful and repeated failures to conduct mandatory Tribal consultation prior to implementing Medicaid policies directly affecting Fishing Point and the Nation, despite multiple formal requests for consultation.

d.  Involve coercive efforts to redirect Medicaid patients away from Fishing Point's federally authorized services to MCOs, undermining the Tribe's self-governance and violating federal protections under ISDEAA and 42 C.F.R. § 438.14.

e.  Include the endorsement of unlawful budgetary legislation (Item 288 #16c, HB1600) that targets Tribal Health Programs based on the AI/AN status of patients, in knowing defiance of federal law, express CMS policy, and direct warnings from Plaintiffs.

f.  Involve the deliberate withholding, beginning on or about March 31, 2025, of virtually all Medicaid reimbursements for services furnished by Fishing Point, with no legal basis for delay—despite Defendants' full knowledge that Fishing Point's claims were valid and that continued nonpayment would destabilize the Nation's health system. Defendants Roberts, Lunardi, and Youngkin each played a direct role in authorizing or maintaining this unlawful policy, thereby exhibiting a willful disregard for federal law and Tribal sovereignty.

371.  Plaintiffs respectfully request an award of reasonable attorneys' fees, litigation costs, and related expenses under 42 U.S.C. § 1988 and other applicable federal statutes.

372.  Plaintiffs respectfully request such further legal or equitable relief as this Court deems just, proper, and appropriate.


//

//

## JURY DEMAND

The Plaintiffs request trial by jury.

Dated: April 1, 2025

Respectfully submitted,

_Jessie Barrington_

Jessie Barrington (VA Bar #100685)
Cultural Heritage Partners, PLLC
1811 East Grace Street, Suite A
Richmond, Virginia 23223
Phone: (202) 567-7594
Jessie@culturalheritagepartners.com
*Counsel for Plaintiffs*

Gregory A. Werkheiser (VA Bar #45986)
Cultural Heritage Partners, PLLC
1811 East Grace Street, Suite A
Richmond, Virginia 23223
Phone: (202) 567-7594
Greg@culturalheritagepartners.com
*Counsel for Plaintiffs*

Lydia Dexter (OR Bar #233151)*
Cultural Heritage Partners, PLLC
1811 East Grace Street, Suite A
Richmond, Virginia 23223
Phone: (202) 567-7594
Lydia@culturalheritagepartners.com
*Counsel for Plaintiffs*

*Pro hac vice forthcoming*