UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

NANSEMOND INDIAN NATION, ET AL.,

      Plaintiffs,

   v.                          CIVIL NO. 2:25-cv-195

COMMONWEALTH OF VIRGINIA, ET AL.,

      Defendants.

## OPINION

This matter comes before the court on Defendants' Motion to Dismiss under Rules 12(b)(1) and 12(b)(6) ("Motion to Dismiss"). ECF No. 26. For the reasons explained below, Defendants' Motion to Dismiss is **GRANTED.**

### I. Procedural History

Plaintiffs filed their Complaint on April 1, 2025. ECF No. 1. A day later, on April 2, 2025, Plaintiffs filed an Ex Parte Motion for a Temporary Restraining Order ("Motion for TRO"). ECF Nos. 4 (Motion); 5 (Memorandum in Support).[1] On April 8, 2025, the court denied Plaintiffs' Motion for TRO. ECF No. 17 at 5. The court also

---

[1] On April 4, 2025, Plaintiffs filed an Amended Memorandum in Support of their Motion for TRO. ECF No. 12. The amended filing corrected a "scrivener's error." Id. at 1. The court considered the Amended Memorandum in Support in ruling on Plaintiffs' Motion for TRO.

directed that Plaintiffs serve their Motion for TRO, ECF No. 4, Memorandum in Support, ECF No. 5, and Amended Memorandum in Support, ECF No. 12, on Defendants, and publicly docket proof thereof. <u>See</u> ECF No. 17 at 5. On April 9, 2025, Plaintiffs certified that they had served the documents on Defendants. ECF No. 20. Once the certificate of service was docketed, the Clerk unsealed Plaintiffs' <u>ex parte</u> submissions.

On April 10, 2025, Plaintiffs filed a Motion for Preliminary Injunction. ECF Nos. 21 (Motion); 22 (Memorandum in Support). Defendants filed their Response in Opposition on April 29, 2025. ECF No. 25. Plaintiffs filed their Reply on May 7, 2025. ECF No. 30. That same day, Plaintiffs filed a Motion to Strike the Declaration of Jeffrey Lunardi, Deputy Director of the Virginia Department of Medical Assistance Services, and Exhibit A ("Motion to Strike"). ECF Nos. 28 (Motion); 29 (Memorandum in Support). The documents Plaintiffs sought to strike were attachments to Defendants' Response in Opposition to Plaintiffs' Motion for Preliminary Injunction. <u>See</u> ECF Nos. 25-1; 25-2. On May 23, 2025, Defendants filed a Response in Opposition to Plaintiffs' Motion to Strike. ECF No. 33. Plaintiffs filed their Reply on June 5, 2025. ECF No. 35.

On May 5, 2025, Defendants filed a Motion to Dismiss the Complaint. ECF Nos. 26 (Motion); 27 (Memorandum in Support). Plaintiffs Responded on May 30, 2025. ECF No. 34. Defendants filed

their Reply on June 6, 2025. ECF No. 36. On June 27, 2025, Defendants filed a Notice of Supplemental Authority informing the court of the Supreme Court's decision, decided on June 26, 2025, in <u>Medina v. Planned Parenthood South Atlantic</u>, 606 U.S. __, 145 S. Ct. 2219 (2025). <u>See</u> ECF Nos. 37 (Notice); 37-1 (Slip Opinion). The court held a hearing on the Motion to Dismiss on July 1, 2025, at which counsel for both parties presented oral argument and were given the opportunity to address <u>Medina</u>. <u>See</u> ECF No. 38 (Hearing on Motion to Dismiss). Accordingly, Defendants' Motion to Dismiss, ECF No. 26, is now ripe for judicial adjudication.

## II. Legal Standards

### A. Federal Rule of Civil Procedure 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the court's subject-matter jurisdiction. <u>See</u> Fed. R. Civ. P. 12(b)(1). If sovereign immunity applies, the court "is deprived of subject matter jurisdiction," and must dismiss the complaint. <u>Nwoga v. N. Virginia Mental Health Inst.</u>, 2025 WL 259203, at *3 (E.D. Va. Jan. 21, 2025) (Trenga, J.) (citing <u>Cunningham v. Gen. Dynamics Info. Tech., Inc.</u>, 888 F.3d 640, 649 (4th Cir. 2018)). A dismissal for lack of subject-matter jurisdiction based on sovereign immunity is without prejudice. <u>See</u> <u>Lancaster v. Sec'y of Navy</u>, 109 F.4th 283, 295 (4th Cir. 2024).

3

## B. Federal Rule of Civil Procedure 12(b)(6)

A complaint must be dismissed if the plaintiff's allegations fail to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To meet the pleading standard established in Rule 8 of the Federal Rules of Civil Procedure and survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). However, while the court must "draw[] all reasonable inferences in favor of the plaintiff," In re Marriott Int'l, Inc., 31 F.4th 898, 901 (4th Cir. 2022) (citing KBC Asset Mgmt. NV v. DXC Tech. Co., 19 F.4th 601, 607 (4th Cir. 2021)), "legal conclusions pleaded as factual allegations, 'unwarranted inferences,' 'unreasonable conclusions,' and 'naked assertions devoid of further factual enhancement' are not entitled to the presumption of truth," Wikimedia Found. v. Nat'l Sec. Agency, 857 F.3d 193, 208 (4th Cir. 2017) (quoting SD3, LLC v. Black & Decker (U.S.) Inc., 801 F.3d 412, 422 (4th Cir. 2015)).

Courts may also consider documents that are either "explicitly incorporated into the complaint by reference" or

"attached to the complaint as exhibits." <u>Goines v. Valley Cmty. Servs. Bd.</u>, 822 F.3d 159, 166 (4th Cir. 2016) (first citing <u>Tellabs, Inc. v. Makor Issues & Rts., Ltd.</u>, 551 U.S. 308, 322 (2007); then citing Fed. R. Civ. P. 10(c)). The court may consider such documents "without converting a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment." <u>Spirito v. Peninsula Airport Comm'n</u>, 350 F. Supp. 3d 471, 480 (E.D. Va. 2018) (Morgan, J.) (citing <u>Pueschel v. United States</u>, 369 F.3d 345, 353 n.3 (4th Cir. 2004)). However, "[a]t the motion-to-dismiss stage, 'in the event of a conflict between the bare allegations in the complaint and any exhibit attached, the exhibit prevails.'" <u>Wells v. Fuentes</u>, 126 F.4th 882, 896 (4th Cir. 2025) (quoting <u>Goines</u>, 822 F.3d at 166).[2]

### III. Factual Background

This case boils down to Plaintiffs' theory that Defendants are engaging in a retaliatory campaign to obscure Defendants' own budgetary mismanagement. <u>See</u> ECF No. 1 ¶ 123. This case is not a challenge to Medicaid's viability as a federal-state program, nor is it about any changes in the law for Medicaid funding under the current budget from Congress. Rather, the case is about payments for care rendered under current law, regulations, and guidance.

---

[2] The Complaint in this case was one hundred thirty-seven (137) pages, with seventy-one (71) exhibits attached, which exhibits consist of two hundred ninety-seven (297) pages.

Specifically, the parties dispute whether Defendants may reimburse Plaintiffs at different rates depending on whether the Medicaid beneficiary is American Indian/Alaskan Native ("AI/AN"). Plaintiffs claim that Medicaid reimbursement rates for non-AI/AN patients treated at their Medicaid clinic should be the same higher rate as for the AI/AN patients they treat, and that Virginia cannot restrict reimbursement for non-AI/AN patients to the lower Medicaid rate for non-AI/AN patients treated at other Medicaid clinics, without violating tribal sovereignty and their federally protected tribal rights. To understand Plaintiffs' theory of the case, a brief review of Plaintiffs' participation in the Medicaid program is in order.

Nansemond Indian Nation ("Nansemond") operates Fishing Point Healthcare, LLC ("Fishing Point"). Id. ¶¶ 30-31. Fishing Point participates in Medicaid, see id. ¶ 2, "a cooperative federal-state program that provides medical care to needy individuals." Douglas v. Indep. Living Ctr. of S. California, Inc., 565 U.S. 606, 610 (2012). As Spending Clause legislation, Medicaid "offers the States a bargain: Congress provides federal funds in exchange for the States' agreement to spend them in accordance with congressionally imposed conditions." Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 323 (2015). That process looks like this: "To qualify for federal funds, States must submit to a federal agency (CMS [Centers for Medicare & Medicaid Services], a

division of the Department of Health and Human Services) a state Medicaid plan that details the nature and scope of the State's Medicaid program." Douglas, 565 U.S. at 610. CMS then "reviews the State's plan . . . to determine whether [it] compl[ies] with the statutory and regulatory requirements governing the Medicaid program." Id. If it does, the state is eligible for Medicaid funding. Id. at 611.

The state must seek CMS approval to amend its plan. Id. at 610. This is commonly referred to as a State Plan Amendment ("SPA"). If CMS finds that the State Plan or Amendments no longer comply with the Medicaid statute, the Secretary of Health and Human Services "shall notify such State agency that further payments will not be made . . . until the Secretary is satisfied that there will no longer be any such failure to comply." 42 U.S.C. § 1396c. This withholding of federal funds has been described as the "sole remedy Congress provided . . . for the State's 'breach' of the Spending Clause contract," i.e., its agreement to spend federal funds in accordance with federal law. Armstrong, 575 U.S. at 328.

Once a state plan is in place, the "state is then entitled to reimbursement from the federal government of a certain percentage of the costs of providing medical care to eligible individuals." West Virginia v. U.S. Dep't of Health & Hum. Servs., 289 F.3d 281, 284 (4th Cir. 2002). This percentage is called the Federal Medical Assistance Percentage ("FMAP") and varies state by state. Id.; see

42 U.S.C. § 1396b(a)(1). A state's FMAP "is determined by a statutory formula that establishes a reimbursement rate of between 50% and 83% and gives higher reimbursement rates to states with lower per-capita incomes." West Virginia, 289 F.3d at 284 n.2 (citing 42 U.S.C. §§ 1396b(a)(1), 1396d(b)). This "financial contribution by both the Federal Government and the participating State" is the "cornerstone of Medicaid." Harris v. McRae, 448 U.S. 297, 308 (1980).

States receiving Medicaid funding must designate a "single State agency to administer or to supervise the administration of" their Medicaid plans. See 42 U.S.C. § 1396a(a)(5). In Virginia, that agency is the Department of Medical Assistance Services ("DMAS"). See 12 Va. Admin. Code § 30-10-10. DMAS is charged with distributing funds to providers who furnish services to Medicaid-eligible individuals. This can be done through a fee-for-service program, in which "beneficiaries seek services directly from providers, who are then paid directly by DMAS." Virginia Hosp. & Healthcare Ass'n v. Roberts, 671 F. Supp. 3d 633, 643 (E.D. Va. 2023) (Hudson, J.). Or, funds can be distributed through a managed-care program, in which DMAS contracts with Managed Care Organizations ("MCOs"), "which in turn provide medical services to beneficiaries by contracting with a network of physicians, hospitals, and other healthcare providers." Id.

Plaintiffs operate Fishing Point as a fee-for-service provider. ECF No. 1-4 at 1 (Tribal Reimbursement SPA). As a Tribal Health Program, Fishing Point is entitled to bill DMAS at the Federal All-Inclusive Rate ("Federal AIR"). Id. The Federal AIR is a flat fee of $801 paid to providers for each patient encounter. See 89 Fed. Reg. 101607 (Dec. 16, 2024). Current guidance requires states to compensate Tribal Health Programs at the Federal AIR for each encounter regardless of whether the Medicaid beneficiary is AI/AN. ECF Nos. 1-2; 1-3 (CMS Guidance). The federal government reimburses the state at a special FMAP of one hundred percent (100%) for services rendered to AI/AN beneficiaries. See ECF No. 1-2 at 7; 42 U.S.C. § 1396d(b). Thus, when Plaintiffs serve AI/AN beneficiaries, Defendants bear essentially none of the cost. See North Dakota ex rel. Olson v. Centers for Medicare & Medicaid Servs., 403 F.3d 537, 539 (8th Cir. 2005) (noting that the 100% FMAP "avoid[s] shifting the federal government's . . . responsibility for Native American health care onto the states").

The situation is markedly different when a Tribal Health Program serves non-AI/AN beneficiaries. In this case, the state is reimbursed at the standard FMAP, which in Virginia is 50.99%. See ECF No. 1-2 at 7; 88 Fed. Reg. 81092 (Nov. 21, 2023). Thus, when Plaintiffs serve non-AI/AN beneficiaries, Defendants bear essentially half the cost, rather than none of it.

9

According to Plaintiffs, this is where Defendants ran afoul. Plaintiffs claim that Defendants "mistakenly assum[ed] that all beneficiaries served by Fishing Point were AI/AN," and "improperly drew down a one hundred percent (100%) [FMAP] even for non-AI/AN patients, thereby creating a substantial risk that the federal government would reclaim millions of dollars from Defendants." ECF No. 1 ¶ 6. Plaintiffs allege Defendants took the following actions to remedy this shortfall.

On October 10, 2024, Cheryl Roberts, Director of DMAS, sent Plaintiffs a letter informing them that DMAS was seeking guidance from CMS on whether reimbursement for Personal Care Attendant ("PCA") services needed to be made at the Federal AIR. See ECF Nos. 1 ¶ 213; 1-45 (letter). The letter explained that during this review, DMAS was pending reimbursement of all PCA claims submitted by Plaintiffs. See ECF No. 1-45 at 1.

At some point during 2024, Plaintiffs sought approval from Defendants to open a Medicaid-eligible dental clinic. Id. ¶ 156. On January 17, 2025, Defendant Jeffrey Lunardi sent Plaintiffs an email informing them that their application was placed into a "pending" status. Id. ¶ 260; ECF No. 1-65 (email). The email explained that "DMAS intends to amend its state plan to clarify that dental services provided by tribal clinics are not reimbursed at the all-inclusive rate" and that "[t]o avoid any uncertainty as

10

to the applicable reimbursement rate . . . we are pending your request until that process is complete." ECF No. 1-65 at 1.

Shortly thereafter, on February 4, 2025, the Senate of Virginia released a proposed Budget Amendment which would amend the state Medicaid plan to condition the state's reimbursement rate on whether the beneficiary was AI/AN. ECF No. 1 ¶ 274. Governor Youngkin returned the proposal to the General Assembly with modifications. Id. ¶ 277. Specifically, Governor Youngkin inserted the following language: "If the above rate structure is not approved by the Centers for Medicare and Medicaid Services, then DMAS shall seek approval to reimburse IHS facilities, tribal clinics, and tribal FQHCs at the standard Medicaid rate for all services." H.B. 1600, 2025 Regular Sess. (Governor's Recommendations), available at https://budget.lis.virginia.gov/ amendment/2025/1/HB1600/Enrolled/GR/ (last accessed August 7, 2025).[3] He stated that "this proposed language 'clarifies that services provided to non-tribal members should be paid based on the DMAS standard rate methodology,' rather than the Federal AIR." Id. ¶ 278 (quoting H.B. 1600, 2025 Regular Sess. (Governor's Recommendations)).

---

[3] The Governor's amendment was included in the enacted version of H.B. 1600. See Acts of Assembly, Chapter 725, Item 288 TTTTT (Va. 2025), available at https://budget.lis.virginia.gov/get/ budget/5130/HB1600/ (last accessed August 7, 2025).

Lastly, on March 31, 2025, Defendants froze roughly $1.7 million worth of Plaintiffs' claims without notice or explanation. Id. ¶¶ 7, 299. A day later, Plaintiffs filed suit against the Commonwealth of Virginia, the Virginia Office of the Secretary of Health and Human Resources ("HHR"), DMAS, Governor Glenn Youngkin in his official and personal capacity, Secretary of HHR Janet Vestal Kelly in her official capacity, Director of DMAS Cheryl Roberts in her official and personal capacity, and Deputy Director of DMAS Jeffrey Lunardi in his official and personal capacity. Id. at 1.

## IV. Analysis

### A. Immunity Doctrines

Defendants argue that sovereign immunity bars all claims for prospective relief, except for those against Defendants Cheryl Roberts and Jeffrey Lunardi in their official capacities. ECF No. 27 at 22. They also contend that legislative immunity bars the personal capacity claims against Governor Youngkin. Id. at 19-20. Plaintiffs agreed to withdraw their claims for prospective relief against the Commonwealth of Virginia, HHR, and DMAS. See ECF Nos. 34 at 9; 38. Since Plaintiffs only sought prospective relief against these entities, Plaintiffs' claims against the Commonwealth of Virginia, HHR, and DMAS are **DISMISSED WITHOUT PREJUDICE**. See Biggs v. North Carolina Dep't of Public Safety, 953 F.3d 236, 242 (4th Cir. 2020) (finding that Ex parte Young does

12

not allow suits against states or state agencies); <u>Lancaster</u>, 109 F.4th at 295 (finding that dismissal for lack of subject-matter jurisdiction should be without prejudice). Accordingly, the parties only dispute whether immunity bars the claims against Governor Youngkin and Secretary Kelly.

## 1. Legislative Immunity

Legislative immunity provides officials with "absolute immunity from liability under § 1983 for their legislative activities." <u>Bogan v. Scott-Harris</u>, 523 U.S. 44, 49 (1998) (citations omitted). This immunity extends to "'officials outside the legislative branch . . . when they perform legislative functions' and attaches to 'all actions taken in the sphere of legitimate legislative activity.'" <u>Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md.</u>, 684 F.3d 462, 470 (4th Cir. 2012) (alteration in original) (quoting <u>Bogan</u>, 523 U.S. at 54-55).

Defendants argue that Governor Youngkin is protected by legislative immunity, as "the only direct conduct the Governor allegedly took [was] 'endors[ing] a state budget amendment.'" ECF No. 27 at 19 (citing ECF No. 1 ¶¶ 38, 277-88, 363(a)). This is true to the extent that endorsing legislation is "legislative activity," and is therefore protected by legislative immunity. <u>Kensington</u>, 684 F.3d at 471 (citing <u>Baraka v. McGreevey</u>, 481 F.3d 187, 196 (3d Cir. 2007) (finding that "when a governor and a governor's appointee advocate bills to the legislature, they act

13

in a legislative capacity")). Plaintiffs counter that they "do not challenge the act of signing the budget itself. Rather, they contest the continuing executive enforcement of its provisions." ECF No. 34 at 12. Plaintiffs are correct that enforcement of the law is not "legislative activit[y]." Bogan, 523 U.S. at 54; cf. Rouse v. Moore, 724 F. Supp. 3d 410, 436 (D. Md. 2024) ("[E]ven if the promulgation (i.e. the development and adoption) of the Maryland [Supreme Court's] Rules is protected by legislative immunity, the execution, enforcement, and administration of those Rules is not."). Accordingly, to the extent that Governor Youngkin allegedly enforced unlawful actions or policies, he is not protected in his personal capacity by legislative immunity.

### 2. Sovereign Immunity

Sovereign immunity "bars federal courts from exercising jurisdiction over suits against nonconsenting states or state entities." Kadel v. North Carolina State Health Plan for Tchrs. & State Emps., 12 F.4th 422, 428 (4th Cir. 2021) (citing Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54 (1996)). Additionally, "'[s]uits against state officials in their official capacity' are 'treated as suits against the State' and are barred by sovereign immunity to the extent they seek monetary relief." King v. Youngkin, 122 F.4th 539, 543 (4th Cir. 2024) (quoting Hafer v. Melo, 502 U.S. 21, 25 (1991)), cert. denied sub nom., O'Bannon v. King, No. 24-964, __ U.S. __, 2025 WL 1727393 (June 23, 2025).

14

Plaintiffs argue that their suit falls under Ex parte Young, 209 U.S. 123 (1908), which provides a "well-settled" exception to sovereign immunity "that allows suits for declaratory or injunctive relief against state officers in their official capacities." King, 122 F.4th at 543 (quoting Gibbons v. Gibbs, 99 F.4th 211, 214 (4th Cir. 2024)). To qualify for this exception, the plaintiff must "allege[] an ongoing violation of federal law and seek[] relief properly characterized as prospective." Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 645 (2002) (citation omitted). The suit must also be "against officers with 'some connection with the enforcement of the act.'" Doyle v. Hogan, 1 F.4th 249, 254 (4th Cir. 2021) (citing Ex parte Young, 209 U.S. at 157). The latter requires a "'special relation' between the state officer sued and the challenged" government action "which provides the officer with the authority to enforce the particular law at issue." Id. (quoting Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 331 (4th Cir. 2001)). "Without this enforcement duty, the officer is merely 'a representative of the State' who cannot be sued because allowing such a suit would essentially 'make the State a party.'" Id. (quoting Ex parte Young, 209 U.S. at 157). Defendants argue that Plaintiffs have not shown this enforcement relationship for Governor Younkin or Secretary Kelly.

15

### a. Governor Youngkin

Plaintiffs contend that Governor Youngkin is amenable to suit because he "exercises authority over the agencies responsible for administrating Virginia's Medicaid program," and "endorsed a state budget amendment he understood to be unlawful." ECF No. 1 ¶ 38. They also claim that Governor Youngkin had "direct involvement in the implementation and enforcement of the challenged Medicaid reimbursement scheme." ECF No. 34 at 11. Plaintiffs cite the existence of a SharePoint folder titled "Governor's Confidential Working Papers," which allegedly contained documents related to the proposed Medicaid changes, as evidence that "[Governor] Youngkin was directly briefed on, and likely coordinated, the strategic rollout of the challenged reimbursement framework." Id. at 12 (citing ECF No. 1 ¶ 134). Additionally, Plaintiffs allege that "state agencies prepared and sent a Decision Package Request seeking authority to alter Medicaid contracts and plan amendments, which upon information and belief, was submitted to Governor Youngkin's office." Id. (citing ECF No. 1 ¶ 148).

At a threshold level, an allegation, such as Plaintiffs', that a governor has general supervisory authority over an executive agency merely by virtue of being Governor, is insufficient. Cf. Doyle, 1 F.4th at 255 (finding that the court must "search for more than the '[g]eneral authority to enforce the laws of the state'" (alteration in original) (quoting Waste Mgmt., 252 F.3d

at 331)). The same is true of Plaintiffs' allegation that Governor Youngkin endorsed the Budget Amendment. See Waste Mgmt., 252 F.3d at 331 ("The fact that [the Governor] has publicly endorsed and defended the challenged statutes does not alter our [conclusion that Ex parte Young does not apply].").

Nor does Plaintiffs' allegation that Governor Youngkin had "direct involvement in the implementation and enforcement of the challenged Medicaid reimbursement scheme," show the requisite enforcement connection. ECF No. 34 at 11. Plaintiffs' allegations show only that Governor Youngkin received materials related to DMAS's decision-making process, and may have consulted with agency officials. See ECF No. 1 ¶¶ 134, 148. There is no case holding that this alone subjects an official to suit under Ex parte Young, and for good reason. To find that the Governor's conduct subjects him to suit would render the enforcement requirement a dead letter, as governors are expected, if not obliged, to consult with officials on important matters of public policy. For this reason and those stated above, Governor Youngkin does not possess sufficient enforcement authority to be sued under Ex parte Young. Accordingly, sovereign immunity protects him from suit in his official capacity, and such claims are **DISMISSED WITHOUT PREJUDICE.**

## b. Secretary Kelly

Plaintiffs argue that Secretary Kelly had "supervisory authority" over DMAS and Medicaid policy, and that she failed to use this authority to prevent alleged violations of law. See ECF No. 1 ¶¶ 35, 364a., 364b. As with Governor Youngkin, such a generalized assertion of supervisory authority is insufficient. See supra Part IV.A.2.a. at 16.

Plaintiffs also allege that unlawful acts were taken "under the direction and with the involvement of Defendant Kelly." ECF No. 1 ¶ 364c. In Doyle, the Fourth Circuit held that it "could find the required connection if the Governor is able to direct [enforcement]." 1 F.4th at 256 (emphasis in original). However, the court was referring to formal direction through a statutory mechanism, not informal direction through political pressure or advisement. See id. (examining statutes and regulations to determine whether the Governor had enforcement power). The Fourth Circuit has underscored this distinction, holding that "political influence over those who are responsible for ongoing violations . . . does not give the governor the 'special relation' needed to make her a proper defendant under Ex parte Young." Kobe v. Haley, 666 F. App'x 281, 300 (4th Cir. 2016) (unpublished) (per curiam) (emphasis in original) (citing Waste Mgmt., 252 F.3d at 331). Given the court's focus on statutory authority, it is noteworthy that the Medicaid regulations require Medicaid

18

officials, and Medicaid officials alone, to administer the state plan. See 42 C.F.R. § 431.10(e) ("The Medicaid agency may not delegate, to other than its own officials, the authority to supervise the plan or to develop or issue policies, rules, and regulations on program matters.").[4] For these reasons, Secretary Kelly does not possess the requisite enforcement connection to be sued under Ex parte Young and is protected by sovereign immunity. Since Secretary Kelly was only sued in her official capacity, all claims against her are **DISMISSED WITHOUT PREJUDICE.**

### B. Parens Patriae

Plaintiffs allege: "The Nation brings this action on its own behalf and in its parens patriae capacity to safeguard the rights and interests of its citizens, including their access to federally protected healthcare." ECF No. 1 ¶ 30. This one sentence is the sole reference in the Complaint to parens patriae. See id.

"A state may sue on behalf of its citizens as parens patriae when the interests of a group of citizens are at stake, as long as the state is also pursuing a quasi-sovereign interest." AU Optronics Corp. v. South Carolina, 699 F.3d 385, 389 n.5 (4th Cir. 2012) (first citing United States v. Johnson, 114 F.3d 476, 481-82

---

[4] At oral argument, Plaintiffs argued that "Medicaid agency," as used in this provision, referred to federal officials. See ECF No. 38. This is mistaken. The regulation states that: "For purposes of this part— . . . Medicaid agency is the single State agency for the Medicaid program." 42 C.F.R. § 431.10(a)(2).

(4th Cir. 1997); then citing <u>In re Edmond</u>, 934 F.2d 1304, 1310 (4th Cir. 1991)). This doctrine is also available to Indian tribes. <u>See, e.g.</u>, <u>Cherokee Nation v. McKesson Corp.</u>, 529 F. Supp. 3d 1225, 1231-32 (E.D. Okla. 2021) (finding that the tribe could bring an action as <u>parens patriae</u> to remedy the effects of the opioid epidemic).

To sustain a suit as <u>parens patriae</u>, a plaintiff must show that: (1) it has "a legitimate quasi-sovereign interest in the litigation"; and (2) "the challenged action ha[s] a sufficiently 'substantial' effect on the state's residents, rather than a narrow and definable class." <u>Aziz v. Trump</u>, 231 F. Supp. 3d 23, 32 (E.D. Va. 2017) (Brinkema, J.) (quoting <u>Alfred L. Snapp & Son, Inc. v. Puerto Rico</u>, 458 U.S. 592, 607-609 (1982)). Plaintiffs allege "that its members and being systematically denied access to medically necessary care." ECF No. 34 at 27; <u>see</u> ECF No. 1 ¶¶ 265, 267 (alleging that pending Plaintiffs' dental clinic application has restricted its citizens' access to dental care). This qualifies as a quasi-sovereign interest. <u>See</u> <u>Snapp</u>, 458 U.S. at 607 ("[A] State has a quasi-sovereign interest in the health and well-being — both physical and economic — of its residents in general.").

Plaintiffs must also "allege[] injury to a sufficiently substantial segment of [their] population." <u>Id.</u> When assessing this requirement, courts "consider persons who are both directly and indirectly affected." <u>Aziz</u>, 231 F. Supp. 3d at 32 (citing

Snapp, 458 U.S. at 609). Indirect effects can be intangible. For example, in addressing a travel ban on individuals from certain Muslim-majority countries, the court in Aziz found that the "stigma of discrimination" carried beyond the roughly three hundred (300) Virginians directly impacted by the travel ban. Id. (citing Snapp, 458 U.S. at 609).

Plaintiffs have not sufficiently pled the "substantiality" requirement. They have not alleged how many of their members are affected by Defendants' alleged actions, let alone how many are being deprived of healthcare. See Northern Arapaho Tribe v. Burwell, 118 F. Supp. 3d 1264, 1278 (D. Wyo. 2015) (rejecting parens patriae standing because "[t]he Tribe has not shown or even alleged that a sufficiently substantial segment of its population faces injury"). Plaintiffs allege that their citizens are being denied care, but only in general terms. See, e.g., ECF No. 1 ¶ 267 ("Tribal citizens—including children and elders—and other Medicaid-eligible patients in underserved areas are being deprived of crucial dental care.") (emphasis added). However, no individual tribe members are named and no specific harm to any individual tribe member is pleaded. Moreover, it is not clear specifically who are the "other Medicaid-eligible patients," or which "underserved areas are being deprived of crucial dental care." Id. These general allegations are not enough to support parens patriae standing in this case. Cf. In re Edmond, 934 F.2d at 1310

(holding that "the challenged activity must affect more than just an 'identifiable group of individual residents'" (quoting Snapp, 458 U.S. at 607)).

### C. Claims I and II – Violation of the Supremacy Clause and Interference with Indian Self-Determination and Educational Assistance Act ("ISDEAA") Contract

Claims I and II seek prospective, injunctive relief against the individual Defendants in their official capacities.[5] See ECF No. 1 ¶¶ 35, 36, 37, 38, 318, 319, 336, 337. Since Governor Youngkin and Secretary Kelly are protected by sovereign immunity, Claims I and II apply only against Director Roberts and Deputy Director Lunardi in their official capacities.[6] See supra Part IV.A.2. (discussing sovereign immunity).

Defendants contend that the court should dismiss both claims for lacking a cause of action. See ECF No. 27 at 23, 25–26. As for Claim I, Violation of the Supremacy Clause, Defendants cite Armstrong for its holding that "the Supremacy Clause is not the

_____

[5] Plaintiffs briefly invoke the Declaratory Judgment Act. See ECF No. 1 ¶¶ 27, 317, 335, 366. "A request for declaratory relief is barred to the same extent that the claim for substantive relief on which it is based would be barred." CGM, LLC v. BellSouth Telecommunications, Inc., 664 F.3d 46, 55–56 (4th Cir. 2011) (quoting Int'l Ass'n of Machinists & Aerospace Workers v. Tennessee Valley Auth., 108 F.3d 658, 668 (6th Cir. 1997)). Since the court ultimately finds that Plaintiffs have not stated a claim for substantive relief, see infra Part V. (Conclusion), they are not entitled to relief under the Declaratory Judgment Act.

[6] Accordingly, references to "Defendants" in this Section C. of the Opinion refer to Director Roberts and Deputy Director Lunardi, unless otherwise indicated.

22

source of any federal rights, and certainly does not create a cause of action." Id. at 23 (quoting Armstrong, 575 U.S. at 324-25). Defendants argue that Claim II, Interference with ISDEAA Contract, lacks a cause of action because "Plaintiffs identify no right of action available against third-party States or state actors for purported 'interference' with an ISDEAA contract." Id. at 25.

Were the court to rigidly adhere to the labels Plaintiffs have affixed to their claims, Defendants may well be correct. However, the Fourth Circuit has instructed that courts should look through such labels and address the underlying merits. See Stanton v. Elliott, 25 F.4th 227, 237-38 (4th Cir. 2022) (instructing courts to "focus on the substance of the allegations," as "[t]he Federal Rules of Civil Procedure 'do not countenance dismissal of a complaint for imperfect statement of the legal theory.'" (quoting Johnson v. City of Shelby, 574 U.S. 10, 11 (2014))). The court opts to do so here.

While these claims are titled differently, they are largely duplicative. Both seek to enjoin Defendants from violating various provisions of federal law, a claim most often associated with Ex parte Young. See ECF No. 1 ¶¶ 28, 306, 332. These claims also both invoke field preemption, i.e., the implied preemption of state regulations in fields which are comprehensively regulated by the federal government. See id. ¶¶ 316, 328. Additionally, Plaintiffs invoke conflict preemption, albeit only in their Response. See ECF

No. 34 at 19 ("Virginia's actions should therefore be judged invalid under conflict preemption principles."). The court will assess Plaintiffs' Claims I and II with these legal theories in mind.

### 1. Equitable Relief under Ex parte Young

Plaintiffs' claims that Defendants are violating federal law sound in Ex parte Young, which "allows private citizens, in proper cases, to petition a federal court to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution or a federal statute." Antrican v. Odom, 290 F.3d 178, 184 (4th Cir. 2002) (citing Ex parte Young, 209 U.S. at 159). A suit under Ex parte Young can be sustained without a separate cause of action. See King 122 F.4th at 544 n.1 ("[A]lthough the Sixth Circuit remarked that 'Ex parte Young provides a path around sovereign immunity if the plaintiff already has a cause of action from somewhere else,' the Supreme Court has since clarified that Ex parte Young is a 'judge-made remedy' that stems from courts' power to grant equitable relief." (emphasis in original) (first quoting Michigan Corr. Org. v. Michigan Dep't of Corr., 774 F.3d 895, 905 (6th Cir. 2014); then quoting Armstrong, 575 U.S. at 326-27)). This doctrine has been used to challenge state officials' compliance with the Medicaid Act. See, e.g., Forloine v. Persily, 726 F. Supp. 3d 617, 631-32 (S.D.W. Va. 2024).

24

To plead such a claim, a plaintiff must "allege[] an ongoing violation of federal law and seek[] relief properly characterized as prospective." Verizon, 535 U.S. at 645 (citation omitted). However, even when a plaintiff does so, the court's power "to enjoin unlawful executive action is subject to express and implied statutory limitations," namely, when "Congress[] 'inten[ded] to foreclose' equitable relief." Armstrong, 575 U.S. at 327-28 (quoting Verizon, 535 U.S. at 647); see, e.g., King, 122 F.4th at 546-47 (applying this principle). Thus, Plaintiffs must: (1) plead an "ongoing violation of federal law," and (2) show that "Congress[] [did not] 'inten[d] to foreclose' equitable relief."

### a. Alleged Violations of State Law

In several instances, Plaintiffs allege that Defendants' actions violate the state Medicaid plan and SPAs. See, e.g., ECF No. 1 ¶ 306d ("The delay also directly undermines Virginia's approved State Medicaid Plan and Tribal Reimbursement SPA . . . ."). While the state plan and SPAs require CMS approval, they are still state law. See Concourse Rehab. & Nursing Ctr., Inc. v. DeBuono, 179 F.3d 38, 44 (2d Cir. 1999) ("The fact that federal law conditions State participation in the Medicaid program on the State's adoption of a Medicaid plan does not thereby transform provisions of a State's plan into federal law."). The Ex parte Young exception is "inapplicable to a suit brought against a State official to compel his compliance with State law."

Bragg v. West Virginia Coal Ass'n, 248 F.3d 275, 290 (4th Cir. 2001) (citing Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106 (1984)). Accordingly, to the extent that Plaintiffs allege that Defendants' actions are contrary to Virginia's state Medicaid plan and SPAs, those claims are barred by sovereign immunity and are **DISMISSED WITHOUT PREJUDICE** against Defendants Roberts and Lunardi in this federal case. However, Plaintiffs are free to pursue these claims through DMAS's administrative appeals process, see Va. Code § 32.1-325.1, after which they may seek review in Virginia's state courts, see MPS Healthcare, Inc. v. Dep't of Med. Assistance Servs./Commonwealth of Virginia, 70 Va. App. 624, 629-30 (2019) (explaining how the case progressed through the appeals process).

### b. Alleged Violations of Federal Law

#### i. Non-Payment of PCA Claims

Plaintiffs also allege violations of federal law. Specifically, Plaintiffs allege that on October 10, 2024, Defendants "began unlawfully withholding Medicaid reimbursements for PCA services." ECF No. 1 ¶¶ 306a-b, 332a. Plaintiffs contend these actions violate the provisions of federal law or regulations addressed below.

- **42 U.S.C. § 1396a(a)(13)(A)**

This section directs the State Medicaid Plan to provide "for a public process for determination of rates of payment" for various

26

services. 42 U.S.C. § 1396a(a)(13)(A). Plaintiffs do not allege that Defendants did not follow this directive, but rather that they are not being paid at all for PCA services. For this reason, Plaintiffs have not stated a claim on this ground.

- **42 U.S.C. § 1396j(d)**

This section cross-references 25 U.S.C. § 1645 "[f]or provisions relating to the authority of certain Indian tribes . . . to elect to directly bill for, and receive payment for, health care services provided by a hospital or clinic of such tribes or organizations." 42 U.S.C. § 1396j(d). Title 25 U.S.C. § 1645 allows tribes to enter into sharing arrangements for health facilities with the Department of Veterans Affairs and the Department of Defense, and for tribes to be reimbursed for services they provide to agency beneficiaries. See 25 U.S.C. § 1645(a), (c). As Plaintiffs do not operate under one of these arrangements, Defendants' conduct does not violate this provision.

- **42 C.F.R. § 447.45(d)**

This section provides that:

(1) The Medicaid agency must require providers to submit all claims no later than 12 months from the date of service.

(2) The agency must pay 90 percent of all clean claims from practitioners, who are in individual or group practice or who practice in shared health facilities, within 30 days of the date of receipt.

(3) The agency must pay 99 percent of all clean claims from practitioners, who are in individual or group

practice or who practice in shared health facilities, within 90 days of the date of receipt.

(4) The agency must pay all other claims within 12 months of the date of receipt, except in the following circumstances: . . . .

42 C.F.R. § 447.45(d). Plaintiffs allege that by withholding payment for PCA services since October 10, 2024, Defendants are violating 42 C.F.R. § 447.45(d)(2)-(3). See ECF No. 1 ¶¶ 72, 306b, 332a. However, Defendants note that subsections (2) and (3) only reference "practitioners," while (4) makes no such distinction. See ECF No. 27 at 27-28. They contend that this shows that Plaintiffs, who are a "clinic," and thus considered a "provider," rather than a "practitioner," are only subject to the time limit in subsection (4). Id.; see 42 C.F.R. § 489.2(b) ("The following providers are subject to the provisions of this part: . . . (4) Clinics, rehabilitation agencies, and public health agencies.") (emphasis added). Underscoring their interpretation is the fact that 42 C.F.R. § 447.45(d)(1) references "providers," while 42 C.F.R. § 447.45(d)(2)-(3) refer to "practitioners." See ECF No. 27 at 27-28.

This interpretation has merit, as "the Supreme Court has reiterated: 'where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" United States

28

v. Serafini, 826 F.3d 146, 149–50 (4th Cir. 2016) (quoting Russello v. United States, 464 U.S. 16, 23 (1983)). Other courts have reached the same conclusion. See, e.g., Crane v. Shewry, 2007 WL 2409665, at *2 (E.D. Cal. Aug. 21, 2007) ("Because Plaintiffs are institutional providers, as opposed to individual or group practitioners, Section 447.45(d)(4) applies." (citing Ill. Council on Long Term Care v. Bradley, 957 F.2d 305, 308 (7th Cir. 1992))). Since twelve (12) months have not passed since Defendants pended Plaintiffs' PCA claims on October 10, 2024, Plaintiffs have not alleged a violation of law.

- **42 C.F.R. § 455.104**

This provision requires providers to disclose their ownership interests. See 42 C.F.R. § 455.104(a)-(b). It does not concern payment and is not relevant to Plaintiffs' claim.

- **42 C.F.R. § 440.90(c)**

This provision defines "clinic services" to include: "Services furnished outside a clinic . . . by clinic personnel under the direction of a physician." 42 C.F.R. § 440.90(c). It does not describe when, if, or how these services are to be reimbursed, and thus does not support Plaintiffs' claim.

- **25 U.S.C. § 1621e**

This section grants Medicaid providers the right to reimbursement for certain services covered under: "(1) workers' compensation laws; or (2) a no-fault automobile accident insurance

29

plan or program." 25 U.S.C. § 1621e(b). This does not relate to Plaintiffs' claims.

- **SHO #16-002 and FAQ #11817**

These documents are CMS guidance advising states to reimburse Tribal Health Clinics at the same rate for AI/AN and non-AI/AN beneficiaries. See ECF Nos. 1-2 at 5 (SHO #16-002); 1-3 at 4 (FAQ #11817). Defendants contend that Plaintiffs' claim under these provisions fails, as "[a]gency 'interpretations contained in policy statements, agency manuals, and enforcement guidelines . . . lack the force of law.'" ECF No. 27 at 24 (quoting Christensen v. Harris Cnty., 529 U.S. 576, 587 (2000)). This may well be true, as the Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law." Armstrong, 575 U.S. at 326 (emphasis added) (citations omitted). Moreover, Defendants have not acted contrary to CMS guidance at this juncture. Pending Plaintiffs' PCA claims does not violate SHO #16-002 or FAQ #11817, since these provisions only mandate the reimbursement rate for submitted claims. They do not speak to when those claims need to be paid. Cf. 42 C.F.R. § 447.45(d).

### ii. Pending Dental Clinic Enrollment

Plaintiffs allege that "[s]ince at least January 17, 2025, Defendants have unlawfully blocked Fishing Point's enrollment as

a Medicaid dental provider by placing its application in indefinite 'pending' statuts." ECF No. 1 ¶ 306c; see id. ¶¶ 306d, 332b. Plaintiffs contend these actions violate federal law and regulations addressed below.

- **42 U.S.C. § 1396a(a)(8)**

Under this section, the State Medicaid Plan must: "provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8). Plaintiffs argue that Defendants violated this section by failing to timely process their application for a dental clinic. See ECF No. 1 ¶ 306c. However, the provision is phrased in terms of individuals; it does not mandate that provider applications be processed with "reasonable promptness." See Anchorage SNF, LLC v. Padilla, 2023 WL 1107994, at *9 (D. Md. Jan. 30, 2023) ("Based on the plain language of § 1396a(a)(8), Congress intended for Medicaid beneficiaries to receive reasonably prompt medical assistance. Section 1396a(a)(8) does not evidence Congressional intent to create a federal right to reasonably prompt payment for Medicaid providers like Plaintiffs." (citing Bio-Med. Applications of North Carolina, Inc. v. Elec. Data Sys. Corp., 412 F. Supp. 2d 549, 553-54 (E.D.N.C. 2006) (finding the same))).

- **42 C.F.R. § 431.107**

This provision "sets forth State plan requirements . . . that relate to the keeping of records and the furnishing of information by all providers of services." 42 C.F.R. § 431.107(a). Pending Plaintiffs' dental clinic application does not violate this provision.

- **42 C.F.R. § 455.104**

This regulation is the ownership disclosure provision. See supra Part IV.C.1.b. at 29. It is not relevant to Plaintiffs' claim.

- **25 U.S.C. § 1621t**

This section provides: "Licensed health professionals employed by a tribal health program shall be exempt, if licensed in any State, from the licensing requirements of the State in which the tribal health program performs the services." 25 U.S.C. § 1621t. The pending of Plaintiffs' dental clinic is unrelated to their providers' licensing, making this provision inapplicable.

- **25 U.S.C. § 1642**

This section allows Indian tribes to use federal funds to purchase healthcare. See 25 U.S.C. § 1642(a) ("Insofar as amounts are made available under law . . . to Indian tribes, . . . [the tribes] may use such amounts to purchase health benefits coverage . . . ."). It is not relevant to this action.

In their Response, Plaintiffs also cite 25 U.S.C. § 1642(b). See ECF No. 34 at 18. This section provides: "The purchase of coverage under subsection (a) by an Indian tribe . . . may be based on the financial needs of such beneficiaries . . . ." 25 U.S.C. § 1642(b). It too is not relevant to this action.

- **42 C.F.R. § 440.90(c)**

This is the definition of "clinic services." See supra Part IV.C.1.b. at 29. As such, it imposes no mandate that Defendants could have violated.

- **42 U.S.C. § 1396a(a)(23)**

This section, commonly referred to as the "freedom of choice" provision, allows Medicaid beneficiaries to obtain services from any provider "qualified to perform the service or services required." 42 U.S.C. § 1396a(a)(23). A provider is "'qualified to perform the service or services required' so long as that provider [is] professionally competent to do so." Planned Parenthood S. Atl. v. Kerr, 95 F.4th 152, 158 (4th Cir. 2024) (citation omitted), rev'd on other grounds, Medina, 606 U.S. __, 145 S. Ct. 2219. Pending Plaintiffs' dental clinic application would seem to violate this provision, since it restricts beneficiaries' choice of provider for a reason not related to that provider's qualifications. However, this provision is phrased in terms of individuals, not providers. See 42 U.S.C. § 1396a(a)(23) ("[A]ny individual eligible for medical assistance . . . may obtain such

assistance from any . . . .”). Plaintiffs, as providers, cannot assert this claim.

- **25 U.S.C. § 1680c(c)(2)**

This section grants Indian tribes the right to decide whether to provide health services to ineligible individuals. <u>See</u> 25 U.S.C. § 1680c(c)(2) (“In the case of health facilities operated under a contract or compact entered in to under the [ISDEAA], the governing body of the Indian tribe . . . is authorized to determine whether health services should be provided under such contract or compact to individuals who are not eligible for such health services . . . .”). This presumes the existence of an operating health clinic; it does not provide an independent right to open a clinic. Accordingly, pending Plaintiffs’ dental clinic application does not violate this provision.

### iii. Non-AI/AN Budget Amendment

Plaintiffs allege: “On March 24, 2024 [sic],[7] Governor Youngkin endorsed Virginia’s biennial Budget Amendment (Item 288 #16c, HB 1600), which unlawfully restricts Medicaid reimbursement for Tribal Health Programs based on the AI/AN status of the

---

[7] The correct date is March 24, 2025. <u>See</u> H.B. 1600, 2025 Regular Sess. (Governor’s Recommendations), available at https://budget.lis.virginia.gov/amendment/2025/1/HB1600/Enrolled /GR/ (last accessed August 7, 2025).

patient."[8] ECF No. 1 ¶ 306e. Plaintiffs allege the Budget Amendment violates the provisions of two federal statutes and the CMS guidance documents addressed below.

- **42 U.S.C. § 1396j(d)**

This provision cross-references 25 U.S.C. § 1645, which allows health facility sharing arrangements between tribes and federal agencies. See supra Part IV.C.1.b. at 27. It is not relevant.

- **25 U.S.C. § 1680c(c)(2)**

This provision gives tribes the right to choose whether to provide benefits to non-eligible beneficiaries. See supra Part IV.C.1.b. at 34. The parties do not dispute that Plaintiffs may serve non-AI/AN beneficiaries. See ECF No. 38. Rather, the Budget Amendment only concerns the reimbursement rates for these beneficiaries; it does not limit whom Plaintiffs can serve. Thus, the Budget Amendment does not violate this provision.

- **SHO #16-002 and FAQ #11817**

These documents are CMS guidance requiring states to reimburse Tribal Health Clinics at the same rate for AI/AN and

---

[8] The court makes clear that despite Plaintiffs' framing of this claim, it can only be asserted against Director Roberts and Deputy Director Lunardi. While Governor Youngkin endorsed the Budget Amendment, Director Roberts and Deputy Director Lunardi, as DMAS officials, would be tasked with enforcing it, making them the proper Defendants to this claim. See supra Part VI.A.2.b. at 18-19. (discussing regulations requiring Medicaid officials to administer the state Medicaid plan).

non-AI/AN beneficiaries. See supra Part IV.C.1.b. at 30. The Budget Amendment would seem to conflict with this guidance. However, the Budget Amendment does not, by itself, affect how Defendants reimburse Tribal Health Clinics for serving non-AI/AN beneficiaries. Rather, it merely authorizes DMAS to seek CMS approval for this change. See Acts of Assembly, Chapter 725, Item 288 TTTTT (Va. 2025) ("DMAS is authorized . . . to seek all necessary federal authority through state plan or waiver amendments submitted to [CMS] . . . to implement the provisions of this paragraph. The department shall implement this reimbursement change consistent with the effective date of the appropriate federal authority . . . ."). Since any change is contingent upon CMS's approval, the Budget Amendment does not violate SHO #16-002 or FAQ #11817.

### iv. Payment Freeze of March 31, 2025

Plaintiffs allege that "on or about March 31, 2025, Defendants began unlawfully withholding virtually all Medicaid reimbursements for services furnished by Fishing Point by placing the associated claims in indefinite 'pending' status without legal justification." ECF No. 1 ¶¶ 306g, 332d. Plaintiffs contend this payment freeze violated the federal provisions addressed below.

- **42 U.S.C. § 1396a(a)(8)**

This provision discusses the furnishing of services to individuals, not providers. See supra Part IV.C.1.b. at 31. It does not support Plaintiffs' claim.

- **42 C.F.R. § 447.45(d)(2)**

This is the timely payment provision. See supra Part IV.C.1.b. at 27-28. Defendants have not violated this provision because Plaintiffs, as providers, are subject to the twelve (12) month payment timeline. See 42 C.F.R. § 447.45(d)(4).

- **42 C.F.R. § 431.107(b)**

This is a recordkeeping provision. See supra Part IV.C.1.b at 31. It does not relate to the payment freeze.

- **42 C.F.R. § 455.104**

This is the ownership disclosure provision. See supra Part IV.C.1.b. at 29. It is not relevant to this action.

- **42 C.F.R. § 440.90(c)**

This is the definition of "clinic services." See supra Part IV.C.1.b. at 29. It does not mandate payment of claims.

### v. Failure to Consult

Plaintiffs allege that Defendants failed to consult them before making certain changes to their Medicaid program, as required by 42 U.S.C. § 1396a(a)(73) and 42 C.F.R. § 431.408(b). ECF No. 1 ¶¶ 306f, 332c, 332e. Specifically, Plaintiffs contend

37

that "Defendants failed to consult with Plaintiffs before: (1) withholding Medicaid payment for PCA services at the Federal AIR; (2) indefinitely delaying Fishing Point's dental provider enrollment; (3) endorsing Virginia's [B]udget [A]mendment . . . which unlawfully limits reimbursement based on AI/AN status; and (4) pended [sic] virtually all Medicaid reimbursements owed to Fishing Point on March 31." ECF No. 1 ¶ 332e.

> [P]rovide for a process under which the State seeks advice on a regular, ongoing basis from designees of such Indian Health Programs and Urban Indian Organizations on matters relating to the application of this subchapter that are likely to have a direct effect on such Indian Health Programs and Urban Indian Organizations and that—
>
> (A) shall include solicitation of advice prior to submission of any plan amendments, waiver requests, and proposals for demonstration projects likely to have a direct effect on Indians, Indian Health Programs, or Urban Indian Organizations; . . . .

Id. Title 42 C.F.R. § 431.408(b) provides more detail on consultation requirements.

The parties dispute the import of these provisions. Defendants, relying on language in 42 C.F.R. § 431.408(b)(2), argue that they only need to comply with the requirements set out in Virginia's Tribal Consultation SPA. See ECF No. 27 at 29; 42 C.F.R. § 431.408(b)(2) ("Consultation with Federally-recognized Indian tribes and solicitation of advice from affected Indian health providers and urban Indian organizations must be conducted in

Under 42 U.S.C. § 1396a(a)(73), the State Medicaid Plan must:

38

accordance with the consultation process outlined in the July 17, 2001 letter or the State's formal tribal consultation agreement or process . . . .") (emphasis added). Under this reading, Defendants argue that they need only "provide 'written communication' about SPAs or waivers before submitting them to CMS and must offer a 30-day period for tribes to request additional information or offer comments." ECF No. 27 at 29 (quoting ECF No. 1-5 (Tribal Consultation SPA)).

Plaintiffs argue that the provisions create a broader right to consultation, and require that "if a state's Medicaid decisions will directly affect Tribal Health Programs, the state must consult those Tribal Nations as part of its plan administration." ECF No. 34 at 31. In doing so, they focus on the more general language in the prefatory section of the statute, which instructs states to "provide for a process under which the State seeks advice on a regular, ongoing basis" from Indian tribes affected by changes in Medicaid policy. 42 U.S.C. § 1396a(a)(73) (emphasis added).

Some portions of the statute support Plaintiffs' interpretation. Notably, the prefatory section is conjunctive. See 42 U.S.C. § 1396a(a)(73) ("[States must] provide for a process under which the State seeks advice on a regular, ongoing basis . . . and that . . . .") (emphasis added). Thus, the more specific requirements in 42 U.S.C. § 1396a(a)(73)(A) and 42 C.F.R.

§ 431.408(b) would seem to apply in addition to the generalized duty in the prefatory section.

However, the court must not miss the "forest for the trees," as much else suggests that Plaintiffs' reading is overbroad. To start, the prefatory section only requires that states "provide for a process under which the State seeks advice on a regular, ongoing basis." 42 U.S.C. § 1396a(a)(73) (emphasis added). The state has done so in its Tribal Consultation SPA. See ECF No. 1-5. If Plaintiffs are dissatisfied with Defendants' compliance with the SPA, they can pursue those claims elsewhere. See Bragg, 248 F.3d at 290 (finding that the Ex parte Young exception is "inapplicable to a suit brought against a State official to compel his compliance with State law" (citing Pennhurst, 465 U.S. at 106)).

Moreover, even if the statute imposes direct consultation requirements on the state, rather than merely directing it to provide a process for consultation, those requirements are far more narrow than Plaintiffs contend. Plaintiffs emphasize the broad language in the prefatory section; however, "[a] 'commonplace of statutory construction [is] that the specific governs the general.'" In re Wright, 826 F.3d 774, 779 (4th Cir. 2016) (alteration in original) (quoting United States ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency, 745 F.3d 131, 138 (4th Cir. 2014)). "Along these lines, a general provision should

40

not be applied when doing so would undermine limitations created by a more specific provision." Id. (internal quotation marks omitted) (quoting Coady v. Vaughn, 251 F.3d 480, 484 (3d Cir. 2001)). Applying this principle, the more specific provisions, in 42 U.S.C. § 1396a(a)(73)(A) and 42 C.F.R. § 431.408(b), would supersede the broad language in the prefatory section, since these provisions prescribe a narrower set of circumstances in which consultation is required. Specifically, the statute directs that the state "shall include solicitation of advice prior to submission of any plan amendments, waiver requests, and proposals for demonstration projects." 42 U.S.C. § 1396a(a)(73)(A). Defendants have done so. See ECF Nos. 1-54 (public notice of intention to amend state plan to exclude PCA services from reimbursement at Federal AIR with a sixty (60) day period for comment); 1-55 (letter to Tribal leaders informing them of the comment period).[9]

While the lion's share of evidence supports a narrower reading of 42 U.S.C. § 1396a(a)(73) than Plaintiffs advise, the court need

---

[9] None of Defendants' other actions, i.e., non-payment of PCA claims, the pending of Plaintiffs' dental clinic application, and freezing all claims on March 31, 2025, would require a comment period, since they did not require submission to CMS for approval. See 42 U.S.C. § 1396a(a)(73)(A) (requiring that the state "shall include solicitation of advice prior to submission [to CMS] of any plan amendments, waiver requests, and proposals for demonstration projects") (emphasis added). The Budget Amendment conditioning reimbursement on a beneficiary's AI/AN status requires CMS approval, but Plaintiffs have not alleged that Defendants submitted anything to CMS on this issue.

not decide this question definitively. For reasons explained in Part IV.C.1.c. below, even if the court were to adopt Plaintiffs' interpretation of 42 U.S.C. § 1396a(a)(73), they would not be able to obtain equitable relief.

### c. Congress's "Intent to Foreclose Relief"

A well-pleaded claim that a state official is violating federal law does not end the inquiry under Ex parte Young. The court must also find that Congress did not "'inten[d] to foreclose' equitable relief." Armstrong, 575 U.S. at 328 (quoting Verizon, 535 U.S. at 647). This question turns on two (2) considerations: (1) whether Congress provided a "sole remedy . . . for a State's failure to comply" with the applicable law, and (2) whether the statutory provision at issue is "judicially unadministrable." Id.

The court assumes, arguendo, that Plaintiffs' interpretation of 42 U.S.C. § 1396a(a)(73) is correct. This provision falls under the Medicaid Act. Defendants argue that claims under the Medicaid Act must be dismissed as "'the sole remedy Congress provided for a State's failure to comply with Medicaid's requirements . . . is the withholding of Medicaid funds by the Secretary of Health and Human Services.'" ECF No. 36 at 12-13 (alteration in original) (quoting Armstrong, 575 U.S. at 328). However, this factor is not necessarily dispositive. See Armstrong, 575 U.S. at 328 ("The provision for the Secretary's enforcement by withholding funds might not, by itself, preclude the availability of equitable

42

relief." (emphasis in original) (citing <u>Virginia Off. for Prot. & Advoc. v. Stewart</u>, 563 U.S. 247, 257 n.3 (2011))). The court must also examine whether a provision under the Medicaid Act is "judicially unadministrable." <u>Id.</u>

<u>Armstrong</u> provides a barometer for judicial administrability. The case concerned 42 U.S.C. § 1396a(a)(30)(A), which requires that a state:

> [P]rovide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area . . . .

<u>Id.</u> The Court found that "[i]t is difficult to imagine a requirement broader and less specific than § 30(A)'s mandate that state plans provide for payments that are 'consistent with efficiency, economy, and quality of care,' all the while 'safeguard[ing] against unnecessary utilization of . . . care and services.'" <u>Armstrong</u>, 575 U.S. at 328 (alterations in original) (quoting 42 U.S.C. § 1396a(a)(30)(A)). It concluded: "Explicitly conferring enforcement of this judgment-laden standard upon the Secretary alone establishes, we think, that Congress 'wanted to make the agency remedy that it provided exclusive.'" <u>Id.</u> (quoting

<u>Gonzaga Univ. v. Doe</u>, 536 U.S. 273, 292 (2002) (Breyer, J., concurring in judgment)).

The Fourth Circuit's recent decision in <u>King</u> also offers a point of comparison. In <u>King</u>, the court examined the Virginia Readmission Act, a federal statute enacted in the wake of the Civil War that set the conditions for Virginia's reentry into the Union, as follows:

> [T]he Constitution of Virginia shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote who are entitled to vote by the Constitution herein recognized, except as a punishment for such crimes as are now felonies at common law . . . .

122 F.4th at 542 (quoting Pub. L. No. 41-10, 16 Sat. 63 (1870)). The court held there was "no basis for concluding the Virginia Readmission Act lacks judicially manageable standards." <u>Id.</u> at 547. This was true even though "interpreting and applying this statute may not always be easy," given courts may have to examine "whether people with certain convictions would have been 'entitled to vote' under Virginia's 1869 constitution or if a particular crime was a 'felon[y] at common law.'" <u>Id.</u> (alteration in original). The court found that "such questions . . . fall within the heartland of what federal courts do every day." <u>Id.</u> (collecting cases).

With these principles in mind, the court turns to Plaintiffs' interpretation of 42 U.S.C. § 1396a(a)(73). Plaintiffs argue that

the statute requires the state to "seek[] advice on a regular, ongoing basis," independent of the more specific requirements. ECF No. 34 at 31 (quoting 42 U.S.C. § 1396a(a)(73)). This places Plaintiffs in a quagmire, for "regular, ongoing basis" is the type of "judgment-laden" standard that the Court in Armstrong found was "judicially unadministrable." See 575 U.S. at 328. Moreover, determining what constitutes a "regular, ongoing basis" in this context is not something that "fall[s] within the heartland of what federal courts do every day." King, 122 F.4th at 547. The result is that even assuming that Plaintiffs' interpretation of 42 U.S.C. § 1396a(a)(73) is correct, they cannot obtain equitable relief because their proposed standard is "judicially unadministrable." Armstrong, 575 U.S. at 328.

### 2. Field Preemption

Plaintiffs also assert that Defendants' actions are barred by field preemption. See ECF No. 1 ¶¶ 316, 328. At the hearing held on July 1, 2025, the court ruled that Plaintiffs have not stated a claim of field preemption. See ECF No. 38. The court briefly reiterates its holding here.

"Field preemption refers to the 'rare case[]' in which Congress intends for federal law to exclusively govern a particular subject." Just Puppies, Inc. v. Brown, 123 F.4th 652, 661 (4th Cir. 2024) (alteration in original) (citations omitted). Courts "can infer that intent when 'Congress has legislated so

45

comprehensively that it has left no room for supplementary state legislation.'" Id. at 661-62 (citations omitted).

Plaintiffs cite two cases for their claim that the field of "Indian healthcare" is preempted: White Mountain Apache Tribe v. Bracker, 448 U.S. 136 (1980), and New Mexico v. Mescalero Apache Tribe, 462 U.S. 324 (1983). See ECF Nos. 1 ¶¶ 316, 328; 34 at 19. Neither is on point. Bracker held that Arizona could not impose motor vehicle license and fuel taxes on a logging company for "operations that are conducted solely on Bureau [of Indian Affairs] and tribal roads within the reservation." 448 U.S. at 148. Mescalero Apache Tribe held that New Mexico could not regulate "hunting and fishing permitted by the Tribe [which] occur[s] entirely on the reservation." 462 U.S. at 341. Neither case bears upon Indian health care, or reimbursement under Medicaid, much less establishes field preemption.

It is also important in assessing this claim that the court "delineate the pertinent regulatory field." Nat'l Fed'n of the Blind v. United Airlines, Inc., 813 F.3d 718, 734 (9th Cir. 2016). While Plaintiffs focus on Indian healthcare, this case is really about their participation in Medicaid. The Supreme Court has found that "[t]he Medicaid statute . . . is designed to advance cooperative federalism." Wisconsin Dep't of Health & Fam. Servs. v. Blumer, 534 U.S. 473, 495 (2002) (citation omitted). It has also noted that "state-level policy discretion and experimentation

46

. . . is Medicaid's hallmark." Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 630 (2012) (Ginsburg, J., concurring in part). Given Medicaid's express allowance for state participation, field preemption is particularly inapposite. Other circuits have reached this same conclusion. See Gallardo v. Dudek, 963 F.3d 1167, 1174 n.10 (11th Cir. 2020); Pharm. Rsch. & Mfrs. of Am. v. Concannon, 249 F.3d 66, 74 n.6 (1st Cir. 2001).

### 3. Conflict Preemption

In their Response, Plaintiffs briefly invoke conflict preemption. See ECF No. 34 at 19 ("Virginia's actions should therefore be judged invalid under conflict preemption principles."). Conflict preemption takes two forms. First, "'direct conflict' preemption" occurs when "compliance with both federal and state regulations [is] a physical impossibility." Guthrie v. PHH Mortg. Corp., 79 F.4th 328, 336-37 (4th Cir. 2023) (quoting S. Blasting Servs., Inc. v. Wilkes Cnty., 288 F.3d 584, 590 (4th Cir. 2002)). Second, "obstacle preemption," which "fall[s] under the broader category of conflict preemption," occurs when "state law stand[s] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id. (quoting S. Blasting Servs., 288 F.3d at 590).

Neither doctrine provides Plaintiffs with a claim. Plaintiffs allege that state officials have engaged in unlawful action, not that state law conflicts with federal law. This type of claim falls

squarely within <u>Ex parte Young</u>, not conflict preemption. <u>Compare</u> <u>Armstrong</u>, 575 U.S. at 326 ("[I]f an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory <u>actions</u> preempted." (emphasis added) (citing <u>Ex parte Young</u>, 209 U.S. at 155-56)), <u>with</u> <u>Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Loc. Union No. 174</u>, 598 U.S. 771, 776 (2023) ("It is a bedrock rule, of course, that federal law preempts <u>state law</u> when the two conflict." (emphasis added) (citing U.S. Const., art. VI, cl. 2)). The only exception would be the AI/AN Budget Amendment. But as discussed earlier, effectuation of the Budget Amendment is contingent on federal approval, and thus it cannot preempt federal law. <u>See</u> <u>supra</u> Part IV.C.1.b. at 36.

### 4. Conclusion

Plaintiffs have not alleged a violation of federal law cognizable under <u>Ex parte Young</u>, nor a valid claim of field or conflict preemption. Accordingly, Claims I and II, against Director Roberts and Deputy Director Lunardi in their official capacities, are **DISMISSED WITH PREJUDICE**, except to the extent that Plaintiffs have alleged violations of state law, which are **DISMISSED WITHOUT PREJUDICE**.

### D. Claim III - Infringement on Tribal Sovereignty

Claim III seeks only prospective, injunctive relief against Defendants in their official capacities. <u>See</u> ECF No. 1 ¶¶ 35, 36,

48

37, 38, 351, 352. Since Governor Youngkin and Secretary Kelly are immune from such suits, Claim III is only against Director Roberts and Deputy Director Lunardi in their official capacities.[10] See supra Part IV.A.2. (discussing sovereign immunity).

There are "two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members": (1) "the exercise of such authority may be pre-empted by federal law," and (2) "it may unlawfully infringe 'on the right of reservation Indians to make their own laws and be ruled by them.'" Bracker, 448 U.S. at 142 (citations omitted). Plaintiffs' claim sounds primarily in the former.

When assessing preemption in this context, "[t]he unique historical origins of tribal sovereignty make it generally unhelpful to apply . . . those standards of pre-emption that have emerged in other areas of the law." Id. at 143. Rather, "[t]he tradition of Indian sovereignty over the reservation and tribal members must inform the determination whether the exercise of state authority has been pre-empted by operation of federal law." Id. (citing Moe v. Confederated Salish & Kootenai Tribes, 425 U.S. 463, 475 (1976)). The court has "rejected the proposition that in order to find a particular state law to have been preempted by

---

[10] See also supra note 6 and accompanying text. Accordingly, references to "Defendants" in this Section D. of the Opinion refer to Director Roberts and Deputy Director Lunardi, unless otherwise indicated.

operation of federal law, an express congressional statement to that effect is required." Id. at 144 (citing Warren Trading Post Co. v. Arizona State Tax Comm'n, 380 U.S. 685 (1965)). However, it has also stressed that "there is a significant geographical component to tribal sovereignty, a component which remains highly relevant to the pre-emption inquiry." Id. at 151.

Under these principles, Plaintiffs have not stated a claim. To start, the cases Plaintiffs cite found that states could not regulate on-reservation conduct, an element not present here. See Bracker, 448 U.S. at 145-151 (finding that Arizona could not tax a logging company for operations performed on an Indian reservation); McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 179-80 (1973) (finding that Arizona could not tax tribal members for work performed entirely on an Indian reservation); Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue of New Mexico, 458 U.S. 832, 844 (1982) (finding that New Mexico could not tax a building contractor for work performed on tribal lands); Mescalero Apache Tribe, 462 U.S. at 338-41 (finding that New Mexico could not impose hunting and fishing regulations on tribal lands); California v. Cabazon Band of Mission Indians, 480 U.S. 202, 207-12 (1987) (finding that California could not regulate bingo and card games played on Indian reservations). Rather, "[i]n the case of 'Indians going beyond reservation boundaries . . . a nondiscriminatory state law' is generally applicable in the

absence of 'express federal law to the contrary.'" Bracker, 448 U.S. at 144 n.11 (quoting Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148-49 (1973)); see Wagnon v. Prairie Band Potawatomi Nation, 546 U.S. 95, 113 (2005) (finding that application of the above-referenced cases to off-reservation activity is "inconsistent with the special geographic sovereignty concerns that gave rise" to them).

Moreover, many of the cases finding that state regulations infringed on Indian sovereignty also found that Congress had installed a comprehensive scheme regulating the field in question. See Bracker, 448 U.S. at 145 ("[T]he Federal Government's regulation of the harvesting of Indian timber is comprehensive."); Ramah Navajo Sch. Bd., 458 U.S. at 841 ("Th[e] detailed regulatory scheme governing the construction of autonomous Indian educational facilities is at least as comprehensive as the federal scheme found to be pre-emptive in [Bracker]."). While Medicaid is certainly a highly regulated program, it invites state participation, rather than displaces it. See supra Part IV.C.2. at 45-46 (discussing field preemption). For these reasons, Plaintiffs have not stated a claim for infringement on tribal sovereignty, and Claim III is **DISMISSED WITH PREJUDICE** in regard to Director Roberts and Deputy Director Lunardi in their official capacities.

### E. Claim IV – 42 U.S.C. § 1983

Claim IV proceeds against Governor Youngkin in his personal capacity, Director Roberts in her official and personal capacity, and Deputy Director Lunardi in his official and personal capacity. Governor Youngkin is immune from suit in his official capacity. See supra Part IV.A.2. (discussing sovereign immunity).

Title 42 U.S.C. § 1983 "authorizes a party who has been deprived of a federal right under the color of state law to seek relief." City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 707 (1999). To state a claim under § 1983, "a plaintiff must allege the violation of a right preserved by another federal law or by the Constitution." Kendall v. City of Chesapeake, 174 F.3d 437, 440 (4th Cir. 1999) (citing Baker v. McCollan, 443 U.S. 137, 140, 144 n.3 (1979)). It is important that the plaintiff "assert the violation of a federal right, not merely a violation of federal law." Gonzaga, 536 U.S. at 282 (quoting Blessing v. Freestone, 520 U.S. 329, 340 (1997) (emphasis in original)).

The Supreme Court has recently clarified: "To prove that a statute secures an enforceable right, privilege, or immunity, and does not just provide a benefit or protect an interest, a plaintiff must show that the law in question 'clear[ly] and unambiguous[ly]' uses 'rights-creating terms.'" Medina v. Planned Parenthood S. Atl., 606 U.S. __, 145 S. Ct. 2219, 2229 (2025) (alterations in

52

original) (quoting <u>Gonzaga</u>, 536 U.S. at 284, 290).[11] "In addition, the statute must display 'an unmistakable focus' on individuals like the plaintiff." <u>Id.</u> (quoting <u>Gonzaga</u>, 536 U.S. at 284). This test is meant to be "'stringent' and 'demanding.'" <u>Id.</u> (quoting <u>Health and Hosp. Corp. of Marion Cnty. v. Talevski</u>, 599 U.S. 166, 180, 186 (2023)). It is even more so for Spending Clause legislation like the Medicaid Act. <u>Id.</u> at 2230 ("Though it is rare enough for any statute to confer an enforceable right, spending-power statutes like Medicaid are especially unlikely to do so.").

### 1. Enforceable Rights under 42 U.S.C. § 1983

Plaintiffs assert that the rights addressed below are enforceable under 42 U.S.C. § 1983.

- **Right to "operate as a distinct provider type exempt from state licensure requirements and to receive Medicaid reimbursement for services furnished outside the physical clinic." ECF No. 1 ¶ 358a.**

Plaintiffs cite 42 C.F.R. § 440.90(c) as authority for this right. However, this alone cannot establish a right, as "[a]n administrative regulation . . . cannot create an enforceable § 1983 interest not already implicit in the enforcing statute." <u>Smith v. Kirk</u>, 821 F.2d 980, 984 (4th Cir. 1987).

---

[11] <u>Medina</u> reversed and remanded <u>Planned Parenthood S. Atl. v. Kerr</u>, 95 F.4th 152 (4th Cir. 2024). <u>Kerr</u> held that 42 U.S.C. § 1396a(a)(23), the "free-choice-of-provider provision," created an enforceable right under § 1983. <u>See</u> 95 F.4th at 159.

- **Right to Receive Medicaid Reimbursement at Federal AIR for Covered Services. ECF No. 1 ¶ 358b.**

Plaintiffs cite 42 U.S.C. § 1396a(a)(8), 1396a(a)(13)(A), 1396j(d), and the Tribal Reimbursement SPA for this right. Title 42 U.S.C. § 1396a(a)(8) provides "that all <u>individuals</u> wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible <u>individuals</u>." <u>Id.</u> (emphasis added). Notably, the statute is phrased as benefitting "individuals," not providers like Plaintiffs. For this reason, it does not create an enforceable right for Plaintiffs. <u>See</u> <u>Medina</u>, 606 U.S. __, 145 S. Ct. at 2229 ("[T]he statute must display 'an unmistakable focus' on individuals like the plaintiff." (quoting <u>Gonzaga</u>, 536 U.S. at 284)); <u>Anchorage SNF</u>, 2023 WL 1107994, at *9 ("Section 1396a(a)(8) does not evidence Congressional intent to create a federal right to reasonably prompt payment for Medicaid providers like Plaintiffs." (citing <u>Bio-Med. Applications</u>, 412 F. Supp. 2d at 553-54)).

Moreover, even if 42 U.S.C. § 1396a(a)(8) were phrased in terms of providers, it would not confer an enforceable right.[12]

---

[12] The Fourth Circuit previously found that 42 U.S.C. § 1396a(a)(8) created rights for <u>beneficiaries</u>. <u>See</u> <u>Doe v. Kidd</u>, 501 F.3d 348, 356-57 (4th Cir. 2007). However, this would no longer hold after <u>Medina</u>. In finding that 42 U.S.C. § 1396a(a)(8) creates an enforceable right, the court in <u>Kidd</u> applied the test set out in <u>Blessing</u>. <u>See</u> 501 F.3d at 355-57. The Court in <u>Medina</u> admonished this approach. <u>See</u> 606 U.S. __, 145 S. Ct. at 2234 ("Some lower

Title 42 U.S.C. § 1396a(a)(8) requires the state to "provide that all individuals wishing to make application for medical assistance under the plan <u>shall</u> have opportunity to do so, and that such assistance <u>shall</u> be furnished with reasonable promptness to all eligible individuals." <u>Id.</u> (emphasis added). While "shall" expresses a mandate, it does not create a right.

In <u>Medina</u>, the Court examined 42 U.S.C. § 1396a(a)(32), which directs "that no payment under the plan for any care or service provided to an individual <u>shall</u> be made to anyone other than such individual or the person or institution providing such care or service." <u>Medina</u>, 606 U.S. __, 145 S. Ct. at 2236 (emphasis added) (quoting 42 U.S.C. § 1396a(a)(32)). The Court observed that "shall" was a "mandatory term[]," but nonetheless found that 42 U.S.C. § 1396a(a)(32) lacks "clear and unambiguous rights-creating language." <u>Id.</u> This was in contrast, the Court explained, to 42 U.S.C. § 1396r(c), which gives individuals "[t]he <u>right</u> to choose a personal attending physician." <u>Id.</u> at 2235 (emphasis in original) (quoting 42 U.S.C. § 1396r(c)). All this is to show that it not enough that the statute "speaks to what a State must do to participate in Medicaid," rather, it must contain "unambiguous 'rights-creating language,'" like that in 42 U.S.C.

_____

court judges . . . still consult <u>Wilder</u>, <u>Wright</u>, and <u>Blessing</u> when asking whether a spending-power statute creates an enforceable individual right. They should not.") (internal citations omitted).

§ 1396r(c). Id. at 2235 (quoting Talevski, 599 U.S. at 186). Accordingly, 42 U.S.C. § 1396a(a)(8) does not create enforceable rights under § 1983.

Plaintiffs also invoke 42 U.S.C. § 1396a(a)(13)(A) as the source of their right. However, the Fourth Circuit has foreclosed this argument, finding that "§ 1396a(a)(13)(A) contains no substantive mandate; it merely requires that states determine their reimbursement rates via a 'public process' that allows providers notice and an opportunity to comment on the proposed rates." HCMF Corp. v. Allen, 238 F.3d 273, 276 (4th Cir. 2001).

Additionally, Plaintiffs cite 42 U.S.C. § 1396j(d). This section cross-references 25 U.S.C. § 1645, which allows Indian tribes to enter into health facility sharing arrangements with Federal agencies. See 25 U.S.C. § 1645. Putting aside whether this creates a right, it is inapplicable to Plaintiffs' case here.

Lastly, Plaintiffs cite the Tribal Reimbursement SPA. While the Tribal Reimbursement SPA is approved by CMS, it is still state law. See Concourse Rehab., 179 F.3d at 44 ("The fact that federal law conditions State participation in the Medicaid program on the State's adoption of a Medicaid plan does not thereby transform provisions of a State's plan into federal law."). As such, it cannot support an action under § 1983. See Clark v. Link, 855 F.2d 156, 163 (4th Cir. 1988) ("[A] section 1983 claim can only be sustained by allegations and proof of a violation of the

56

Constitution or statutes of the United States and specifically may not rest solely on a violation of state statutes . . . .").

- **Right to Freedom from Enrollment Delays and Discriminatory Criteria. ECF No. 1 ¶ 358c.**

Plaintiffs invoke the following authority for this right: 42 U.S.C. § 1396a(a)(5), 1396a(a)(8), 1396a(a)(23), and 42 C.F.R. §§ 431.107, 431.110(b), and 455.104. This analysis is confined to the statutory provisions, since "[a]n administrative regulation . . . cannot create an enforceable § 1983 interest not already implicit in the enforcing statute." Kirk, 821 F.2d at 984.

Title 42 U.S.C. § 1396a(a)(5) requires the state to establish "a single State agency to administer or to supervise the administration" of Medicaid. 42 U.S.C. § 1396a(a)(5). It is "a structural programmatic requirement that facilitates federal oversight of state Medicaid programs. It does not create 'individual entitlements.'" San Lazaro Ass'n v. Connell, 286 F.3d 1088, 1099 (9th Cir. 2002) (quoting Blessing, 520 U.S. at 343-44); see Forloine, 726 F. Supp. 3d. at 631 ("Section 1396a(a)(5) lacks the 'clear and unambiguous' rights-conferring language Congress typically uses to create private causes of action." (quoting Kerr, 95 F.4th at 167)).

As previously discussed, 42 U.S.C. § 1396a(a)(8) does not create rights under § 1983. See supra Part IV.E.1. at 54. The same

holds for 42 U.S.C. § 1396a(a)(23). See Medina, 606 U.S. __, 145 S. Ct. at 2234-35.

- **Right to Enforce the Terms of Virginia's State Medicaid Plan. ECF No. 1 ¶ 358d.**

Plaintiffs cite Wilder v. Virginia Hospital Ass'n, 496 U.S. 498 (1990), Health and Hospital Corp. of Marion County v. Talevski, 599 U.S. 166 (2023), and Antrican v. Odom, 290 F.3d 178 (4th Cir. 2002), for this right. See ECF No. 1 ¶ 358d. None of these cases holds what Plaintiffs claim.

In Wilder, the Court found that "the Boren Amendment imposes a binding obligation on States participating in the Medicaid program to adopt reasonable and adequate rates and that this obligation is enforceable under § 1983 by health care providers." 496 U.S. at 512.[13] Further, in Talevski the Court held that certain provisions of the Federal Nursing Home Reform Act, specifically the "unnecessary-restraint and predischarge-notice provisions" contained in 42 U.S.C. § 1396r(c)(1) and (2), created enforceable rights under § 1983. See 599 U.S. at 184-86. Both cases show that § 1983 can provide a remedy for the violation of _federal_ law, not of a State Medicaid plan, as Plaintiffs claim.

---

[13] It should be noted that the Supreme Court has disavowed Wilder. See Medina, 606 U.S. __, 145 S. Ct. at 2234 ("To the extent lower courts feel obliged, or permitted, to consider the contrary reasoning of Wilder, Wright, or Blessing, they should resist the impulse."). Additionally, the subject of Wilder, the Boren Amendment, was repealed. See Pub. L. No. 105-33, § 4711 (1997).

Nor does <u>Antrican</u> support Plaintiffs' asserted right. The court made clear that "plaintiffs [were] seeking to enforce . . . federal standards" that applied to the state plan, not provisions of the state plan itself. <u>Antrican</u>, 290 F.3d at 188-89. This comports with the well-established principle that § 1983 cannot be used to remedy violations of state law. <u>Accord</u> <u>Clark</u>, 855 F.2d at 163.

- **Right to Operate Fishing Point Free from State Interference, Including the Right to Serve non-AI/AN Medicaid Beneficiaries without Penalty. ECF No. 1 ¶ 358e.**

Plaintiffs cite 25 U.S.C. §§ 1642, 1680c(c)(2), and 42 U.S.C. § 1396j(d). None of them establishes this right.

The first provision, 25 U.S.C. § 1642, allows Indian tribes to use federal funds to buy healthcare, an issue unrelated to their purported right. <u>See</u> 25 U.S.C. § 1642(a). The next provision, 25 U.S.C. § 1680c(c)(2), allows tribal leaders to decide whether to provide services to "individuals who are not eligible for such health services under any other subsection of this section or under any other provision of law." <u>See</u> 25 U.S.C. § 1680c(c)(2). While this provision bears upon whom Plaintiffs may serve, it does not concern reimbursement rates for non-AI/AN patients. And lastly, 42 U.S.C. § 1396j(d) cross references to 25 U.S.C. § 1645, which governs shared health facilities. This issue is not present in this case.

59

- **Right to Meaningful and Timely Tribal Consultation. ECF No. 1 ¶ 358f.**

Plaintiffs cite 42 U.S.C. § 1396a(a)(73) and 42 C.F.R. § 431.408(b) as the source of this right. Since "[a]n administrative regulation . . . cannot create an enforceable § 1983 interest not already implicit in the enforcing statute," the court first turns to 42 U.S.C. § 1396a(a)(73). <u>Kirk</u>, 821 F.2d at 984.

Under the Supreme Court's test in <u>Medina</u>, 42 U.S.C. § 1396a(a)(73) does not create enforceable rights. It instructs states to "<u>provide for a process</u>" that "<u>shall</u> include solicitation of advice." 42 U.S.C. § 1396a(a)(73)(A) (emphasis added). It does not give tribes the "right" to consultation. Much like 42 U.S.C. § 1396a(a)(8), this provision uses "mandatory terms" and "speaks to what a State must do to participate in Medicaid," but lacks "clear and unambiguous 'rights-creating language.'" <u>Medina</u>, 606 U.S. __, 145 S. Ct. at 2235-36 (quoting <u>Talevski</u>, 599 U.S. at 186); <u>see</u> <u>supra</u> Part IV.E.1. at 55-56 (discussing what qualifies as "rights-creating language").

- **Right to Act with Full Legal Authority to Provide Healthcare Services and be Free From Conflicting State Regulation. ECF No. 1 ¶ 358g.**

Plaintiffs cite 25 U.S.C. §§ 5302, 5321(a)(1), and 5331(a) for this right. Title 25 U.S.C. § 5302 is merely a "Congressional declaration of policy." It does not create any rights. Title

25 U.S.C. § 5321(a)(1) directs that the federal government "upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts with a tribal organization." Id. Even if this statute conferred a right, it would not be the right Plaintiffs claim. Lastly, 25 U.S.C. § 5331(a) provides: "The United States district courts shall have original jurisdiction over any civil action or claim against the appropriate Secretary arising under this chapter." Id. This is inapplicable, as it authorizes suit against federal officials, not state officials.

- **Other rights**

At oral argument and in their Response, Plaintiffs argue that several provisions not mentioned in the § 1983 section of their Complaint, 25 U.S.C. §§ 1647a(a)(1), 1647a(a)(2), 1680c(c)(3)(A), and 42 U.S.C. § 1396j(a), create enforceable rights.[14] See ECF Nos. 34 at 19-21; 38. It is "well-established that parties cannot amend their complaints through briefing or oral advocacy." S. Walk

---

[14] Plaintiffs cite 42 U.S.C. § 1396j(a) in their Complaint, but do not allege whether or how Defendants violated it. See ECF No. 1 ¶ 57. The Complaint makes no reference to 25 U.S.C. §§ 1647a(a)(1), 1647a(a)(2), or 1680c(c)(3)(A). Plaintiffs cite all four provisions in their Response under the heading, "Count II: State Interference is Preempted by Federal Law and Actionable Under 42 U.S.C. § 1983." See ECF No. 34 at 19-20. They argue that "[t]hese statutory provisions confer enforceable rights," and "[n]othing in the statues shows Congressional intent to preclude enforcement via Section 1983." Id. at 21. Accordingly, the court considers these claims as brought under § 1983.

at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC, 713 F.3d 175, 184 (4th Cir. 2013) (citations omitted). The court has no obligation to consider theories for relief not asserted in the Complaint. Cf. Vinayagam v. Malpani, 2022 WL 4131197, at *13 (E.D. Va. July 29, 2022) (Novak, J.) ("To the extent Plaintiff's Response asserts new causes of action that she did not allege in the Complaint, the Court declines to consider those new legal theories.") (citations omitted). However, for the sake of thoroughness, and because Defendants had a chance to address these arguments in their Reply, the court will assess these provisions under the Medina test.

Title 25 U.S.C. § 1647a(a)(1) provides that:

> A Federal health care program must accept an entity that is operated by the Service, an Indian tribe, tribal organization, or urban Indian organization as a provider eligible to receive payment under the program for health care services furnished to an Indian on the same basis as any other provider qualified to participate as a provider of health care services under the program if the entity meets generally applicable State or other requirements for participation as a provider of health care services under the program.

Id. Plaintiffs allege that Defendants violated this provision by pending their PCA claims and withholding approval for their dental clinic. See ECF No. 34 at 20. However, this language does not create enforceable rights under Medina. Like many of the provisions already discussed, it is phrased in mandatory terms, but lacks "clear and unambiguous 'rights-creating language.'" Medina, 606

U.S. __, 145 S. Ct. at 2235 (quoting Talevski, 599 U.S. at 186); see supra Part IV.E.1. at 55-56 (discussing what qualifies as "rights-creating language").

Title 42 U.S.C. § 1647a(a)(2) provides that state licensure requirements "shall be deemed to have been met in the case of an entity operated by the Service, an Indian tribe, tribal organization, or urban Indian organization if the entity meets all the applicable standards for such licensure or recognition, regardless of whether the entity obtains a license or other documentation under such State or local law." Id. As an initial matter, this provision does not contain "clear and unambiguous 'rights-creating language.'" Medina, 606 U.S. __, 145 S. Ct. at 2235 (quoting Talevski, 599 U.S. at 186). Even if it did, it is not relevant, as this action does not concern Plaintiffs' licensure.

Title 42 U.S.C. § 1680c(c)(3)(A) concerns "health services for ineligible persons," and provides that "[p]ersons receiving health services provided by the Service under this subsection shall be liable for payment of such health services under a schedule of charges prescribed by the Secretary." 42 U.S.C. § 1680c(c)(3)(A). Aside from lacking "clear and unambiguous 'rights-creating language,'" it is unclear what rights this would create for Plaintiffs as providers. Medina, 606 U.S. __, 145 S. Ct. at 2235 (quoting Talevski, 599 U.S. at 186).

Title 42 U.S.C. § 1396j(a) similarly lacks the necessary rights-creating language. It provides:

> A facility of the Indian Health Service . . ., whether operated by such Service or by an Indian tribe or tribal organization . . ., shall be eligible for reimbursement for medical assistance provided under a State plan if and for so long as it meets all of the conditions and requirements which are applicable generally to such facilities under this subchapter.

Id. Like the other provisions, it uses mandatory terms, but does not contain "clear and unambiguous 'rights-creating language.'" Medina, 606 U.S. __, 145 S. Ct. at 2235 (quoting Talevski, 599 U.S. at 186); see supra Part IV.E.1. at 55-56 (discussing what qualifies as "rights-creating language").

## 2. Plaintiffs' Arguments Regarding Medina

At the hearing held on July 1, 2025, Plaintiffs made two arguments as to why Medina should be applied differently to their case. The court briefly will address these arguments.

Plaintiffs argue that Medina's holding was confined to the specific Medicaid provision at issue, and that a more permissive standard should be applied when assessing rights under other statutes. See ECF No. 38. The Court's opinion does not support this interpretation. At the beginning of its analysis, the Court announced that it was "outlining how to determine whether a statute confers an individually enforceable right under § 1983." Medina, 606 U.S. __, 145 S. Ct. at 2229. It could have said that its test only applied to Spending Clause legislation like the Medicaid Act,

64

but it did not. The Court did remark that, "[t]hough it is rare enough for any statute to confer an enforceable right, spending-power statutes like Medicaid are especially unlikely to do so," but this was only after laying out a generally-applicable test. Id. at 2230; see id. at 2229. Thus, while Spending Clause legislation may be "especially unlikely" to create a right, the Court applies the same approach to other statutes.

Plaintiffs also argue that the unique status of Indian tribes portends a less rigorous standard than that set out in Medina. See ECF No. 38. They contend that this is not inconsistent with Medina, which they claim encouraged courts to "read [the provision at issue] in the context of surrounding statutes." Id. There is some support for this view, as Medina did look at the "surrounding statutory context," in determining whether 42 U.S.C. § 1396a(a)(23) created an enforceable right. 606 U.S. __, 145 S. Ct. at 2235. However, the Court only did so after finding that the text of the statute lacked "clear and unambiguous 'rights-creating language.'" Id. (quoting Talevski, 599 U.S. at 186). This underscores the fact that, at bottom, Medina is a textualist opinion, which instructs that enforceable rights must be gleaned from a statute's text, not outside considerations. Cf. id. at 2236 ("When it comes to interpreting the law, speculation about what Congress may have intended matters far less than what

65

Congress actually enacted." (citing <u>Epic Sys. Corp. v. Lewis</u>, 584 U.S. 497, 523 (2018))).

Accordingly, Plaintiffs have not "allege[d] the violation of a right preserved by another federal law or by the Constitution." <u>Kendall</u>, 174 F.3d at 440 (citing <u>Baker</u>, 443 U.S. at 144 n.3). Claim IV is therefore **DISMISSED WITH PREJUDICE** in regard to Governor Youngkin in his personal capacity, and Director Roberts and Deputy Director Lunardi in both their personal and official capacities. Because this disposes of all of the personal capacity claims, the court does not reach the issue of qualified immunity.

### V. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss, ECF No. 26, is **GRANTED**. The claims against the Commonwealth of Virginia, the Virginia Office of the Secretary of Health and Human Resources, the Virginia Department of Medical Assistance Services, and Secretary Kelly are **DISMISSED WITHOUT PREJUDICE**. The claims against Governor Youngkin in his official capacity are also **DISMISSED WITHOUT PREJUDICE**. The claims against Governor Youngkin in his personal capacity, as well as all claims against Director Roberts and Deputy Director Lunardi in their personal and official capacities, with the exception of Plaintiffs' claims that Director Roberts and Deputy Director Lunardi are acting in violation of state law, are **DISMISSED WITH PREJUDICE**. All claims that Director Roberts and Deputy Director Lunardi are acting in violation of

state law are **DISMISSED WITHOUT PREJUDICE**, and may be pursued through DMAS's administrative appeals process, as appropriate. Since all claims in Plaintiffs' Complaint, ECF No. 1, have been dismissed, Plaintiffs' Motion for Preliminary Injunction, ECF No. 21, and Motion to Strike, ECF No. 28, are **DISMISSED AS MOOT**. The Clerk is **DIRECTED** to send a copy of this Opinion to counsel for the parties.

    **IT IS SO ORDERED.**

                                                  _____
                                               REBECCA BEACH SMITH
                         SENIOR UNITED STATES DISTRICT JUDGE

August 8, 2025